XAVIER BECERRA
Attorney General of California
DAVID A. ZONANA
Supervising Deputy Attorney General
DAVID G. ALDERSON, State Bar No. 231597
Supervising Deputy Attorney General
GEORGE TORGUN, State Bar No. 222085
TARA MUELLER, State Bar No. 161536
ERIN GANAHL, State Bar No. 248472
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-1002
 Fax:  (510) 622-2270
 E-mail:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiff State of California*

[Additional counsel listed on signature page]

MAURA HEALEY
Attorney General of Massachusetts
MATTHEW IRELAND
TURNER SMITH
Assistant Attorneys General
 Office of the Attorney General
 Environmental Protection Division
 One Ashburton Place, 18th Floor
 Boston, MA 02108
 Telephone:  (617) 727-2200
 Email:  Matthew.Ireland@mass.gov
 Email:  Turner.Smith@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF MARYLAND, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS, PEOPLE OF THE STATE OF MICHIGAN, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, DISTRICT OF COLUMBIA, and CITY OF NEW YORK,** | Case No. |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | (Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*) |
| v. | |
| **DAVID BERNHARDT, U.S. Secretary of the Interior, WILBUR ROSS, U.S. Secretary of Commerce, UNITED STATES FISH AND WILDLIFE SERVICE, and NATIONAL MARINE FISHERIES SERVICE,** | |
| Defendants. | |

1

**INTRODUCTION**

1.      Plaintiffs State of California, by and through Xavier Becerra, Attorney General; Commonwealth of Massachusetts, by and through Maura Healey, Attorney General; State of Maryland, by and through Brian Frosh, Attorney General; State of Colorado, by and through Phil Weiser, Attorney General; State of Connecticut, by and through William Tong, Attorney General; State of Illinois, by and through Kwame Raoul, Attorney General; People of the State of Michigan, by and through Dana Nessel, Attorney General; State of Nevada, by and through Aaron Ford, Attorney General; State of New Jersey, by and through Gurbir S. Grewal, Attorney General; State of New Mexico, by and through Hector Balderas, Attorney General; State of New York, by and through Letitia James, Attorney General; State of North Carolina, by and through Joshua H. Stein, Attorney General; State of Oregon, by and through Ellen Rosenblum, Attorney General; Commonwealth of Pennsylvania, by and through Josh Shapiro, Attorney General; State of Rhode Island, by and through Peter F. Neronha, Attorney General; State of Vermont, by and through Thomas J. Donovan, Jr., Attorney General; State of Washington, by and through Robert W. Ferguson, Attorney General; District of Columbia, by and through Karl A. Racine, Attorney General; and the City of New York, by and through Georgia Pestana, Acting Corporation Counsel (hereinafter collectively "State Plaintiffs") bring this action to challenge the decision by the Secretary of the Interior and the Secretary of Commerce, acting through the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, "the Services"), to promulgate three separate final rules ("Final Rules") that undermine key requirements of the federal Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*

2.      The Final Rules violate the plain language and purpose of the ESA, its legislative history, numerous binding judicial precedents interpreting the ESA, and its precautionary approach to protecting imperiled species and critical habitat.  The Final Rules also lack any reasoned basis and are otherwise arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*  Moreover, the Services have failed to consider and disclose the significant environmental impacts of this action in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*

3.      Congress enacted the ESA nearly forty-five years ago in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); *see* 16 U.S.C. § 1531(a).  The ESA accordingly enshrines a national policy of "institutionalized caution" in recognition of the "overriding need to *devote whatever effort and resources [are] necessary* to avoid further diminution of national and worldwide wildlife resources." *Hill*, 437 U.S. at 177, 194 (internal quotation omitted, emphasis in original).  The ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

4.      The fundamental purposes of the ESA are to "provide a means whereby the ecosystems upon which endangered ... and threatened species depend may be conserved, [and] to provide a program for the conservation of such [endangered and threatened] species[.]"  16 U.S.C. § 1531(b).  Furthermore, the ESA declares "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered … and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c).  The ESA defines "conserve" broadly as "to use and the use of all methods and procedures which are necessary to bring any endangered … or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"—*i.e.*, to the point of full recovery. *Id.* § 1532(3).

5.      Since the law's passage in 1973, ninety-nine percent of species protected by the ESA have not gone extinct.  Multiple species at the brink of extinction upon the ESA's enactment have seen dramatic population increases, including the black footed ferret (*Mustela nigripes*), California condor (*Gymnogyps californianus*), whooping crane (*Grus americana*), and shortnose sturgeon (*Acipenser brevirostrum*), and the ESA has resulted in the successful recovery and delisting of several species, including our national bird, the bald eagle (*Haliaeetus leucocephalus*), the American peregrine falcon (*Falco peregrinus anatum*), the Delmarva Peninsula fox squirrel (*Sciurus niger cinereus*), and the American alligator (*Alligator mississippiensis*).

6.     The ESA achieves its overriding statutory purposes through multiple vital programs, each of which is undermined by the Final Rules.  Section 4 of the ESA, 16 U.S.C. § 1533, provides for the listing of both endangered and threatened species based solely on the best scientific and commercial data about threats to the species, and ensures the survival and recovery of listed species by requiring the Services to designate "critical habitat" essential to their conservation.  Section 7, *id.* § 1536, mandates that all federal agencies, in consultation with the Services, utilize their authorities in furtherance of the purposes of the ESA by carrying out programs for the conservation of endangered and threatened species, and that such federal agencies also ensure that any actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of any listed species or destroy or adversely modify their designated critical habitat.  Finally, section 9 of the ESA, *id.* § 1538, prohibits the "take" (e.g., killing, injuring, harassing, or harming) of listed endangered fish and wildlife species, and section 4(d) separately authorizes extension of that prohibition to listed threatened species, *see id.* § 1533(d).

7.     The State Plaintiffs have a concrete interest in the Services' lawful implementation of the ESA and its role in preventing harm to and promoting recovery of imperiled wildlife, resources that are owned and held in trust by many of the State Plaintiffs for the benefit of their citizens.  Imperiled plants and animals protected by the ESA are found in all of the State Plaintiffs, along with critical habitat, federal lands, and non-federal facilities and activities requiring federal permits and licenses subject to the ESA's section 7 consultation requirements.

8.     As the federal agencies tasked by Congress with implementing the ESA, the Services have promulgated regulations to implement the ESA's requirements.

9.     While the Services claim that the primary purposes of the Final Rules are to increase clarity and encourage efficiency and transparency, these changes fail to do so and, instead, fundamentally undermine and contradict the requirements of the ESA.

10.     The Final Rule addressing listing decisions and critical habitat designations, "Revision of the Regulations for Listing Species and Designating Critical Habitat," 84 Fed. Reg. 45,020 (Aug. 27, 2019) (the "Listing Rule"), unlawfully and arbitrarily: injects economic considerations and quantitative thresholds into the ESA's science-driven, species-focused

4

analyses; limits the circumstances under which species can be listed as threatened; eliminates consideration of species recovery in the delisting process; expands the ESA's expressly narrow exemptions from the requirement to designate critical habitat; and severely limits when presently unoccupied critical habitat would be designated, particularly where climate change poses a threat to species habitat.

11. The Final Rule revising regulations governing cooperation between federal agencies and the Services for federal agency actions that may affect listed species or critical habitat, "Revision of Regulations for Interagency Cooperation," 84 Fed. Reg. 44,976 (Aug. 27, 2019) (the "Interagency Consultation Rule"), unlawfully and arbitrarily: limits when a federal agency action would be deemed to destroy or adversely modify designated critical habitat; significantly restricts analysis of the type and extent of effects of a federal agency action; limits when changed circumstances require re-initiation of consultation on a federal agency action; limits federal action agencies' duty to insure mitigation of the adverse effects of their proposals and gives these agencies the ability to make biological determinations that the Services are required to make themselves; places an unexplained time limit on informal consultation; and allows for "programmatic" and "expedited" consultations that lack the required and in-depth, site-specific analysis of a proposed federal agency action.

12. Finally, the Final Rule entitled "Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants," 84 Fed. Reg. 44,753 (Aug. 27, 2019) (the "4(d) Rule") unlawfully and arbitrarily removes the FWS's prior regulatory extension to all threatened species of the "take" prohibitions under section 9 of the ESA, which the statute automatically affords to endangered species. This change constitutes a radical departure from the longstanding, conservation-based agency policy and practice of providing default section 9 protections to all newly-listed threatened species, without any reasoned explanation. This change also contravenes the ESA's conservation purpose and mandate by leaving threatened species without protections necessary to promote their recovery and increasing the risk that they will become endangered.

13. Furthermore, the Services violated NEPA by failing to assess the environmental impacts of the Final Rules or to circulate such analyses for public review and comment. Each of

1   the Final Rules is without question a major federal action, and each will significantly affect the

2   human environment by eviscerating the ESA's important species protections.  None of the Final

3   Rules qualify for the limited, procedural categorical exclusions from NEPA compliance that the

4   Services rely upon.

5         14.    Accordingly, State Plaintiffs seek a declaration that the Services' issuance of the

6   Final Rules violates the ESA, the APA, and NEPA, and request that the Court vacate and set

7   aside the Final Rules.

8   **JURISDICTION AND VENUE**

9         15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

10  laws of the United States), 28 U.S.C. § 1346 (civil action against the United States), and 5 U.S.C.

11  §§ 701–706 (APA).  An actual controversy exists between the parties within the meaning of 28

12  U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief

13  pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

14        16.    The Final Rules constitute final agency actions under the APA.  5 U.S.C. §§ 704, 706.

15  Many of the State Plaintiffs submitted timely and detailed comments opposing the Services'

16  proposed regulations and have therefore exhausted all administrative remedies with regard to this

17  action.  All State Plaintiffs have suffered legal wrong due to the Services' actions, and are

18  adversely affected or aggrieved by the Services' actions within the meaning of the United States

19  Constitution and the APA.  5 U.S.C. § 702.

20        17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because this is

21  the judicial district in which Plaintiff State of California resides, and this action seeks relief

22  against federal agencies and officials acting in their official capacities.

23  **INTRADISTRICT ASSIGNMENT**

24        18.    Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of

25  this action to any particular location or division of this Court.  However, this case is related to

26  *Center for Biological Diversity, et al. v. Bernhardt, et al.*, Case No. 3:19-cv-05206 (complaint

27  filed Aug. 21, 2019), which challenges the same Final Rules and has been assigned to the

28

6

1   Oakland Division.  Pursuant to Civil Local Rule 3-12(b), State Plaintiffs intend to promptly file

2   an Administrative Motion to Consider Whether Cases Should Be Related.

3                                          **PARTIES**

4          19.    Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney

5   General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the State

6   and has the authority to file civil actions in order to protect public rights and interests, including

7   actions to protect the natural resources of the State.  Cal. Const. art. V, § 13; Cal. Gov't Code §§

8   12600-12612.  This challenge is brought in part pursuant to the Attorney General's independent

9   constitutional, statutory, and common law authority to represent the people's interests in

10  protecting the environment and natural resources of the State of California from pollution,

11  impairment, or destruction.  Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600-12612;

12  *D'Amico v. Bd. of Med. Exam'rs*, 11 Cal. 3d 1 (1974).

13         20.    The State of California has a sovereign interest in its natural resources and is the

14  sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are

15  State property held in trust by the State for the benefit of the people of the State.  *People v.*

16  *Truckee Lumber Co.*, 116 Cal. 397 (1897); *Betchart v. Cal. Dep't of Fish & Game*, 158 Cal. App.

17  3d 1104 (1984); *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal. 3d 419 (1983); Cal. Water Code §

18  102; Cal. Fish & Game Code §§ 711.7(a), 1802.  In addition, the State of California has enacted

19  numerous laws concerning the conservation, protection, restoration and enhancement of the fish

20  and wildlife resources of the State, including endangered and threatened species, and their habitat.

21  Such laws include, but are not limited to, the California Endangered Species Act, which declares

22  that the conservation, protection and enhancement of endangered and threatened species and their

23  habitat is a matter of statewide concern, and that it is the policy of the state to conserve, protect,

24  restore, and enhance endangered and threatened species and their habitat.  Cal. Fish & Game

25  Code §§ 2050, 2051(c), 2052.  As such, the State of California has a sovereign and statutorily-

26  mandated interest in protecting species in the State from harm both within and outside of the

27  State.

28

21.     There are currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland state.  Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central Valley rivers and streams. California has tens of millions of acres of federal public lands, multiple federal water projects, numerous military bases and facilities and other federal facilities and infrastructure projects that are subject to the ESA's section 7 consultation requirements.  Moreover, countless acres of non-federal lands and numerous non-federal facilities and activities in California are subject to federal permitting and licensing requirements—and therefore section 7 consultation requirements.

22.     Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Maura Healey.  The Attorney General is the chief legal officer of the Commonwealth and brings this action on behalf of itself and its residents to protect the Commonwealth's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment.  *See* Mass. Const. Am. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 and 11D.

23.     At least twenty-five federally listed endangered or threatened species are known to occur in Massachusetts, including, for example, the threatened piping plover (*Charadrius melodus*) and northern long-eared bat (*Myotis septentrionalis*), and the endangered shortnose sturgeon (*Acipenser brevirostrum*) and leatherback sea turtle (*Dermochelys coriacea*). Massachusetts also has enacted and devotes significant resources to implementing numerous laws concerning the conservation, protection, restoration, and enhancement of the Commonwealth's plant, fish, and wildlife resources, including the Massachusetts Endangered Species Act, which protects over four hundred imperiled species, including those listed as endangered, threatened, and special concern species and their habitat.  *See* Mass. Gen. Laws, ch. 131A.  As such, the

Commonwealth has an interest in protecting species in the Commonwealth from harm both within and outside of Massachusetts.

24.     Plaintiff STATE OF MARYLAND brings this action by and through its Attorney General, Brian E. Frosh.  The Attorney General of Maryland is the State's chief legal officer with general charge, supervision, and direction of the State's legal business.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); Md. Code Ann., State Gov't § 6-106.1.

25.     The State of Maryland has enacted laws to protect sensitive species and their habitat and explicitly incorporates federally listed species into state regulations governing imperiled species.  Nongame and Endangered Species Act, MD Code. Nat. Res. §§ 10-2A *et seq.*  Twenty-one federally listed species, including thirteen animals and eight plants, are believed to occur in Maryland.  A few examples include the federally endangered dwarf wedgemussel (*Alasmidonta heterodon*), the federally threatened bog turtle (*Glyptemys muhlenbergii*), and the federally threatened Puritan tiger beetle (*Cicindela puritan*).  Several of these species occur not just in Maryland but in other states as well.  Maryland therefore has a distinct interest in the recovery of these species not just within its own borders but throughout each species' range.

26.     The STATE OF COLORADO brings this action by and through its Attorney General, Philip J. Weiser.  The Attorney General has authority to represent the State, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

27.     Wildlife within the State of Colorado is the property of the State.  Colo. Rev. Stat. § 33-1-101(2).  In addition to providing for management of game species, Colorado has enacted laws protecting nongame and endangered and threatened species in the State.  *See, e.g., id.* §§ 24-33-101; 33-2-101-107.  Colorado's General Assembly has declared that wildlife indigenous to Colorado determined to be threatened or endangered "should be accorded protection in order to maintain and enhance their numbers" and that in addition, Colorado should "assist in the

protection of species or subspecies of wildlife which are deemed to be endangered or threatened elsewhere." *Id.* § 33-2-102.  In addition, the General Assembly has recognized the importance of conserving native species of animals and plants, including those that are listed or candidate species under federal law, and has charged the State's department of natural resources and the division of parks and wildlife with developing and implementing programs for such conservation. *Id.* § 24-33-111(1).  To facilitate these programs, the general assembly created a Species Conservation Trust Fund to provide a reliable source of funding for conservation of species and habitat.  *Id.* § 24-33-111(2).

28.    Accordingly, Colorado has invested millions of dollars in conservation of these species and their habitat in the State, with the goal of maintaining sufficiently robust populations to avoid the need to list them under the ESA.  These conservation successes include Arkansas darter (*Etheostoma cragini*), Gunnison's prairie dog (*Cynomys gunnisoni*), greater sage-grouse (*Centrocercus urophasianus*), and Rio Grande cutthroat trout (*Oncorhynchus clarki virginalis*). In addition, Colorado is home to numerous federally listed plant and animal species, including the Canada lynx (*Lynx canadensis*), Gunnison sage-grouse (*Centrocercus minimus*), greenback cutthroat trout (*Oncorhynchus clarkii stomias*), Preble's meadow jumping mouse (*Zapus hudsonius preblei*), Mesa Verde cactus (*Sclerocactus mesae-verde*), and Parachute beardtongue (*Penstemon debilis*).  In partnership with federal land management agencies and the FWS, Colorado has implemented programs to assist in protecting and recovering these and other listed species.

29.    Colorado also has over twenty million acres of federally owned lands, including eleven national forests, four national parks, 42 national wilderness areas, and six major military bases, all subject to ESA's section 7 consultation requirements.

30.    Plaintiff STATE OF CONNECTICUT brings this action by and through Attorney General William Tong.  The Attorney General of Connecticut is generally authorized to have supervision over all legal matters in which the State of Connecticut is a party.  He is also statutorily authorized to appear for the State "in all suits and other civil proceedings, except upon criminal recognizances and bail bonds, in which the State is a party or is interested ... in any court

1    or other tribunal, as the duties of his office require; and all such suits shall be conducted by him

2    or under his direction."  Conn. Gen. Stat. § 3-125.

3        31.    Pursuant to the Connecticut Endangered Species Act, Conn. Gen. Stat. § 26-303 *et*

4    *seq.*, it is the position of the Connecticut General Assembly that those species of wildlife and

5    plants that are endangered or threatened are of "ecological, scientific, educational, historical,

6    economic, recreational and aesthetic value to the people of the [State of Connecticut], and that the

7    conservation, protection, and enhancement of such species and their habitats are of state-wide

8    concern."  *Id.* § 26-303.  As a consequence, "the General Assembly [of Connecticut] declares it is

9    a policy of the [S]tate to conserve, protect, restore, and enhance any endangered or threatened

10   species and essential habitat."  *Id.*

11       32.    At least fourteen federally-listed endangered or threatened species are known to occur

12   in Connecticut, including, but not limited to, the endangered Northern Long-Eared Bat (*Myotis*

13   *septentrionalis*), Indiana Bat (*Myotis sodalis*), Kemp's Ridley Sea Turtle (*Lepidochelys kempii*),

14   Atlantic Green Turtle (*Chelonia mydas*), Loggerhead Turtle (*Caretta caretta*), and Atlantic

15   Sturgeon (*Acipenser oxyrinchus*).  Connecticut also has enacted and devotes significant resources

16   to implementing a comprehensive environmental statutory scheme concerning the conservation,

17   protection, restoration and enhancement of the plant, fish, and wildlife resources and habitats

18   within the State, including the Connecticut Endangered Species Act, which protects hundreds of

19   imperiled species and their habitats, as well as the Connecticut Environmental Protection Act,

20   which protects the air, water, and natural resources of the State held within the public trust.  *See*

21   Conn. Gen. Stat. §§ 26-303 *et seq.*; 22a-14 *et seq.*  As such, the State of Connecticut has a

22   sovereign and statutorily mandated interest in protecting species in the State from harm both

23   within and outside of the State.

24       33.    Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General

25   Kwame Raoul.  The Attorney General is the chief legal officer of the State of Illinois (Ill. Const.,

26   art V, § 15) and "has the prerogative of conducting legal affairs for the State."  *Envt'l Prot.*

27   *Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977).  He has common law

28   authority to represent the People of the State of Illinois and "an obligation to represent the

11

interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

34.     The State of Illinois has "ownership of and title to all wild birds and wild mammals" (520 ILCS 5/2.1 (2018)) and "all aquatic life" within the State (515 ILCS 5 (2018)).  *See United Taxidermists Ass'n v. Illinois Dept. of Natural Resources*, 436 Fed. Appx. 692, 695 (7th Cir. 2011).  Furthermore, the State of Illinois has enacted numerous laws to protect endangered species (e.g., 520 ILCS 10 (2018)), animal habitat (*e.g.*, 520 ILCS 20 (2018)), and the State's natural areas and caves (*e.g*., 525 ILCS 33 (2018), 525 ILCS 5/6 (2018)).  Accordingly, the State has a substantial interest in protecting wildlife both within and outside its borders.

35.     There are currently over 34 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Illinois and its waters.  For example, the Illinois cave amphipod (*Gammarus acherondytes*) is a small crustacean that is endemic to six cave systems in Illinois' Monroe County and St. Clair County.  Illinois is also home to the piping plover (*Charadrius melodus*); two piping plover chicks recently hatched on the shores of Lake Michigan in Chicago's north side.  Additionally, Illinois has significant federally owned lands, including two areas managed by the U.S. Forest Service and numerous military bases, all subject to ESA's section 7 consultation requirements.

36.     Michigan Attorney General Dana Nessel brings this suit on behalf of Plaintiff the People of the STATE OF MICHIGAN.  The Michigan Attorney General is authorized to "appear for the people of [the] state in any ... court or tribunal, in any cause of matter ... in which the people of [the] state may be a party or interested."  Mich. Comp. Laws § 14.28.  The People declared when they enacted Michigan's Constitution that the "conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people."  Mich. Const. art. 4, § 52.  Accordingly, they tasked Michigan's Legislature with "the protection of ... [the] natural resources of the state from ... impairment and destruction."  *Id.*

37.     The Legislature responded by passing the Natural Resources and Environmental Protection Act.  Mich. Comp. Laws § 324.101 *et seq.*  That law declares that "[a]ll animals found

1   in this state, whether resident or migratory and whether native or introduced, are the property of

2   the people of the state." *Id.* § 324.40105; *see also id.* § 324.48702(1) ("all fish, reptiles,

3   amphibians, mollusks, and crustaceans found in this state are the property of the state."). Part 365

4   of that law, titled Endangered Species Protection, requires Michigan to "perform those acts

5   necessary for the conservation, protection, restoration, and propagation of endangered and

6   threatened species of fish, wildlife, and plants in cooperation with the federal government,

7   pursuant to the endangered species act of 1973, Public Law 93-205, 87 Stat. 884, and with rules

8   promulgated by the secretary of the interior under that act." *Id.* § 324.36502.

9   38.   Michigan has 26 plants and animals the Services have listed as threatened or

10  endangered. These include the Eastern massasauga rattlesnake in Michigan's marsh areas

11  (*Sistrurus catenatus*), the piping plover on the shores of the Great Lakes (*Charadrius melodus*),

12  and the iconic Michigan monkey-flower (*Mimulus michiganensis*). Recovering these and other

13  threatened or endangered species is key to protecting the People's interest in conserving and

14  developing Michigan's natural resources. Additionally, millions of acres in Michigan are owned

15  by the federal government, making them subject to the ESA's section 7 consultation

16  requirements. These include forest areas such as the Hiawatha National Forest, and national

17  parks such as Isle Royale National Park, Pictured Rocks National Lakeshore, and Sleeping Bear

18  Dunes National Lakeshore.

19  39.   Plaintiff STATE OF NEVADA brings this action by and through Attorney General

20  Aaron Ford. The Nevada Attorney General is the chief law enforcement officer of the State and

21  has the authority to file civil actions in order to protect public rights and interests, including

22  actions to protect the natural resources of the State. Nev. Const. art. V, § 19; N.R.S. 228.180.

23  This challenge is brought in part pursuant to the Attorney General's independent constitutional,

24  statutory, and common law authority to represent the people's interests in protecting the

25  environment and natural resources of the State of Nevada from pollution, impairment, or

26  destruction. Nev. Const. art. V, § 19; N.R.S. 228.180. In addition, the Nevada Department of

27  Wildlife, established as a state agency by the Nevada Legislature pursuant to N.R.S. § 501.331,

28

has requested that the Attorney General bring this suit to protect Nevada's sovereign interest in preserving threatened and endangered species.

40.     The State of Nevada has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are State property held in trust by the State for the benefit of the people of the State.  N.R.S. 501.100 provides that "[w]ildlife in this State not domesticated and in its natural habitat is part of the natural resources belonging to the people of the State of Nevada [and] [t]he preservation, protection, management and restoration of wildlife within the State contribute immeasurably to the aesthetic, recreational and economic aspects of these natural resources." *See Ex parte Crosby*, 38 Nev. 389 (1915); *see also Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions.").  In addition, the State of Nevada has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat.  As such, the State of Nevada has an interest in protecting species in the State from actions both within and outside of the State.

41.     Nevada has approximately 58,226,015.60 acres of federally-managed land, totaling 84.9 percent of the State's lands.  The federal agencies that manage Nevada's many acres are subject to the ESA's section 7 consultation requirements, including the Bureau of Indian Affairs, the Bureau of Land Management, the Bureau of Reclamation, the Department of Defense, the Department of Energy, the Fish and Wildlife Service, the Forest Service, and the National Park Service.  Moreover, additional non-federal lands and facilities in Nevada are subject to federal permitting and licensing requirements.  There are currently over 38 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Nevada.  Examples include the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the Devil's Hole pupfish (*Cyprinodon diabolis*) reliant on limited aquifers within the Amargosa Desert ecosystem, the Lahontan cutthroat trout (*Oncorhynchus clarkii henshawi*) indigenous to Pyramid and Walker Lakes and nearly extirpated by American settlement in the Great Basin, Sierra Nevada bighorn sheep (*Ovis Canadensis sierrae*), and the greater sage-grouse

(*Centrocercus urophasianus*) found in the foothills, plains and mountain slopes where sagebrush is present across fifteen of Nevada's seventeen counties.

42.     Plaintiff STATE OF NEW JERSEY is a sovereign state of the United States of America and brings this action on behalf of itself and as a trustee, guardian and representative of the residents and citizens of New Jersey.  New Jersey holds wildlife in trust for the benefit of all of its people.  The New Jersey Legislature has declared that it is the policy of the State to manage all forms of wildlife to insure their continued participation in the ecosystem.  N.J. Stat. Ann. § 23:2A-2.

43.     At least fourteen federally-listed endangered or threatened species are known to occur in New Jersey, including, for example, the threatened piping plover (*Charadrius melodus*), red knot (*Calidris canutus rufa*), and Northern long-eared bat (*Myotis septentrionalis*), and the endangered Indiana bat (*Myotis sodalist*) and dwarf wedgemussel (*Alasmidonta heterodon*).  Earlier this year, New Jersey designated the threatened bog turtle (*Clemmys muhlenbergii*) as the official state reptile.  New Jersey protects, conserves, restores and enhances plants, fish and wildlife resources within the State through direct protective legislation such as the Endangered Non-Game Species Conservation Act (ENSCA), N.J. Stat. Ann. §§ 23:2A-1 to -16, and the Endangered Plant Species List Act, *id.* §§ 13:1B-15.151 to -158.  New Jersey also incorporates consideration of federal and state-listed species through other legislation including, but not limited to, the Freshwater Wetlands Protection Act, *id.* § 13:9B-7(a)(2), and the Highlands Water Protection and Planning Act, *id.* § 13:20-34(a)(4), and regulatory provisions such as the Pinelands Comprehensive Management Plan, N.J. Admin. Code §§ 7:50-6.27 and -6.33 (adopted, in part, pursuant to 16 U.S.C. § 471i(f)(1)(A)) and the Coastal Zone Management Rules, N.J. Admin. Code § 7:7-9.36.

44.     New Jersey also expends significant resources purchasing and maintaining key habitats relied upon by listed species, including vital foraging and nesting habitats along the State's coastal Barrier Islands and the Cape May Peninsula.  For example, New Jersey invests time, resources and funding to manage the federally-listed threatened red knot.  Twice annually, red knots migrate between South America and the Arctic.  New Jersey and Delaware are critically

important stops during the red knot's northern migration to feed on horseshoe crab eggs where the red knots must eat enough to continue their arduous journey to the Arctic.  New Jersey has an interest in protecting species inhabiting this State from harm both inside and outside of its borders, and New Jersey depends on its federal partners and other states to equally protect the red knot when it is not in New Jersey.

45.    Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the State requires such action.  NMSA 1978, § 8-5-2.  Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is . . . declared to be of fundamental importance to the public interest, health, safety and the general welfare."  N.M. Const. art. XX, § 21.  This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources ... for the benefit of the people of this state."  *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015).  The New Mexico Game and Fish Department is entrusted with the maintenance of wildlife and wildlife habitat and related consultations with federal and other agencies toward that goal, NMSA 1978, § 17-1-5.1, and oversees a program for conserving endangered plant species, *id.* § 75-6-1; *see also id*. 19.33.2-19.33.6 (rules pertaining to state endangered and threatened species).

46.    FWS lists 40 animal and 13 plant species as threatened or endangered in New Mexico.  These include the endangered, iconic Southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered Rio Grande silvery minnow (*Hybognathus amarus*), the endangered jaguar (*Panthera onca*), the endangered Mexican wolf (*Canis lupus baileyi*), and the threatened Mexican spotted owl (*Strix occidentalis lucida*).

47.    Protecting rare species and their habitats is fundamental to protecting New Mexico's wildlife and wild places.  Tourism, often focused on outdoor recreational activities, is an important driver of New Mexico's economy.  In 2015, tourism accounted for $6.1 billion in direct spending and created roughly 89,000 jobs.  Among the most-visited places in the State is the Bosque del Apache National Wildlife Refuge, established in 1939 to provide a critical stopover

1    for migrating waterfowl and recognized as one of the premier bird-watching areas in North

2    America.  New Mexico hosts eight additional national wildlife refuges, fifteen national parks, and

3    numerous national monuments, national conservation areas, and Department of Defense lands.

4    New Mexico's five national forests—the Carson, Cibola, Gila, Lincoln, and Santa Fe national

5    forests—encompass 9.4 million acres, including most of the State's mountainous areas, plus

6    isolated sections of the State's eastern prairies.  Overall, 27,001,583 acres in New Mexico are

7    federally owned, accounting for nearly 35 percent of the State's land mass.

8         48.    Plaintiff STATE OF NEW YORK brings this action by and through Attorney General

9    Letitia James.  The Attorney General is the chief legal officer of the State of New York and

10   brings this action on behalf of the State and its citizens and residents to protect their interests, and

11   in furtherance of the State's sovereign and proprietary interests in the conservation and protection

12   of the State's natural resources and the environment.  The State of New York has an ownership

13   interest in all non-privately held fish and wildlife in the State, and has exercised its police powers

14   to enact laws for the protection of endangered and threatened species, protections long recognized

15   to be vitally important and in the public interest.  *See* N.Y. Envtl. Conserv. Law §§ 11-0105, 11-

16   0535; *Barrett v. State*, 220 N.Y. 423 (1917).  Wildlife conservation is a declared policy of the

17   State of New York.  *See* N.Y. Const. art. XIV, § 3.

18        49.    There are dozens of federally endangered or threatened species that reside in whole or

19   in part within the State of New York and its waters.  Many of these species are highly migratory,

20   and their recovery requires conservation efforts in New York, up and down the Atlantic Seaboard,

21   and beyond.  Examples include four species of sea turtles that can be found in New York

22   waters—the loggerhead (*Caretta caretta*), green (*Chelonia mydas*), leatherback (*Dermochelys*

23   *coriacea*) and Kemp's Ridley (*Lepidochelys kempii*).  Achieving effective recovery for each of

24   these species requires strong ESA enforcement to protect such individuals that feed around Long

25   Island, as well as those breeding and nesting in the southern United States.

26        50.    Robust species protections under the ESA are very important to New York.  New

27   York hosts ten National Wildlife Refuges, home to federally protected species like the Piping

28   Plover (*Charadrius melodus*), and dozens of other federal sites, which along with numerous in-

1   State activities that require federal licensing and/or permitting and are subject to ESA section 7

2   consultation requirements.  Full and adequate implementation of the ESA's species-listing and

3   habitat-designation provisions is critical for species' survival within New York and elsewhere.

4   To date, faithful implementation of the ESA by the federal government, coordinated together with

5   state efforts, have helped species recover from the brink of extinction.  Habitat protection efforts

6   led by NMFS and New York have greatly increased populations of the endangered shortnose

7   sturgeon (*Acipenser brevirostrum*) and Atlantic sturgeon (*Acipenser oxyrinchus*).  The Northern

8   long-eared bat (*Myotis septentrionalis*) also resides in-state and benefits from federal-state

9   coordination.  And one of the greatest endangered species success stories, the recovery and

10  delisting of the iconic Bald Eagle (*Haliaeetus leucocephalus*), is due to federal and state efforts

11  including FWS critical habitat protections under the ESA, and New York's reintroduction of this

12  virtually extirpated species by importing young birds and hand-rearing them before release.

13  Thus, strong ESA protections both within its State borders and throughout each species' range are

14  fundamental to New York's interests.

15      51.    Plaintiff STATE OF NORTH CAROLINA brings this action by and through

16  Attorney General Joshua H. Stein.  The North Carolina Attorney General is the chief legal officer

17  of the State of North Carolina.  The Attorney General is empowered to appear for the State of

18  North Carolina "in any cause or matter ... in which the State may be a party or interested."  N.C.

19  Gen. Stat. § 114-2(1). Moreover, the Attorney General is authorized to bring actions on behalf of

20  the citizens of the State in "all matters affecting the public interest."  *Id.* § 114-2(8)(a).

21      52.    The State of North Carolina has a sovereign interest in its public trust resources.

22  Under North Carolina law, "the wildlife resources of North Carolina belong to the people of the

23  State as a whole."  N.C. Gen. Stat. § 113-131(a).  The State of North Carolina has enacted laws

24  and regulations concerning the conservation of the State's fish and wildlife resources, including

25  endangered and threatened species.  *See e.g., id.* §§ 113-331 to -337.

26      53.    FWS lists 39 animal and 27 plant species as endangered or threatened in North

27  Carolina, including the endangered Red-cockaded woodpecker (*Picoides borealis*), Carolina

28  northern flying squirrel (*Glaucmys sabrinus coloratus*), and Leatherback sea turtle (*Dermochelys*

18

1   *coriacea*).  North Carolina contains over 2 million acres of federally-owned lands, including lands

2   managed by the U.S. Forest Service, FWS, National Park Service, and Department of Defense, all

3   of which are subject to the ESA's section 7 consultation requirements.

4       54.   Plaintiff STATE OF OREGON brings this suit by and through Attorney General

5   Ellen Rosenblum.  The Oregon Attorney General is the chief legal officer of the State of Oregon.

6   The Attorney General's duties include acting in federal court on matters of public concern and

7   upon request by any State officer when, in the discretion of the Attorney General, the action may

8   be necessary or advisable to protect the interests of the State.  Ore. Rev. Stat. § 180.060(1).  The

9   Oregon Department of Fish and Wildlife, established as a State agency by the Oregon Legislature

10  pursuant to Ore. Rev. Stat. § 496.080, has requested that the Attorney General bring this suit to

11  protect Oregon's sovereign interest in preserving threatened and endangered species.

12      55.   The State of Oregon has a sovereign interest in its natural resources and is the

13  sovereign owner of the State's fish and wildlife.  Under Oregon law, "[w]ildlife is the property of

14  the State."  Ore. Rev. Stat. § 498.002.  The State of Oregon has enacted numerous laws and rules

15  concerning the conservation and protection of the fish and wildlife resources of the State,

16  including endangered and threatened species and their habitat.  *See, e.g.*, Oregon Endangered

17  Species Act, Ore. Rev. Stat. §§ 496.171–496.192, 498.026; Fish and Wildlife Habitat Mitigation

18  Policy, Or. Admin. R. 635-415-0000 (creating goals and standards to "mitigate impacts to fish

19  and wildlife habitat caused by land and water development actions"); and Goal 5 of Oregon's

20  statewide land use planning goals, Or. Admin. R. 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(5) ("[l]ocal governments shall

21  adopt programs that will protect natural resources," including wildlife habitat).  The State of

22  Oregon has an interest in protecting species in the State from harm both within and outside of the

23  State.

24      56.   Oregon is home to numerous fish, land animals, and plants that the Services have

25  listed as endangered or threatened species.  Of most significance in this case is that the fate of

26  many of these species is directly a result of, and tied to, Federal projects (*e.g.*, dams) or Federal

27  land management that is subject to section 7 consultation.  For example, many of the State's

28  iconic salmon and steelhead runs have been listed because of sharp population declines.  This

1    includes the majority of salmon and steelhead runs in the Columbia River basin where the

2    construction of federal dams was a primary factor in their decline and continues to hinder their

3    recovery.

4         57.    Elsewhere in the State, there are listed species—such as the marbled murrelet

5    (*Brachyramphus marmoratus*), snowy plover (*Charadrius nivosus*), bull trout (*Salvelinus*

6    *confluentus*), Foskett Dace (*Rhinichthys osculus*), Borax Lake Chub (*Gila boraxobius*)—that

7    depend on the tens of millions of acres of federal public lands, including 12 national forests, 18

8    national wildlife refuges, Crater Lake National Park, and over 15 million acres of Bureau of Land

9    Management lands.  Because of this close link to the federal government, the new implementing

10   regulations for section 7 consultations will have a significant negative effect on Oregon's ability

11   to recover many of its species.

12        58.    Plaintiff the COMMONWEALTH OF PENNSYLVANIA is a sovereign state of the

13   United States of America.  This action is brought on behalf of the Commonwealth by Attorney

14   General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.

15   Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his

16   statutory authority.  71 Pa. Stat. § 732-204.

17        59.    The Commonwealth of Pennsylvania has a sovereign interest in its public natural

18   resources, which "are the common property of all the people, including generations yet to come."

19   Pa. Const. art. I, § 27.  The Commonwealth, as trustee, must "conserve and maintain them for the

20   benefit of all the people."  *Id.; Robinson Twp., Washington Cty. v. Pennsylvania*, 83 A.3d 901,

21   955-56 (Pa. 2013); *see also* 34 Pa. Stat. and Cons. Stat. Ann. § 103 (game and wildlife); 34 Pa.

22   Stat. and Cons. Stat. Ann. § 2161 (game and wildlife); 30 Pa. Stat. and Cons. Stat. Ann. § 2506

23   (fish).  The Pennsylvania Constitution further protects every Pennsylvania resident's "right to

24   clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of

25   the environment."  Pa. Const. art. I, § 27.  As such, the Commonwealth of Pennsylvania has an

26   interest in protecting species in the Commonwealth from harm both within and outside of the

27   Commonwealth.

28

60.     At least 19 federally listed and protected endangered or threatened species are known to occur in Pennsylvania, including the endangered rusty patched bumble bee (*Bombus affinis*) and piping plover (*Charadrius melodus*) and the threatened northern long-eared bat (*Myotis septentrionalis*).  Pennsylvania has enacted laws and regulations to protect endangered and threatened species and their habitat in the Commonwealth.  *See, e.g.*, 34 Pa. Stat. and Cons. Stat. Ann. § 2167 (wild birds and animals); 30 Pa. Stat. and Cons. Stat. Ann. § 2305 (fish, reptiles, amphibians, mussels).  Pennsylvania law explicitly extends state protection to all federally listed wild birds, animals, fish, reptiles, amphibians, and mussels.  30 Pa. Stat. and Cons. Stat. § 102 (defining endangered and threatened fish, reptiles, amphibians, mussels); 34 Pa. Stat. and Cons. Stat. § 102 (defining endangered and threatened wild birds and animals).  Pennsylvania further empowers Commonwealth agencies to list and protect additional imperiled species.  Pa. Stat. and Cons. Stat. § 102 (fish, reptiles, amphibians, mussels); 34 Pa. Stat. and Cons. Stat. § 102 (wild birds and animals); 17 Pa. Code ch. 45 (plants).  As a result, Pennsylvania protects hundreds of endangered or threatened species.

61.     Plaintiff STATE OF RHODE ISLAND brings this action by and through Attorney General Peter F. Neronha.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  R.I. Const. art. I, § 17; R.I. Gen. Laws R.I. § 10-20-1, *et seq.*  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Rhode Island from pollution, impairment, or destruction.  *Id.; Newport Realty, Inc. v. Lynch*, 878 A.2d 1021 (R.I. 2005).

62.     The State of Rhode Island has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are State property held in trust by the State for the benefit of the people of the State.  RI. Const. Art. I § 17.  In addition, the State of Rhode Island has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the

State, including endangered and threatened species, and their habitat. As such, the State of Rhode Island has an interest in protecting species in the State from actions both within and outside of the State.

63. There are currently thirteen species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Rhode Island and its waters. Examples include the New England cottontail (*Sylvilagus transitionalis*), which, as recently as 1960, could be found throughout much of New England, but whose range has shrunk by 86 percent; the roseate tern (*Sterna dougallii*) and piping plover (*Charadrius melodus*), found along Rhode Island's coastal beaches and islands; the sandplain gerardia (*Agalinis acuta*), which inhabits dry, sandy, poor-nutrient soils in sandplain and serpentine sites; and the American burying beetle (*Nicrophorus americanus*), which once lived in 35 states, the District of Columbia, and three Canadian provinces, but now are known to occur in only four states. Rhode Island has 5,157 acres of federal public lands, numerous federal wildlife refuges, multiple federal water projects, numerous military facilities and other federal facilities and infrastructure projects that are subject to the ESA's section 7 consultation requirements. Moreover, countless acres of non-federal lands and numerous non-federal facilities and activities in Rhode Island are subject to federal permitting and licensing requirements—and therefore section 7 consultation requirements.

64. Plaintiff STATE OF VERMONT brings this action by and through Attorney General Thomas J. Donovan, Jr. The Attorney General is the chief legal officer of the State of Vermont. *See* Vt. Stat. Ann. tit. 3, § 152 ("The Attorney General may represent the State in all civil and criminal matters as at common law and as allowed by statute."). Vermont is a sovereign entity and brings this action to protect its own sovereign and proprietary rights. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Vermont.

65. "[T]he fish and wildlife of Vermont are held in trust by the State for the benefit of the citizens of Vermont and shall not be reduced to private ownership. The State of Vermont, in its sovereign capacity as a trustee for the citizens of the State, shall have ownership, jurisdiction, and

control of all the fish and wildlife of Vermont."  Vt. Stat. Ann. tit. 10, § 4081(a)(1).  The State of Vermont has enacted laws protecting endangered and threatened species and critical habitat, and currently lists 52 animal species, 8 of which are listed under the ESA, and 163 plant species, 3 of which are listed under the ESA.  *See id.*, §§ 5401 *et seq.*  The Vermont Department of Fish and Wildlife implements the Vermont endangered species protections and has a strong interest in species protections both within Vermont and outside the State.

66.    Vermont hosts nearly a half a million acres of federal lands, including the Green Mountain National Forest, the Missisquoi National Wildlife Refuge, and the Silvio O. Conte National Fish and Wildlife Refuge.  These lands are subject to the ESA's section 7 consultation requirements as are other State lands subject to federal permits and federal funding.

67.    Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this action to protect its own sovereign and proprietary rights.  The Attorney General is the chief legal adviser to the State of Washington.  The Attorney General's powers and duties include acting in federal court on matters of public concern.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

68.    Wildlife, fish, and shellfish are the property of the State of Washington. Rev. Code Wash. (RCW) § 77.04.012.  The Washington Department of Fish and Wildlife actively carries forth the legislative mandate to, inter alia, preserve, protect, perpetuate, and manage wildlife, fish, and wildlife and fish habitat.  *Id.*; *id.* § 77.04.055; *see also id.* § 77.110.030 (declaring that "conservation, enhancement, and proper utilization of the state's natural resources … are responsibilities of the state of Washington").

69.    The Washington Fish and Wildlife Commission classifies forty-five species as Endangered, Threatened, or Sensitive under State law.  Wash. Admin. Code 220-610-010; 220-200-100.  More than half of these species are also federally listed as endangered or threatened under the ESA, including southern resident killer whales (*Orcinus orca*), pygmy rabbits (*Brachylagus idahoensis*), streaked horned larks (*Eremophila alpestris strigata*), and green sea turtles (*Chelonia mydas*).  In addition, the Washington Department of Fish and Wildlife

designates 102 species as candidates for state listing as endangered, threatened, or sensitive, and more than twenty of the state candidate species, including chinook (*Oncorhynchus tshawytscha*), chum (*Oncorhynchus keta*), and sockeye (*Oncorhynchus nerka*) salmon and steelhead (*Oncorhynchus mykiss*), are listed as threatened or endangered under the ESA.  In total, forty-nine federally listed species live in Washington. Washington also has several species, including wolverines (*gulo gulo*), Island Marble butterflies (*Euchloe ausonides*), and fishers (*Martes pennanti*) that are candidates for federal listing.

70.    Washington expends significant resources to monitor, protect, and recover state and federally listed species and their critical habitat.  For example, the Washington Department of Fish and Wildlife spends approximately $600,000 annually for management and recovery of the endangered Taylor's checkerspot butterfly (*Euphydryas editha taylori*), which is native to the Pacific Northwest and is restricted to just eleven known populations, with eight of those populations occurring in Washington State.

71.    Washington hosts tens of millions of acres of federal lands across ten national forests, three national parks, twenty-three national wildlife refuges, three national monuments, and numerous Department of Defense lands.  These lands are subject to the ESA's section 7 consultation requirements.

72.    Plaintiff DISTRICT OF COLUMBIA is a municipal corporation empowered to sue and be sued and is the local government for the territory constituting the permanent seat of the government of the United States.  The District is represented by and through its chief legal officer the Attorney General for the District of Columbia.  The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.  D.C. Code § 1-301.81(a)(1).  Two species that the Services have listed as endangered are known to occur in the District: the Hay's Spring amphipod (*Stygobromus hayi*) and the Atlantic sturgeon (*Acipenser oxyrinchus oxyrinchus*).  The northern long-eared bat (*Myotis septentrionalis*), which the Services have listed as threatened, is also known to occur in the District.  The District is in the historic range of and has potential habitat for two other species that the Services have listed as endangered: the dwarf wedgemussel

(*Alasmidonta heterodon*) and the shortnose sturgeon (*Acipenser brevirostrum*); and two other species that the Services have listed as threatened: the yellow lance (*Elliptio lanceolata*) and the bog turtle (*Clemmys muhlenbergii*).  The District's Department of Energy and Environment, the state trustee agency for fish and wildlife resources, is responsible for providing biological expertise to review and comment on environmental documents and impacts relating to development, infrastructure, and other projects that may impact federally listed species or Species of Greatest Conservation Need (SGCN).

73.   Plaintiff the CITY OF NEW YORK brings this action by and through the Acting Corporation Counsel Georgia Pestana.  The Corporation Counsel is the chief legal officer of the City of New York and brings this action on behalf of itself and its residents to protect New York City's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment.  *See* New York City Charter Chap. 17, § 394.

74.   New York City has a longstanding commitment to protection of endangered species and their habitat.  New York City hosts, among other species, a population of Atlantic Coast piping plovers (*Charadrius melodus*), that nests on the beach of the Rockaways in Brooklyn and was designated a threatened species by the U.S. Fish and Wildlife Service.  New York City has substantial interest in protecting wildlife both within and outside of its borders.

75.   Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior and is sued in his official capacity.  Mr. Bernhardt has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to endangered and threatened terrestrial and freshwater plant and animal species and certain marine species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  Mr. Bernhardt signed the Final Rules at issue in this Complaint.

76.   Defendant WILBUR ROSS is the Secretary of the United States Department of Commerce and is sued in his official capacity.  Mr. Ross has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including the administration of the ESA with regard to most endangered and threatened marine and anadromous fish species,

1  and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  Mr.

2  Ross signed the Listing Rule and the Interagency Consultation Rule at issue in this Complaint.

3       77.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within

4  the United States Department of the Interior to which the Secretary of the Interior has delegated

5  authority to administer the ESA with regard to endangered and threatened terrestrial and

6  freshwater plant and animal species and certain marine species, and bears responsibility, in whole

7  or in part, for the acts complained of in this Complaint.

8       78.    Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the

9  United States Department of Commerce to which the Secretary of Commerce has delegated

10 authority to administer the ESA with regard to most endangered and threatened marine and

11 anadromous fish species, and bears responsibility, in whole or in part, for the acts complained of

12 in this Complaint.

13 **STATUTORY BACKGROUND**

14 **I.**    **ENDANGERED SPECIES ACT.**

15      79.    As discussed above, the fundamental purposes of the ESA are to "provide a means

16 whereby the ecosystems upon which endangered ... and threatened species depend may be

17 conserved, [and] to provide a program for the conservation of such [endangered and threatened]

18 species."  16 U.S.C. § 1531(b).  The ESA achieves these statutory purposes through multiple vital

19 programs, each of which are directly affected by the Final Rules.

20      80.    Section 4 of the ESA, 16 U.S.C. § 1533, prescribes the process for the Services to list

21 a species as "endangered" or "threatened" within the meaning of the statute and to designate

22 "critical habitat" for each such species.  The ESA defines an endangered species as one "in

23 danger of extinction throughout all or a significant portion of its range," while a threatened

24 species is "likely to become an endangered species within the foreseeable future throughout all or

25 a significant portion of its range."  *Id.* § 1532(6), (20).

26      81.    When the Services list a species as endangered or threatened, they generally also must

27 designate critical habitat for that species.  16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C).  The ESA

28 defines critical habitat as: "(i) the specific areas *within* the geographical area occupied by the

species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas *outside* the geographical area occupied by the species at the time it is listed ... upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A) (emphasis added).

82.     Section 7 of the ESA, 16 U.S.C. § 1536, requires all federal agencies, including the Services, to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of" endangered and threatened species.  16 U.S.C. § 1536(a)(1).  Section 7 also requires all federal agencies to "insure" that any action they propose to authorize, fund, or carry out "is not likely to jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification of" any designated critical habitat.  *Id.* § 1536(a)(2).  If a federal agency action "may affect" any listed species or critical habitat, the federal action agency must initiate consultation with the relevant Service.  50 C.F.R. §§ 402.12(c)-(e), 402.14(a), (b)(1); *see* 16 U.S.C. §§ 1536(b)(3), (c)(1).  As the Services have long recognized, the "may affect" standard is a low threshold for triggering consultation: *"[a]ny possible effect*, whether beneficial, benign, adverse or of an undetermined character" triggers the requirement.  *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009) (quoting Interagency Cooperation – Endangered Species Act of 1973, as amended, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)) (emphasis in original).

83.     If the federal action agency or the appropriate Service determines that the action is "likely to adversely affect" a listed species and/or designated critical habitat, the Service must prepare a biological opinion on the effects of the action on the species and/or critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(b)(1).  Under section 7, the Services' biological opinion must determine whether the action is likely to jeopardize the continued existence of any listed species or adversely modify or destroy any designated critical habitat.  16 U.S.C. § 1536(b)(3)(A).

84.     If jeopardy or adverse modification is found, the biological opinion must include "reasonable and prudent alternatives" to the agency action that "can be taken by the federal

agency or applicant in implementing" the action and that the Secretary believes would avoid jeopardy or adverse modification.  16 U.S.C. § 1536(b)(3)(A).  Finally, the biological opinion must include a written statement (referred to as an "incidental take statement") specifying the impacts of any incidental take on the species, any "reasonable and prudent measures that the [Services] consider [] necessary or appropriate to minimize such impact," and the "terms and conditions" that the agency must comply with in implementing those measures.  *Id.* § 1536(b)(4).

85.     Section 9 of the ESA, 16 U.S.C. § 1538, prohibits any person from "taking" any endangered fish or wildlife species.  *Id.* §§ 1538(a)(1)(B), (G).  The ESA defines "take" broadly as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct."  *Id.* § 1532(19).  Section 9 of the ESA also prohibits any person from taking certain harmful actions with respect to any endangered plant species.  *Id.* § 1538(a)(2). The ESA contains two permit-type processes that enable the Services to authorize some degree of "take" or other harm that does not jeopardize the continued existence of any listed fish, wildlife or plant species, subject to mitigation measures and other conditions.  *See id.* §§ 1536(b)(4), 1539(a)(1)(B).  Section 4(d) of the ESA, *id.* § 1533(d), authorizes the Services to extend by regulation any or all of the section 9 prohibitions to any or all species listed as threatened under the ESA.  *Id.* § 1533(d).  Since the 1970s, the FWS has utilized this provision to extend all of the ESA's section 9 prohibitions applicable to endangered species to all threatened fish, wildlife and plant species.  *See* 40 Fed. Reg. 44,412 (Sept. 26, 1975) (promulgating 50 C.F.R. § 17.31 regarding threatened fish and wildlife species); 42 Fed. Reg. 32,374, 32,380 (June 24, 1977) (promulgating 50 C.F.R. § 17.71 regarding threatened plant species).

## II.     ADMINISTRATIVE PROCEDURE ACT.

86.     The APA, 5 U.S.C. §§ 551 *et seq.*, governs the procedural requirements for federal agency decision-making, including the agency rulemaking process.  Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"  "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  An agency action is arbitrary and capricious under

1  the APA where "the agency has relied on factors which Congress has not intended it to consider,

2  entirely failed to consider an important aspect of the problem, offered an explanation for its

3  decision that runs counter to the evidence before the agency, or is so implausible that it could not

4  be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

5  *Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").  An

6  agency does not have authority to adopt a regulation that is "manifestly contrary to the statute."

7  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also* 5

8  U.S.C. § 706(2)(C).

9      87.    Additionally, "[a]gencies are free to change their existing policies," but they must

10  "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.

11  2117, 2125 (2016) (citing *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

12  U.S. 967, 981–82 (2005)).  While an agency need not show that a new rule is "better" than the

13  rule it replaced, it still must demonstrate that "it is permissible under the statute, that there are

14  good reasons for it, and that the agency *believes it* to be better, which the conscious change of

15  course adequately indicates." *Federal Commc'ns. Comm'n v. Fox Television Stations, Inc.*, 556

16  U.S. 502, 515 (2009) (emphasis in original).  Further, an agency must "provide a more detailed

17  justification than what would suffice for a new policy created on a blank slate" when "its new

18  policy rests upon factual findings that contradict those which underlay its prior policy," "or when

19  its prior policy has engendered serious reliance interests that must be taken into account." *Id.*

20  Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to

21  be an arbitrary and capricious change from agency practice." *National Cable & Telecomms.*

22  *Ass'n*, 545 U.S. at 981.

23      88.    Finally, prior to promulgating, amending, or repealing a rule, agencies must engage in

24  a public notice-and-comment process.  5 U.S.C. §§ 551(5), 553.  Notice must include "either the

25  terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.*

26  § 553(b).  To satisfy the requirements of APA section 553(b), notice of a proposed rule must

27  "provide an accurate picture of the reasoning that has led the agency to the proposed rule," so as

28  to allow an "opportunity for interested parties to participate in a meaningful way in the discussion

29

1    and final formulation of rules." *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*,

2    673 F.2d 525, 528-30 (D.C. Cir. 1982).  An agency must afford public notice of specific

3    regulatory changes and their reasoned basis to provide the public an opportunity for meaningful

4    comment.  *Home Box Office v. Federal Commc'ns Comm'n*, 567 F.2d 9, 35-36 (D.C. Cir. 1977).

5    The public may then submit comments, which the agency must consider before promulgating a

6    final rule.  5 U.S.C. § 553(c).  This process is designed to "give interested persons an opportunity

7    to participate in the rule making through submission of written data, views, or arguments."  *Id.*

8    Further, while an agency may modify a proposed rule in response to public comments, it may not

9    finalize a rule that is not a "logical outgrowth" of the proposed rule.  *Natural Res. Def. Council v.*

10   *Environmental Prot. Agency*, 279 F.3d 1180, 1186 (9th Cir. 2002).  If "a new round of notice and

11   comment would provide the first opportunity for interested parties to offer comments that could

12   persuade the agency to modify its rule," the agency must afford a new opportunity for notice and

13   comment on the rule.  *Id.*

## III.   NATIONAL ENVIRONMENTAL POLICY ACT.

15   89.    NEPA, 42 U.S.C. §§ 4321 *et seq.*, is the "basic national charter for the protection of

16   the environment." 40 C.F.R. § 1500.1(a).  The fundamental purposes of the statute are to ensure

17   that "environmental information is available to public officials and citizens before decisions are

18   made and before actions are taken," and that "public officials make decisions that are based on

19   understanding of environmental consequences, and take actions that protect, restore, and enhance

20   the environment."  *Id.* § 1500.1(b)-(c).

21   90.    To achieve these purposes, NEPA requires the preparation of a detailed

22   environmental impact statement ("EIS") for any "major federal action significantly affecting the

23   quality of the human environment."  42 U.S.C. § 4332(2)(C).  A "major federal action" includes

24   "new or revised agency rules [and] regulations."  40 C.F.R. § 1508.18(a).  As a preliminary step,

25   an agency may first prepare an environmental assessment ("EA") to determine whether the effects

26   of an action may be significant.  *Id.* § 1508.9.  If an agency decides not to prepare an EIS, it must

27   supply a "convincing statement of reasons" to explain why a project's impacts are insignificant.

28   *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).  An EIS

must be prepared, however, if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

91.    To determine whether a proposed action may significantly affect the environment, NEPA requires that both the context and the intensity of an action be considered.  40 C.F.R. § 1508.27.  In evaluating the context, "[s]ignificance varies with the setting of the proposed action" and includes an examination of "the affected region, the affected interests, and the locality."  *Id.* § 1508.27(a).  Intensity "refers to the severity of impact," and NEPA's implementing regulations list ten factors to be considered in evaluating intensity, including "[t]he degree to which the action may adversely affect an endangered or threatened species or its [critical] habitat" under the ESA.  *Id.* § 1508.27(b)(9).  The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

92.    In "certain narrow instances," an agency does not have to prepare an EA or EIS if the action to be taken falls under a categorical exclusion ("CE").  *See Coalition of Concerned Citizens to Make Art Smart v. Federal Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 902 (10th Cir. 2016) (citing 40 C.F.R. § 1508.4).  However, agencies may invoke a CE only for "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of [NEPA] regulations."  40 C.F.R. § 1508.4; *see also id.* § 1507.3(b)(2)(ii).  When adopting such procedures, an agency "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," *id.* § 1508.4, in which case an EA or EIS would be required.  The Services have established categorical exclusions for certain actions, including regulations "that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis."  *See* 43 C.F.R. § 46.210(i); *see also* National Oceanic and Atmospheric Administration ("NOAA") Administrative Order 216-6A.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    SPECIES PROTECTION UNDER THE ESA.

93.    Currently, the ESA protects more than 1,600 plant and animal species in the United States and its territories, and millions of acres of land have been designated as critical habitat to allow for species conservation (recovery).  Ninety-nine percent of species protected by the ESA have not gone extinct.

94.    The States have seen significant benefits and steps toward recovery of at-risk species due to implementation of the ESA.  Among other examples, populations of the Atlantic Coast piping plover (*Charadrius melodus*), which is listed as a threatened species along most of the East Coast and thus subject to FWS's longstanding regulation prohibiting take of threatened species, have more than doubled in the last twenty years due to FWS's conservation planning, federal enforcement, and cooperative efforts between federal, state, and local partners.  Recovery efforts have been particularly successful in Massachusetts, where the East Coast's largest piping plover breeding population has rebounded from fewer than 150 pairs in 1990, to about 688 pairs in 2018, increasing more than 500 percent since the species was listed in 1986.  Despite these gains, however, piping plovers' continued recovery is threatened by habitat loss from sea level rise caused by climate change.

95.    The California condor (*Gymnogyps californianus*), the largest land bird in North America, has been listed as "endangered" since the ESA's inception and was on the brink of extinction in 1982 with just twenty-three known individuals.  By 1987, all remaining wild condors had been placed into a captive breeding program.  Recovery efforts led by FWS, California state agencies, and other partners have increased the population to 463 birds as of 2017 and successfully reintroduced captive-bred condors to the wild.  These efforts are now in their final phase, with a focus on creating self-sustaining populations and managing continued threats to the species, such as lead ammunition, trash, and habitat loss.

96.    The smallest rabbit in North America, the pygmy rabbit (*Brachylagus idahoensis*), was listed as an endangered species under Washington state law in 1993 and by 2001 was considered nearly extinct, with an estimated population of fewer than fifty individuals.  In 2003,

FWS also listed a distinct population segment of the species known as the Columbia Basin pygmy rabbit as endangered under the ESA. Since that time, the species has begun to recover in Washington as a result of a cooperative effort by FWS, the Washington Department of Fish and Wildlife, researchers, and other state agencies. Thousands of rabbits have been reintroduced on state and private land, with promising evidence of a growing population. These steps toward recovery would not be possible without the mutually supporting protections of state and federal law.

97. The shortnose sturgeon (*Acipenser brevirostrum*) is an anadromous fish found in rivers, estuaries, and coastal waters along the Atlantic Coast of North America. Overfishing, river damming, and water pollution greatly reduced its numbers, and the shortnose sturgeon was listed as endangered under the ESA's precursor in 1967. However, fishing prohibitions and habitat protection efforts led by NMFS and New York have allowed the shortnose sturgeon population to increase in New York's Hudson River from about 12,669 in 1979 to more than 60,000 today.

## II. THE ESA'S IMPLEMENTING REGULATIONS AND THE FINAL RULES.

98. FWS and NMFS share joint responsibility for the protection and conservation of endangered and threatened species under the ESA. In general, FWS is responsible for terrestrial and inland aquatic fish, wildlife, and plant species, while NMFS is responsible for marine and anadromous species.

99. The Services adopted joint regulations implementing sections 4 and 7 of the ESA during the 1980s. *See e.g.*, 45 Fed. Reg. 13,010 (Feb. 27, 1980) (section 4); 48 Fed. Reg. 38,900 (Oct. 1, 1984) (section 4); 51 Fed. Reg. 19,926 (June 3, 1986) (section 7). The Services have not substantially amended these regulations since that time, although the Services adopted minor amendments to the processes for listing species, designating critical habitat, and conducting section 7 consultations in 2015 and 2016. *See* 81 Fed. Reg. 7,439 (Feb. 11, 2016); 81 Fed. Reg. 7,214 (Feb. 11, 2016); 80 Fed. Reg. 26,832 (May 11, 2015).

100. On July 25, 2018, the Services published three separate notices in the Federal Register proposing to revise several key requirements of the ESA's implementing regulations. 83

Fed. Reg. 35,174 (July 25, 2018) (the "Proposed 4(d) Rule"); 83 Fed. Reg. 35,178 (July 25, 2018) (the "Proposed Interagency Consultation Rule"); 83 Fed. Reg. 35,193 (July 25, 2018) (the "Proposed Listing Rule") (collectively, the "Proposed Rules").  While the Services characterized the Proposed Rules as changes to assist and increase clarity and efficiency in implementation of the ESA, in fact the Proposed Rules were identified as a "deregulatory action" pursuant to President Trump's Executive Order 13771 ("Reducing Regulation and Controlling Regulatory Costs"), and they would significantly weaken protections for our nation's most imperiled species.

101.  On September 24, 2018, many of the undersigned State Plaintiffs submitted comments on the Proposed Rules, urging the Services to withdraw the Proposed Rules on the grounds that they would, if finalized, be unlawful, arbitrary, capricious, and contrary to the ESA and State Plaintiffs' interests.

102.  On August 27, 2019, the Services issued the Final Rules.  84 Fed. Reg. 44,753 (the 4(d) Rule); 84 Fed. Reg. 44,976 (the Interagency Consultation Rule); 84 Fed. Reg. 45,020 (the Listing Rule).  The Final Rules retained most of the unlawful and arbitrary provisions discussed in State Plaintiffs' comments and included certain additional or different unlawful and arbitrary provisions.

103.  For example, the Listing Rule unlawfully and arbitrarily:

    a. injects economic considerations into the ESA's science-driven, species-focused analyses by removing the statutory restriction on considering economic impacts;

    b. limits the circumstances under which species can be listed as based on the Services' determination of the "likelihood" of both future threats to a species and the species' responses to those threats in the "foreseeable future";

    c. eliminates consideration of species' recovery in the delisting process by eliminating language that refers to recovery as a basis for delisting;

    d. expands significantly the ESA's expressly and purposefully narrow "not prudent" exemption for designating critical habitat; and

  e. limits severely the circumstances under which unoccupied critical habitat would be designated, which is essential for species recovery, particularly where climate change poses a threat to species habitat.  The rules now require for the first time that there be a "reasonable certainty" that such unoccupied habitat will contribute to the conservation of a species and that the area currently contain one or more of those physical or biological features essential to the conservation of the species.

104. The Interagency Consultation Rule improperly:

  a. limits the circumstances under which a federal agency action would be deemed to destroy or adversely modify designated critical habitat by requiring the action to affect such habitat "as a whole";

  b. limits significantly the nature and scope of the analysis of the effects of a federal agency action by altering the definitions of "effects of the action" and "environmental baseline" and requiring that the effects be both a "but for" result of the agency action and "reasonably certain to occur" based on "clear and substantial information";

  c.  limits the instances where changed circumstances would require re-initiation of consultation on a federal agency action;

  d. limits federal action agencies' duty to insure mitigation of the adverse effects of their proposals and unlawfully delegates to federal action agencies the ability to make biological determinations that the Services are required to make; and

  e. allows for broad-based "programmatic" and "expedited" consultations that lack necessary site-specific and in-depth analysis of a proposed federal agency action.

105. The 4(d) Rule removes, prospectively, the "blanket" extension to threatened species of all section 9 protections afforded to endangered plants and animals under the ESA, a radical departure from FWS's longstanding, conservation-based policy and practice of providing default section 9 protections to all newly-listed threatened plant and animal species.

106.   Each of these Final Rules is a major federal action that will significantly affect the human environment under NEPA. The Services, however, provided no environmental analysis of the Proposed Rules under that statute.  Instead, the Services erroneously contend that the Final Rules are categorically excluded from NEPA review because they "are of a legal, technical, or procedural nature," citing 43 C.F.R. § 46.210(i) and NOAA Administrative Order 216-6.  For the 4(d) Rule, FWS also claims, without basis, that any potential impacts of the rule "are too broad, speculative, and conjectural to lend themselves to meaningful analysis."

### III.   IMPACTS OF THE FINAL RULES ON STATE PLAINTIFFS.

107.   State Plaintiffs are uniquely harmed by the Final Rules' undermining and weakening of key requirements of the ESA.  First, State Plaintiffs have a concrete interest in preventing harm to their natural resources, both in general and under the ESA in particular.  As the Supreme Court has recognized, State Plaintiffs are entitled to "special solicitude" in seeking to remedy environmental harms.  *See Massachusetts v. Environmental Prot. Agency*, 549 U.S. 497, 519-22 (2007).  These interests are particularly robust in the context of the ESA, which conserves the invaluable natural heritage within States' borders.

108.   Indeed, in most of the State Plaintiffs, fish and wildlife resources are owned and held by the State in both a proprietary and regulatory capacity in trust by the States for the benefit of the entire people of the State.

109.   The ESA specifically directs the Services to "cooperate to the maximum extent practicable with the States" in implementing the ESA and also gives State Plaintiffs a distinct role in ensuring faithful and fully informed implementation of the ESA's species conservation mandates.  16 U.S.C. § 1535(a).

110.   State Plaintiffs are also harmed in their quasi-sovereign *parens patriae* capacity when their residents suffer due to environmental and natural resource degradation.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737-38 (1981).  The State Plaintiffs thus have an important interest in preventing and remedying harm to endangered and threatened species and their habitat that reside inside and that cross the State Plaintiffs' borders.  The Final Rules' weakening of the ESA's substantive and procedural

36

safeguards significantly and adversely affects the fish and wildlife resources of State Plaintiffs and curtails the ability of State Plaintiffs to help prevent federally-listed species from sliding further toward extinction.  In addition, federally listed species in the State Plaintiffs' states are vulnerable to the escalating adverse effects of climate change, such as species in coastal states that are at increasing risk from the effects of rising sea levels.

111.  Second, and relatedly, the ESA expressly declares that endangered and threatened "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."  16 U.S.C. § 1531(a)(3).  Reducing our wealth of wild species would damage each of these values and "diminish[] a natural resource that could otherwise be used for present and future commercial purposes."  *National Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1053 (D.C. Cir. 1997); *see also San Luis & Delta– Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1177 (9th Cir. 2011).  And although the harms that would result from the loss of biological diversity are enormous, the nation cannot fully apprehend their scope because of the "*unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet."  *Hill*, 437 U.S. at 178-79 (emphases in original) (noting that the value of this genetic heritage is "quite literally, incalculable").

112.  Third, State Plaintiffs have institutional, proprietary, and regulatory interests in the Services' full compliance with the ESA's plain language and overriding conservation purpose and mandate.  The Final Rules weaken important backstop protections for listed species and critical habitat under the ESA and increases the burden on States to fill the regulatory and enforcement void left by the Services' failure to adequately protect the nation's irreplaceable biological resources.  Many State Plaintiffs have laws and regulations that protect species within their borders to the same or an even greater extent than the federal ESA.  Many State Plaintiffs also own lands, and have programs to acquire and protect properties, that are home to endangered and threatened species and critical habitat.  In such circumstances, the Services and State Plaintiffs take account of each other's efforts to conserve rare species and often work cooperatively to share the responsibility and workload required for their protection.  *See* 16 U.S.C. § 1535(c).

113.   With the Final Rules' weakening of federal protections, the responsibility for, and burden of, protecting imperiled species and habitats within State borders would fall more heavily on State Plaintiffs.  *See Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (impact on State resources provides basis for standing).  This would detract from State Plaintiffs' efforts and resources to carry out their own programs and impose significantly increased costs and burdens on the State Plaintiffs.  As just one example, under the proposed 4(d) Rule, species newly listed as threatened under both federal law and a state's law would be subject to a "take" prohibition only under the state's law.  *See, e.g.*, Mass. Gen. Laws ch. 131A, § 2; Cal. Fish & Game Code §§ 2080, 2085.  Even if FWS opts to create a species-specific take rule, the State would need to shoulder the costs of conservation of threatened species while FWS clears its backlog and crafts such a rule, which might ultimately provide substantially weaker protections that the species would have been afforded under the previous blanket take rule.  *See Air Alliance Hous. v. U.S. Envtl. Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself.").

114.   Moreover, while State Plaintiffs can act to protect imperiled species within their own borders, they cannot do the same for such species outside of state borders.  Thus, despite the resource-intensive efforts described above, the State Plaintiffs may not be able to wholly fill the regulatory gaps created by the new regulations because other non-plaintiff states that host species with inter-state ranges may not adequately protect endangered or threatened species under their state laws.

115.   Finally, the Services' failure to prepare an EA or EIS for the Final Rules, and provide sufficient opportunity for public notice and comment on these regulations, has harmed State Plaintiffs' procedural interests in participating in a legally-sound rulemaking and environmental review process that adequately considers and accounts for public input, and adequately considers the impacts of federal rulemaking on the State Plaintiffs' natural resources and provides mitigation measures for such impacts.

116.   Consequently, State Plaintiffs have suffered a legal wrong and concrete injury as a result of the Services' actions and have standing to bring this suit.  Declaring the Final Rules *ultra vires* and arbitrary and capricious, and vacating these actions, will redress the harm suffered by State Plaintiffs.

### FIRST CAUSE OF ACTION
### (Violations of the ESA and APA,
### 16 U.S.C. §§ 1532, 1533, 1536; 5 U.S.C. § 706)

117.   Paragraphs 1 through 116 are realleged and incorporated herein by reference.

118.   Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(A), (C).  An agency does not have authority to adopt a regulation that is "manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 703 (1995).

119.   Here, the Services' adoption of the Listing Rule, the Interagency Consultation Rule, and the 4(d) Rule violates the ESA's plain language, structure, and purpose, and exceeds the scope of the Agencies' jurisdiction, authority and discretion under the ESA in several ways.

120.   The Listing Rule violates the ESA and APA in the following respects:

    a.  The elimination of regulatory language in 50 C.F.R. § 424.11(b) that species listing, reclassification, and delisting decisions must be made "without reference to possible economic or other impacts of such determination" is contrary to 16 U.S.C. § 1533(b)(1)(A), and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and 1536(a)(1).

    b.  The injection of the requirement that threats and species' responses to those threats in the foreseeable future must be "likely" based on "environmental variability" in order to list species as threatened in 50 C.F.R. § 424.11(d) is contrary to the requirements of 16 U.S.C. § 1533(b)(1)(A) that such decisions be made "solely on the basis of the best scientific and commercial data

available," the definition of threatened species in 16 U.S.C. § 1532(20), and the
ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and
1536(a)(1).

    c.  The modification of language in 50 C.F.R. § 424.11(d) to eliminate species
recovery as a key basis for delisting is contrary to 16 U.S.C. §§ 1531(b) & (c),
1532(3), 1533(f), and 1536(a)(1).

    d.  The significant expansion of the circumstances in which the Services may find
that it is "not prudent" to designate critical habitat for listed species in 50
C.F.R. § 424.12 is contrary to 16 U.S.C. § 1533(a)(3)(A), and the ESA's
conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and
1536(a)(1).

    e.  Restricting the designation of unoccupied critical habitat by requiring that the
Services first evaluate whether currently occupied areas are inadequate for
species conservation, and that the Services make that determination at the time
of critical habitat designation rather than listing in 50 C.F.R. § 424.12(b)(2), is
contrary to 16 U.S.C. §§ 1532(5)(A) and 1533(a)(3)(A), the recovery purposes
of the ESA, and the ESA's conservation purposes and mandate in 16 U.S.C. §§
1531(b) & (c) and 1536(a)(1).

    f.  Restricting the designation of unoccupied critical habitat by adding the
requirement that the Services must determine that there is a "reasonable
certainty" that the area will contribute to the conservation of the species, and
that the area currently contains one or more of those physical or biological
features "essential to the conservation of the species" in 50 C.F.R. §
424.12(b)(2), is contrary to 16 U.S.C. § 1532(5)(A), and the ESA's
conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and
1536(a)(1).

    121.  The Interagency Consultation Rule violates the ESA and the APA in the following
respects:

a. The revised definition of "destruction or adverse modification" in 50 C.F.R. § 402.02 to require destruction or adverse modification of critical habitat "as a whole," and the elimination of existing language regarding the alteration of "the physical or biological features essential to the conservation of a species," is contrary to 16 U.S.C. §§ 1536(a)(2) and 1532(5)(A), and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and 1536(a)(1).

b. The changes to the definition of "effects of the action" in 50 C.F.R. §§ 402.02 and 402.17 limiting both the type and extent of effects of a proposed federal agency action that must be considered during the consultation process are contrary to 16 U.S.C. §§ 1536(a)(2), (b) and (c), the requirement to make such decisions based on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and 1536(a)(1).

c. The new definition of "environmental baseline" in 50 C.F.R. § 402.02 to include the impacts of all past and present federal, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early section 7 consultation, as well as "ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify," would result in consultations that fail to account for the full suite of effects of proposed federal agency actions, in violation of 16 U.S.C. §§ 1536(a)(2), (b), and (c), and is contrary to the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and 1536(a)(1).

d. The weakening of the mitigation requirements in 50 C.F.R. § 402.14(g)(8) is contrary to 16 U.S.C. § 1536(a)(1), (a)(2) and (b)(4), and the ESA's conservation purposes and mandate in 16 U.S.C. § 1531(b) & (c) and 1536(a)(1).

  e. Creating a new consultation procedure in 50 C.F.R. § 402.14(h) to allow the Services to adopt an action agency's biological analyses is contrary to the Services' statutory duties in 16 U.S.C. § 1536(a)(1) and (b)(3)(A), and the ESA's conservation purposes and mandate in 16 U.S.C. § 1531(b) & (c) and 1536(a)(1).

  f. The new definition of "programmatic consultation" in 50 C.F.R. § 402.02 to provide for "a consultation addressing an agency's multiple actions on a program, region or other basis" is contrary to 16 U.S.C. § 1536(a)(1), (a)(2) and (b), and the ESA's conservation purposes and mandate in 16 U.S.C. § 1531(b) & (c) and 1536(a)(1).

  g. The new requirements in 50 C.F.R. § 402.14(l) authorizing "expedited consultations" are contrary to 16 U.S.C. § 1536(a)(1), (a)(2) and (b), and the ESA's conservation mandate in 16 U.S.C. § 1531(b) & (c).

  h. The new exemptions in 50 C.F.R. § 402.16(b) from the requirement to reinitiate consultation for U.S. Bureau of Land Management resource management plans, upon the listing of a new species or designation of new critical habitat, are contrary to 16 U.S.C. § 1536(a)(1), (a)(2) and (b), and the ESA's conservation purposes and mandate in 16 U.S.C. § 1531(b) & (c) and 1536(a)(1).

122. FWS's 4(d) Rule's removal of the "blanket" extension to threatened species of all protections afforded to endangered plants and animals under section 9 of the ESA is contrary to the ESA's conservation purposes and mandate in 16 U.S.C. §§ 1531(b) & (c) and 1536(a)(1).

123. Accordingly, in promulgating the Final Rules the Services acted in a manner that constituted an abuse of discretion, is not in accordance with law, and is in excess of the Services' statutory authority, in violation of the ESA and the APA.  16 U.S.C. §§ 1531, 1532, 1533, 1536; 5 U.S.C. § 706.  Consequently, the Listing Rule, the Interagency Consultation Rule, and the 4(d) Rule should be held unlawful and set aside.

**SECOND CAUSE OF ACTION**
**(Violations of the APA,**
**5 U.S.C. §§ 553, 706)**

124.   Paragraphs 1 through 123 are realleged and incorporated herein by reference.

125.   In promulgating a regulation under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (quotation and citation omitted).  Agency regulation is arbitrary and capricious if the agency "relie[s] on factors which Congress has not intended it to consider," "entirely fail[s] to consider an important aspect of the problem," or has "offered an explanation for its decision that runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference of view or the product of agency expertise."  *Id.*

126.   Moreover, the APA requires that interested parties have a "meaningful opportunity to comment on proposed regulations."  *See Safe Air for Everyone v. U.S. Envtl. Prot. Agency*, 488 F.3d 1088, 1098 (9th Cir. 2007).  To satisfy the requirements of APA section 553, notice of a proposed rule must "provide an accurate picture of the reasoning that has led the agency to the proposed rule," so as to allow an "opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules."  *Connecticut Light & Power*, 673 F.2d at 528-30; *see also Prometheus Radio Project v. Federal Commc'ns. Comm'n*, 652 F.3d 431, 449 (3d Cir. 2011) ("an agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible") (citations and emphasis omitted).

127.   Here, in promulgating the Final Rules, the Services failed to provide a reasoned analysis for the changes, relied on factors Congress did not intend for them to consider, offered explanations that run counter to the evidence before the Services, and entirely overlooked important issues at the heart of their species-protection duties under the ESA.

128.   With regard to the Listing Rule:

a. The Services failed to provide a reasoned explanation for the elimination of regulatory language in 50 C.F.R. § 424.11(b) that species listing, reclassification, and delisting decisions must be made "without reference to possible economic or other impacts of such determination," and failed to consider the increased resource burden on the Services that will result from this change.

b. The Services failed to provide a reasoned explanation for the injection in 50 C.F.R. § 424.11(d) of the requirement that threats, and species' responses to those threats in the foreseeable future, must be "likely" based on "environmental variability" in order to list species as threatened, and failed to consider the need to address threats resulting from climate change and other reasonably foreseeable threats.

c. The Services provided no reasoned basis for changing their longstanding policy and practice regarding delisting and modifying 50 C.F.R. § 424.11(d) to eliminate current regulatory language that refers to species recovery as a key basis for delisting.

d. The Services provided no reasoned explanation for the substantial expansion in 50 C.F.R. § 424.12(a)(1) of circumstances in which the Services may find it is "not prudent" to designate critical habitat for listed species, and failed to consider the need to address threats resulting from climate change or the myriad conservation benefits to species that are provided by critical habitat designations.

e. The Services failed to provide a reasoned basis for restricting the designation of unoccupied critical habitat in 50 C.F.R. § 424.12(b)(2) by requiring that the Services first evaluate whether currently occupied areas are inadequate for species conservation, and that the Services make that determination at the time of critical habitat designation rather than listing, and failed to consider the need to address climate change and other reasonably foreseeable future threats to

1    listed species and the reasonably foreseeable potential for future occupation of

2    currently unoccupied but suitable or potentially suitable habitat due to climate

3    and other changes to species present ranges.

4        f.   The Services failed to provide a reasoned basis for restricting the designation of

5    unoccupied critical habitat in 50 C.F.R. § 424.12 by requiring that the Secretary

6    must determine that there is a "reasonable certainty" that the area will

7    contribute to the conservation of the species and that the area currently contains

8    one or more of those "physical or biological features essential to the

9    conservation of the species."

10   129.   With regard to the Interagency Consultation Rule:

11       a.   The Services provided no reasoned explanation for the revised definition of

12   "destruction or adverse modification" of critical habitat in 50 C.F.R. § 402.02

13   to require destruction or adverse modification to the designated critical habitat

14   "as a whole," or the elimination of existing language regarding the alteration of

15   "the physical or biological features essential to the conservation of a species."

16       b.   The Services provided no reasoned explanation for changes to the definition of

17   "effects of the action" in 50 C.F.R. §§ 402.02 and 402.17, which limits

18   significantly both the type and extent of effects of a proposed federal agency

19   action that must be considered during the consultation process, misstates the

20   Services' existing practice in considering such effects, and ignores agency

21   contributions to climate change and, by extension, listed species.

22       c.   The Services failed to provide a reasoned basis for the new definition of

23   "environmental baseline" in 50 C.F.R. § 402.02 to include the impacts of all

24   past and present Federal, State, or private actions and other human activities in

25   the action area, the anticipated impacts of all proposed Federal projects in the

26   action area that have already undergone formal or early section 7 consultation,

27   as well as "ongoing agency activities or existing agency facilities that are not

28   within the agency's discretion to modify."

d. The Services failed to provide a reasoned basis for the inclusion of a 60-day deadline, subject to extension by consent of the Services and the action agency, for informal consultations in 50 C.F.R. § 402.13(c).

e. The Services provided no reasoned explanation for the weakening of agency mitigation requirements in 50 C.F.R. § 402.14(g)(8) and no data to support its assumption that all mitigation measures will be implemented notwithstanding the elimination of any regulatory duty to ensure mitigation occurs.

f. The Services failed to provide a reasoned explanation for creating a new consultation procedure in 50 C.F.R. § 402.14(h) to allow the Services to adopt a federal action agency's biological assessment.

g. The Services failed to provide a reasoned explanation for the new definition of "programmatic consultation" in 50 C.F.R. § 402.02 to provide for "a consultation addressing an agency's multiple actions on a program, region or other basis," and the new definition contradicts other Service regulations and is internally inconsistent regarding the Services' reasoning for changes to the reinitiation of formal consultation regulation in 50 C.F.R. § 402.16.

h. The Services failed to provide a reasoned explanation for the new requirements in 50 C.F.R. § 402.14(l) authorizing "expedited consultations," and these procedures are vague, arbitrary, contradictory to other Service regulations, and internally inconsistent regarding the Services' reasoning for changes to the reinitiation of formal consultation regulation in 50 C.F.R. § 402.16.

i. The Services provide no reasoned explanation for allowing new exemptions, in 50 C.F.R. § 402.16(b), from the requirement to reinitiate consultation for U.S. Bureau of Land Management resource management plans upon the listing of a new species or designation of new critical habitat, and failed to consider the effects of such plans on listed species and critical habitat.

130.   With regard to the 4(d) Rule, FWS provided no reasoned basis for abandoning its longstanding policy and practice of providing default protections to all newly listed threatened

46

species, subject only to exceptions carved out by special rule as necessary on a species-by-species basis.  FWS's stated rationale of aligning its policy with NMFS ignores the vast differences between the two agencies in the number of species managed by these agencies and the resources available to promulgate species-specific rules.  FWS failed to explain why or how the proposal will fulfill the ESA's policy of "institutionalized caution" and species recovery mandates, given that it will inevitably result in FWS neglecting to provide adequate protections to threatened species, either temporarily or permanently.  Moreover, the 4(d) Rule fails to properly consider FWS's resource constraints or the increased workload and protracted delay that will inevitably result from conducting species-by-species assessments and promulgating special rules necessary to adequately protect all newly listed threatened animals and plants in the absence of the blanket take prohibition.

131.  Furthermore, the Services failed to provide a meaningful opportunity to comment on several aspects of the Final Rules that were not included in, and are not logical outgrowths of, the Proposed Rules.  These changes include but are not limited to: (i) the Listing Rule's requirement that the Secretary must determine that there is a "reasonable certainty" that an unoccupied area will contribute to the conservation of the species and that the area currently contains one or more of those physical or biological features essential to the conservation of the species in order to be designated as critical habitat; (ii) the Interagency Consultation Rule's new definition of "activities that are reasonably certain to occur" to require that such a conclusion be based upon "clear and substantial information"; and (iii) the Interagency Consultation Rule's expansion of the "environmental baseline" to include "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify."

132.  Accordingly, the Services acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and failed to follow the procedures required by law, in violation of the APA.  5 U.S.C. §§ 553, 706.  Consequently, the Final Rules should be held unlawful and set aside.

**THIRD CAUSE OF ACTION**
**(Violation of NEPA and the APA;**
**42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706)**

133.   Paragraphs 1 through 132 are realleged and incorporated herein by reference.

134.   NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action.  *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3.

135.   NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS, including "[t]he degree to which the action may adversely affect an endangered or threatened species or its [critical] habitat" under the ESA.  40 C.F.R. § 1508.27.  The presence of any single significance factor can require the preparation of an EIS.  "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

136.   As the comment letter by many of the State Plaintiffs demonstrates, the Final Rules will have significant environmental impacts on imperiled species and their habitat.  For example, the Final Rules would, among other adverse impacts to imperiled species and their habitat:

    a. limit the scope and circumstances of critical habitat designations; result in fewer listings of—and significantly less protection for— threatened species; and increase the likelihood that species will be delisted before they have recovered;

    b. limit the scope and circumstances of section 7 consultations; and

    c. limit the situations in which the Services will impose alternatives and mitigation measures to avoid or reduce the impacts of federal actions on listed species and critical habitat.

137.   Because of these significant environmental impacts on imperiled species and their habitat, the Final Rules do not qualify for the categorical exclusion from NEPA review for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of [NEPA] regulations[.]"  40 C.F.R. § 1508.4.

138.   The categorical exclusions for policies and regulations of an administrative or procedural nature also do not apply to the substantive, significant changes reflected in the Final Rules, which will have significant direct, indirect and cumulative effects.  *See* 84 Fed. Reg. at 44,758, 45,014, 45,050 (Office of Information and Regulatory Affairs determination that the Final Rules constitute significant regulatory action pursuant to Executive Order 12866).

139.   Finally, "extraordinary circumstances," including significant impacts on listed species and critical habitat and violations of the ESA, preclude the application of an exclusion from NEPA review.  *See* 43 C.F.R. § 46.215.

140.   Consequently, the Final Rules constitute a "major federal action" that significantly affects the quality of the human environment requiring preparation of an EIS prior to finalization of the rules.

141.   The Services' failure to take a "hard look" at the environmental impacts of the Final Rules, and their determination that the Final Rules are subject to a categorical exclusion from NEPA, was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA.  5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C).  Consequently, the Final Rules should be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, State Plaintiffs respectfully request that this Court:

1.   Issue a declaratory judgment that the Services acted arbitrarily, capriciously, contrary to law, abused their discretion and in excess of their statutory jurisdiction and authority in their promulgation of the Final Rules, in violation of the ESA and the APA;

2.      Issue a declaratory judgment that the Services acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedures required by law in their promulgation of the Final Rules, in violation of the APA;

3.      Issue a declaratory judgment that the Services acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedures required by law in their promulgation of the Final Rules, in violation of NEPA and the APA;

4.      Issue an order vacating the Services' unlawful issuance of the Final Rules so that the prior regulatory regime is immediately reinstated;

5.      Issue a mandatory injunction requiring the Services to immediately withdraw the Final Rules and reinstate the prior regulatory regime;

6.      Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

7.      Award such other relief as the Court deems just and proper.

Dated:  September 25, 2019

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
DAVID A. ZONANA
Supervising Deputy Attorney General
DAVID G. ALDERSON
Supervising Deputy Attorney General

/s/ George Torgun
GEORGE TORGUN, State Bar No. 222085
TARA MUELLER, State Bar No. 161536
ERIN GANAHL, State Bar No. 248472
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone:  (510) 879-1002
Email:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiff State of California*

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN*
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone:  (410) 576-6414
Email:  sgoldstein@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

WILLIAM TONG
Attorney General of Connecticut

/s/ Matthew I. Levine
MATTHEW I. LEVINE*
DANIEL M. SALTON*
Assistant Attorneys General
Office of the Attorney General
P.O. Box 120
55 Elm Street
Hartford, CT 06141-0120
Telephone:  (860) 808-5250
Email:  Daniel.Salton@ct.gov

*Attorneys for Plaintiff State of Connecticut*

MAURA HEALEY
Attorney General of Massachusetts

/s/ Matthew Ireland
MATTHEW IRELAND*
TURNER SMITH*
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone:  (617) 727-2200
Email:  Matthew.Ireland@mass.gov

*Attorneys for Plaintiff*
*Commonwealth of Massachusetts*

PHILIP J. WEISER
Attorney General of Colorado

/s/ Eric R. Olson
ERIC R. OLSON*
Solicitor General
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone:  (720) 508-6548
Email:  Eric.Olson@coag.gov

*Attorneys for Plaintiff State of Colorado*

KWAME RAOUL
Attorney General of Illinois

/s/ Jason E. James
JASON E. JAMES*
Assistant Attorney General
MATTHEW J. DUNN*
Chief, Environmental Enf./Asbestos Litig. Div
Office of the Attorney General,
Environmental Bureau
69 W. Washington St., 18th Floor
Chicago, IL 60602
Telephone:  (312) 814-0660
Email:  jjames@atg.state.il.us

*Attorneys for Plaintiff State of Illinois*

1    FOR THE PEOPLE OF THE STATE OF MICHIGAN

2    /s/ Nathan A. Gambill
NATHAN A. GAMBILL*
3    (Michigan Bar No. P75506)
Assistant Attorney General
4    Environment, Natural Resources,
and Agriculture Division
5    P.O. Box 30755
Lansing, MI 48909
6    Telephone:  (517) 335-7664
Email:  gambilln@michigan.gov

7

8    *Attorney for Plaintiff the People of the State of Michigan*

9    GURBIR S. GREWAL
Attorney General of New Jersey

10

11    /s/ Lisa Morelli
LISA MORELLI*
Deputy Attorney General
12    Environmental Enforcement &
Environmental Justice
13    R.J. Hughes Justice Complex
P.O. Box 093
14    Trenton, NJ 08625
Telephone:  (609) 376-2708
15    Email: Lisa.Morelli@law.njoag.gov

16    *Attorneys for Plaintiff State of New Jersey*

17    LETITIA JAMES
Attorney General of New York

18

19    /s/ Mihir A. Desai
MIHIR A. DESAI*
Assistant Attorney General
20    TIMOTHY HOFFMAN*
Senior Counsel
21    JENNIFER NALBONE
Environmental Scientist
22    Office of the Attorney General
Environmental Protection Bureau
23    28 Liberty Street, 19th Floor
New York, NY 10005
24    Telephone:  (212) 416-8478
Email:  mihir.desai@ag.ny.gov

25    *Attorneys for Plaintiff State of New York*

26

27

28

---

AARON D. FORD
Attorney General of Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN*
(Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
Telephone:  (702) 486-3420
Email:  HStern@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM*
Assistant Attorney General
ANNE MINARD*
Special Assistant Attorney General
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 717-3520
E-Mail: wgrantham@nmag.gov

*Attorneys for Plaintiff State of New Mexico*

JOSHUA H. STEIN
Attorney General of North Carolina

/s/ Amy L. Bircher
AMY L. BIRCHER*
Special Deputy Attorney General
SCOTT A. CONKLIN*
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
Telephone:  (919) 716-6400
Email:  abircher@ncdoj.gov
Email:  sconklin@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

1   ELLEN F. ROSENBLUM                          JOSH SHAPIRO
    Attorney General of Oregon                  Attorney General of Pennsylvania
2
    /s/ Paul Garrahan                           /s/ Aimee D. Thomson
3   PAUL GARRAHAN*                              AIMEE D. THOMSON*
    Attorney-in-Charge                          Deputy Attorney General
4   STEVE NOVICK*                               ANN R. JOHNSTON
    Special Assistant Attorney General          Senior Deputy Attorney General
5   Natural Resources Section                   Office of Attorney General
    Oregon Department of Justice                1600 Arch Street, Suite 300
6   1162 Court Street NE                        Philadelphia, PA 19103
    Salem, OR 97301-4096                        Telephone:  (267) 940-6696
7   Telephone:  (503) 947-4593                  Email:  athomson@attorneygeneral.gov
    Email: Steve.Novick@doj.state.or.us
8                                               *Attorneys for Plaintiff*
    *Attorneys for Plaintiff State of Oregon*   *Commonwealth of Pennsylvania*
9
    PETER F. NERONHA                            THOMAS J. DONOVAN, JR.
10  Attorney General of Rhode Island            Attorney General of Vermont

11  /s/ Gregory S. Schultz                      /s/ Ryan P. Kane
    GREGORY S. SCHULTZ*                         RYAN P. KANE*
12  Special Assistant Attorney General          Office of the Attorney General
    Office of the Attorney General              109 State Street
13  150 South Main Street                       Montpelier, VT 05602
    Providence, RI 02903                        Telephone:  (802) 828-3171
14  Telephone:  (401) 274-4400                  Email:  ryan.kane@vermont.gov
    Email:  gschultz@riag.ri.gov
15                                              *Attorneys for Plaintiff State of Vermont*
    *Attorneys for Plaintiff State of Rhode Island*
16
    ROBERT W. FERGUSON                          KARL A. RACINE
17  Attorney General of Washington             Attorney General of the
                                                District of Columbia
18  /s/ Aurora Janke
    AURORA JANKE*                               /s/ Sarah Kogel-Smucker
19  Special Assistant Attorney General          SARAH KOGEL-SMUCKER*
    Washington Attorney General's Office Counsel Special Assistant Attorney General
20  for Environmental Protection                Public Advocacy Division
    800 5th Ave Ste. 2000 TB-14                 Office of the Attorney General
21  Seattle, Washington 98104-3188              441 4th Street, N.W., Suite 630 South
    Telephone:  (206) 233-3391                  Washington, D.C. 20001
22  Email:  Aurora.Janke@atg.wa.gov             Telephone:  (202) 724-9727
                                                Email: sarah.kogel-smucker@dc.gov
23  *Attorneys for Plaintiff State of Washington*
                                                *Attorneys for Plaintiff District of Columbia*
24

25

26

27

28

1
               GEORGIA M. PESTANA
               Acting Corporation Counsel
2
               for the City of New York

3
               /s/ Antonia Pereira
               ANTONIA PEREIRA*
4
               Assistant Corporation Counsel
               New York City Law Department
5
               Environmental Law Division
               100 Church Street, Room 6-140
6
               New York, New York 10007
               Telephone: (212) 356-2309
7
               Email: anpereir@law.nyc.gov

8
               *Attorneys for Plaintiff City of New York*

9

10
               *\*Application for admission pro hac vice forthcoming*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

54