UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>DAVID BERNHARDT, et al.,<br><br>　　　　Defendants. | Case No. 19-cv-06013-JST<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: ECF No. 46 |

Before the Court is U.S. Secretary of the Interior David Bernhardt, Secretary of Commerce Wilbur Ross, U.S. Fish and Wildlife Service, and National Marine Fisheries Service ("Federal Defendants")'s motion to dismiss. ECF No. 46. The Court will deny the motion.

I.　　BACKGROUND[1]

　　A.　　**Endangered Species Act**

"The Endangered Species Act ("ESA") was enacted in 1973 to prevent the extinction of various fish, wildlife, and plant species." *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003). The Act aims "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA represents "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978). It reflects "a conscious decision by Congress to give endangered species

---

[1] In reviewing Federal Defendants' Rule 12(b)(1) motion to dismiss for lack of jurisdiction, the Court takes the allegations in the plaintiffs' complaint as true. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

priority over the 'primary missions' of federal agencies." *Id.* at 185. "The responsibility for administration and enforcement of the ESA lies with the Secretaries of Commerce and Interior, who have delegated the responsibility to the [National Marine Fisheries Service ("NMFS")] with respect to marine species, and to the Fish and Wildlife Service ("FWS") with respect to terrestrial species." *Turtle Island*, 340 F.3d at 973-74 (citing 50 C.F.R. § 402.01).

To accomplish its purposes, the Act "sets forth a comprehensive program to limit harm to endangered species within the United States." *California ex rel. Lockyer v. U.S. Dept. of Agriculture*, 575 F.3d 999, 1018 (9th Cir. 2009). Section 4 of the Act requires NMFS and FWS (collectively "the Services") to identify endangered and threatened species and designate their "critical habitats." 16 U.S.C. 1533(a)(1)-(3). Section 7 "imposes a procedural duty on federal agencies to consult with either the [NMFS] or the FWS before engaging in a discretionary action, which may affect listed species."[2] *Turtle Island*, 340 F.3d at 974 (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.01(b)). This consultation procedure aims to allow the Services "to determine whether the federal action is likely to jeopardize the survival of a protected species or result in the destruction of its critical habitat, and if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Id.* (citing 16 U.S.C. § 1536(b)(3)(A)). Section 9 prohibits the "take" (e.g. killing, harassing, harming, or collecting) of listed endangered fish and wildlife species and prohibits other actions with respect to listed endangered plant species. 16 U.S.C. §§ 1532, 1538. Section 4(d) authorizes the extension of Section 9 prohibitions to threatened species. *Id.* § 1533(d).

B.   **Regulatory History**

During the 1980s, the Services adopted joint regulations for implementation of Sections 4 and 7 of the ESA. *See, e.g.,* 45 Fed. Reg. 13,010 (Feb. 27, 1980); 49 Fed. Reg. 38,900 (Oct. 1, 1984); 51 Fed. Reg. 19,926 (June 3, 1986). "The Services have not substantially amended these regulations since that time, although the Services adopted minor amendments to the processes for

---

[2] "When the acting agency is either the [NMFS] or the FWS, the obligation to consult is not relieved, instead, the agency must consult within its own agency to fulfill its statutory mandate." *Turtle Island*, 340 F.3d at 974 (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.01(b)).

listing species, designating critical habitat, and conducting section 7 consultations in 2015 and 2016." ECF No. 28 ¶ 106; *see* 81 Fed. Reg. 7,439 (Feb. 11, 2016); 81 Fed. Reg. 7,214 (Feb. 11, 2016); 80 Fed. Reg. 26,832 (May 11, 2015).

"On July 25, 2018, the Services published three separate notices in the Federal Register proposing to revise several key requirements of the ESA's implementing regulations." ECF No. 28 ¶ 107; 83 Fed. Reg. 35,193 (July 25, 2018) ("Proposed Listing Rule"); 83 Fed. Reg. 35,178 (July 25, 2018) ("Proposed Interagency Consultation Rule"); 83 Fed. Reg. 35,174 (July 25, 2018) ("Proposed 4(d) Rule") (collectively, the "Proposed Rules"). The three proposed regulatory changes sought to carry out Executive Order 13777, which directs federal agencies to eliminate allegedly "unnecessary regulatory burdens." ECF No. 28 ¶ 107; 82 Fed. Reg. 12,285 (Mar. 1, 2017). "The Services characterized the Proposed Rules as changes to assist and increase clarity and efficiency in implementation of the ESA." *Id.* After accepting comments on the proposed revisions, *id.* ¶ 108, the Services issued three Final Rules: (1) the Listing Rule, 84 Fed. Reg. 45,020; (2) the Interagency Consultation Rule, 84 Fed. Reg. 44,976; and (3) the 4(d) Rule, 84 Fed. Reg. 44,753. *Id.* ¶¶ 108-109.

### C. Procedural Background

On September 25, 2019, the State of California, Commonwealth of Massachusetts, State of Maryland, State of Colorado, State of Connecticut, State of Illinois, People of the State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin, District of Columbia, and City of New York (collectively "State Plaintiffs") brought this action to challenge the Services' decision to promulgate the Final Rules which allegedly "undermine key requirements of the [ESA]."[3] ECF No. 1; ECF No. 28 ¶ 1. The operative first amended complaint ("FAC") alleges that the Services' issuance of the Final Rules violates the ESA, the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA"). *Id.* ¶ 2. In

---

[3] The State of Minnesota and State of Wisconsin were not initially parties to this lawsuit but were added as plaintiffs in the first amended complaint. ECF No. 28 ¶ 1.

3

particular, the FAC alleges that in promulgating the Final Rules the Services (1) "acted in a manner that constituted an abuse of discretion, is not in accordance with law, and is in excess of the Services' statutory authority, in violation of the ESA and the APA," 16 U.S.C. §§ 1531, 1532, 1533, 1536; 5 U.S.C. § 706; (2) "acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and failed to follow the procedures required by law, in violation of the APA," 5 U.S.C. §§ 553, 706; and (3) failed "to take a 'hard look' at the environmental impacts of the Final Rules, and their determination that the Final Rules are subject to a categorical exclusion from NEPA, . . . contrary to the requirements of NEPA and the APA," 5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C). *Id.* ¶¶ 131-48.

On December 6, 2019, Federal Defendants moved to dismiss State Plaintiffs' FAC for lack of jurisdiction. ECF No. 46. State Plaintiffs oppose this motion, ECF No. 74, and Federal Defendants have filed a reply, ECF No. 79.

## II.   LEGAL STANDARD

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of injury in fact, causation, and redressability." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992)). A defendant may attack a plaintiff's assertion of jurisdiction by moving to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004); *see also* 5B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1350 (3d ed. 2004) ("A motion to dismiss an action under Federal Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it.")

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal

4

jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. Where, as here, defendants make a facial attack,[4] the court assumes that the allegations are true and draws all reasonable inferences in the plaintiff's favor. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted); *Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017). A court addressing a facial attack must confine its inquiry to the allegations in the complaint. *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).

## III.   DISCUSSION

Federal Defendants request that the Court dismiss Plaintiffs' Complaint because Plaintiffs lack Article III standing and the claims are not ripe for judicial review. ECF No. 46 at 2, 12. The Court rejects this request and finds that State Plaintiffs allege facts sufficient to invoke federal jurisdiction.

### A.   Standing

#### 1.   Legal Standard

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, ––– U.S. –––, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* "Where, as here, a case is at the pleading stage, the

---

[4] Defendants "move to dismiss the complaints on facial grounds." ECF No. 33 at 24.

5

plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, (1975)). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, ––– U.S. –––, 137 S. Ct. 1645, 1650 (2017) (citation omitted).

"States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Because states have "an interest independent of and behind the titles of its citizens, in all the earth and air within [their] domain," they are "entitled to special solicitude in [the] standing analysis." *Id.* at 518-20 (quoting *Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237 (1907)). A state's "well-founded desire to preserve its sovereign territory" supports standing in cases implicating environmental harms. *Id.* at 519.

### 2. Discussion

Federal Defendants argue that the FAC is insufficient to demonstrate standing, "even at the pleading stage," because State Plaintiffs do not "allege any specific *facts*" as to how they are harmed by the Final Rules. ECF No. 46 at 26. A review of State Plaintiffs' complaint, however, reveals detailed allegations that demonstrate injury-in-fact, causation, and redressability with respect to both their substantive and procedural claims.

#### a. Substantive Claim
#### i. Injury-in-Fact

State Plaintiffs allege that "the Services' adoption of the Listing Rule, the Interagency Consultation Rule, and the 4(d) Rule violates the ESA's plain language, structure, and purpose, and exceeds the scope of the Agencies' jurisdiction, authority and discretion under the ESA." ECF No. 28 ¶¶ 124-30. The FAC demonstrates several "concrete and particularized" injuries stemming from these ESA violations by detailing (1) the species and land in each state which are subject to ESA regulations, (2) the Final Rules' weakening of ESA's safeguards, and (3) the expected biological and economic harms resulting from the weakened safeguards.

First, the FAC alleges that each State Plaintiff's territories are home to hundreds of federally-listed species, designated critical habitat, federal lands, non-federal facilities, and activities subject to ESA protection and regulation. *Id.* ¶¶ 7, 19-81; *see, e.g., id.* ¶ 21 ("There are

currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters – more than any other mainland state. Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central Valley rivers and streams."); *id.* ¶¶ 43 ("Nevada has approximately 58,226,015.60 acres of federally-managed land, totaling 84.9 percent of the State's lands. The federal agencies that manage Nevada's many acres are subject to the ESA's section 7 consultation requirements.").

Second, State Plaintiffs' allege that the Final Rules "fundamentally undermine and contradict the requirements of the ESA." *Id.* ¶ 9. They do so, State Plaintiffs allege, by "unlawfully and arbitrarily . . . inject[ing] economic considerations and quantitative thresholds into the ESA's science-driven, species-focused analyses; limit[ing] the circumstances under which species can be listed as threatened; eliminat[ing] consideration of species recovery in the delisting process; expand[ing] the ESA's expressly narrow exemptions from the requirement to designate critical habitat; and severely limit[ing] when presently unoccupied critical habitat would be designated, particularly where climate change poses a threat to species habitat." *Id.* ¶ 10. The State Plaintiffs provide several examples of the ways the Final Rules achieve these effects. *See id.* ¶¶ 110-12. For one, the Final Rules "inject[] economic considerations into the ESA's science-driven, species-focused analyses by removing the statutory restriction on considering economic impacts" and "require for the first time that there be a 'reasonable certainty' that . . . unoccupied habitat will contribute to the conservation of a species and that the area currently contain one or more of those physical or biological features essential to the conservation of the species," thereby making it less likely that such critical habitat will be designated. *Id.* ¶ 110. For another, the Final Rules eliminate the so-called "Blanket 4(d) Rule," under which the FWS has extended to threatened species by default all the protections afforded to endangered plants and animals under section 9 of the ESA, 16 U.S.C. § 1538. *Id.* ¶ 112. The FAC provides many other examples, but

United States District Court
Northern District of California

these are sufficient to make the point.

Third, the FAC alleges several concrete and particularized injuries which result from these weakened protections. For instance, the alleged weakening of ESA's "substantive and procedural safeguards" will result in the "loss of biological diversity" and diminish the fish and wildlife "natural resources that could otherwise be used for present and future commercial purposes." *Id.* ¶¶ 117-18 (citing *Nat'l Ass'n of Home Builders v. Babbit*, 130 F.3d 1041, 1053 (D.C. Cir. 1997) ("Each time a species becomes extinct, the pool of wild species diminishes" which, in turn "diminish[es] a natural resource that could otherwise be used for present and future commercial purposes."); *San Luis & Delta-Mendota Water Authority v. Salazar*, 638 F.3d 1163, 1177 (9th Cir. 2011) ("[T]he ESA, including sections 7 and 9, 'bears a substantial relation to commerce.'") (citation omitted)). Because most of these "fish and wildlife resources are owned and held by the State in both a proprietary and regulatory capacity," *id.* ¶ 115, the State Plaintiffs have "alleged a particularized injury in [their] capacity as [] landowners." *Massachussets v. EPA*, 549 U.S. at 522.

State Plaintiffs also allege harm to their economic interests by asserting that, "[w]ith the Final Rules' weakening of federal protections, the responsibility for, and burden of, protecting imperiled species and habitats within State borders would fall more heavily on State Plaintiffs." *Id.* ¶¶ 119-21. This alleged "economic harm" is sufficient to establish injury-in-fact. *See California v. Azar*, 911 F.3d 558, 571-73 (9th Cir. 2018) (finding it "reasonably probable" that a federal rule exempting employers from covering contraceptive care in group health plans "will inflict economic harm to the states" because "women who lose coverage will seek contraceptive care through state-run programs or programs that the states are responsible for reimbursing"); *Air Alliance Hous. v. U.S. Envtl. Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself."); *Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) (finding that Texas "has satisfied the first standing requirement by demonstrating that it would incur significant costs" if the challenged federal program were implemented).

Federal Defendants argue that State Plaintiffs' alleged harms are "speculative and

conjectural" because the states "cannot possibly know how the Services will apply the regulation to species within their borders." ECF No. 79 at 13-16. The argument misses the mark. Contrary to Federal Defendants' assertions, a plaintiff need not show that "*every* application of the regulations will harm them" to establish injury-in-fact. *Id.* at 14. Rather, "an increased *risk* of future environmental injury constitutes injury-in-fact for purposes of standing." *US Citrus Science Counsel v. U.S. Dept. of Agriculture*, No. 1:17-cv-00680-LJO-SAB, 2017 WL 4844376, at *7 (E.D. Cal. Oct. 25, 2017) (citations omitted) (emphasis added); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947–48 (9th Cir. 2002) ("The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements.") (citation omitted); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151-52 (9th Cir. 2000) ("[A]n increased risk of harm can itself be injury in fact for standing."). "If a plaintiff faces a credible threat of harm, and that harm is both real and immediate, not conjectural or hypothetical, the plaintiff has met the injury-in-fact requirement for standing under Article III." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010).

Here, an "enhanced risk" of biodiversity loss and degradation of fish and wildlife natural resources clearly follows from the Services' alleged weakening of ESA safeguards designed to conserve hundreds of endangered and threatened species within State Plaintiffs' territories. *Cent. Delta Water Agency*, 306 F.3d at 949-950 (describing a "substantial" or "enhanced" risk as sufficient to establish injury-in-fact). This "credible threat of harm is sufficient to constitute actual injury." *Id.* at 950 (finding standing where "the risk of harm to plaintiffs' crops created by the [agency's] water management procedures is not so speculative or diffuse as to render the controversy a hypothetical one"); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 856-60 (9th Cir. 2005) (finding injury-in-fact where the U.S. Army Corps of Engineers granted a dock-construction permit and "dock extension risks increased tanker traffic and a greater potential for an oil spill," which "would cause a markedly decreased opportunity for [the nonprofit plaintiff's] members to study the ecological area, observe wildlife, and use Cherry Point for recreation."); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) (finding an "increased risk of wildfire" sufficient to afford plaintiffs standing where the Forest

Service's challenged logging plan "reduced potential wildfire fuels by 5.4%, rather than plaintiffs' preferred plan, which reduced the fuels by 14.2%").

Federal Defendants also argue that State Plaintiffs have "jumped the gun" and alleged mere "generalized grievances" by bringing facial challenges to the Final Rules. ECF No. 46 at 34. Defendants contend that plaintiffs must wait for the Services to "apply these revisions in a manner that concretely harms their interests" and causes them to suffer an injury-in-fact. *Id.* Federal Defendants' argument misstates the law. Environmental plaintiffs have standing to challenge not only species-specific decisions, but also higher-level, programmatic rules that impose or remove requirements on the application of the ESA. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 975 (9th Cir. 2003). Because declines in species populations and extinction of species is "difficult or impossible to remedy," plaintiffs need not wait until these harms occur "before challenging the government action leading to the potential destruction." *Cent. Delta Water Agency*, 306 F.3d at 950 ("[P]laintiffs need not wait until the natural resources are despoiled before challenging the government action leading to the potential destruction."). Indeed, "[t]he ability to challenge actions creating threatened environmental harms is particularly important because in contrast to many other types of harms, monetary compensation may well not adequately return plaintiffs to their original position." *Id.*

Federal Defendants argue that "FWS intends to address the level of protection [afforded to threatened species] through a species-specific rule." ECF No. 46 at 20. Thus, they contend, "[i]f FWS issues a species-specific rule concurrent with listing a new threatened species, Plaintiffs will suffer no harm from the revised 4(d) regulation whatsoever." *Id.* at 29.[5] However one construes

---

[5] In support for their argument that FWS intends to issue species-specific rules that will cause no harm to State Plaintiffs, Federal Defendants note that on "November 21, 2019 FWS listed the meltwater lednian stonefly and the western glacier stonefly as threatened species" and "concurrently issued a species-specific 4(d) rule extending Section 9 protections and prohibitions to these stoneflies." ECF No. 49 at 29-30. Notwithstanding that FWS took this step on two occasions, it will be under no obligation to extend similar protection to any species in the future under the amended regulation. Additionally, "[p]ost-filing events are not relevant to the standing inquiry." *San Luis & Delta-Mendota Water Authority v. U.S. Dept. of Interior*, 905 F. Supp. 2d 1158, 1169 (E.D. Cal. 2012) (citing *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).

10

this statement of intent, however, the fact remains that Federal Defendants would be under no obligation to extend any particular protection to a threatened species. The comprehensive protections of the Blanket 4(d) Rule would be eliminated, and "[s]pecies listed or reclassified as a threatened species after the effective date of this rule . . . would have protective regulations only if the Service promulgates a species-specific rule (also referred to as a special rule)." 83 Fed. Reg. 35175 (ellipsis added). Such a species-specific rule would contain "the applicable prohibitions and exceptions" deemed to apply to that species, *id.* at 35178, which might be fewer than all of those available under the Blanket 4(d) Rule, or even no protections at all. Also, whatever protections were included in the species-specific rule would be of uncertain duration, because "[n]otwithstanding [the Federal Defendants'] intention," the revised regulations give them "discretion to revise or promulgate species-specific rules at any time after the final listing or reclassification determination," *id.* at 35175. The Federal Defendants' statement of intention is insufficient to prevent a finding that the State Plaintiffs' have adequately alleged injury. "It would be inequitable in the extreme for us to permit one party to create a significantly increased risk of harm to another, and then avoid the aggrieved party from trying to prevent the potential harm because the party that created the risk promises that it will ensure that the harm is avoided . . . ." *Cent. Delta Water Agency*, 306 F.3d at 950 (9th Cir. 2002).

In sum, the Court concludes that the risk of harm to State Plaintiffs' natural resources and economic interests "is not so speculative or diffuse as to render the controversy a hypothetical one. Rather, the risk is sufficient to afford plaintiffs standing." *Id.* at 950.

### ii. Causation and Redressability

In order to establish causation and redressability, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant," and it must be "'likely,' as opposed to 'speculative,' that the injury will be redressed by a favorable decision." *Tyler v. Cuomo*, 236 F.3d 1124, 1131-32 (9th Cir. 2000) (quoting *Lujan*, 504 U.S. at 560-61). The Federal Defendants do not dispute the sufficiency of the State Plaintiffs' causation and redressability allegations, ECF No. 28 ¶¶ 114-23, and the Court finds that they meet both requirements. At a minimum, the Final Rules and their alleged weakening of federal protections for endangered and threatened species,

"contribute[] to [State Plaintiffs'] injuries." *Massachussets v. EPA*, 549 U.S. at 523 (internal quotation marks omitted). Furthermore, State Plaintiffs' requested relief – a declaration that the Final Rules are unlawful and vacatur of the Final Rules – would reduce or eliminate their risk of injury, thereby establishing redressability. *Id.* at 526.

### b. Procedural Claims

State Plaintiffs bring several procedural claims under NEPA and the APA. First, they allege that "the Services violated NEPA by failing to assess the environmental impacts of the Final Rules or to circulate such analyses for public review and comment." ECF No. 28 ¶¶ 13, 140-48; *see W. Watershed Project v. Kraayenbrink*, 632 F.3d 472, 494-95 (9th Cir. 2011) (applying procedural standing analysis to plaintiffs' claims that an agency violated NEPA).

Second, they allege that "the Services failed to provide meaningful opportunity to comment" in violation of APA Section 553. ECF No. 28 ¶ 138-39; *see California v. Azar*, 911 F.3d at 571-72 (applying procedural standing analysis to plaintiff's claim that defendant failed to comply with the APA's notice and comment requirement). Federal Defendants argue that Plaintiffs fail to "allege any omitted procedure set forth in APA Section 553." ECF No. 79 at 18. The assertion is incorrect. The FAC alleges that "the Services failed to provide meaningful opportunity to comment on several aspects of the Final Rules that were not included in, and are not logical outgrowths of, the Proposed Rules," and then provides examples. ECF No. 28 ¶ 138 ("These changes include but are not limited to: (i) the Listing Rule's requirement that the Secretary must determine that there is a 'reasonable certainty' that an unoccupied area will contribute to the conservation of the species and that the area currently contains one or more of those physical or biological features essential to the conservation of the species in order to be designated as critical habitat; (ii) the Interagency Consultation Rule's new definition of 'activities that are reasonably certain to occur' to require that such a conclusion be based upon 'clear and substantial information'; and (iii) the Interagency Consultation Rule's expansion of the 'environmental baseline' to include '[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify.'"). These allegations clearly challenge the Services' compliance with the

notice and comment procedures set forth in APA Section 553.  *See id.* ¶ 139 (alleging that the Services "failed to follow the procedures required by law" and citing Section 553); *id.* ¶ 95 (detailing the notice and comment procedures required under APA Sections 553(b) and (c)).

Third, State Plaintiffs allege that the Final Rules are arbitrary and capricious under the APA because the agency "failed to provide a reasoned analysis for the changes, relied on factors Congress did not intend for them to consider, offered explanations that run counter to the evidence before the Services, [] entirely overlooked important issues," and "failed to follow the procedures required by law."  ECF No. 28 ¶¶ 132-137, 139.  Defendants argue that State Plaintiffs' APA Section 706 challenges "are not 'procedural' claims subject to a procedural rights standing inquiry."  ECF No. 79 at 18.

Supreme Court jurisprudence dictates otherwise.  In *Massachusetts v. EPA*, the Supreme Court explained that Massachusetts asserted its "*procedural* right to challenge the rejection of its rulemaking petition [under the Clean Air Act] as arbitrary and capricious." 549 U.S. at 520 (emphasis added).  Notably, the Clean Air Act provision in question empowered a reviewing court to reverse agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" – the exact language found in the APA.  *Compare* 42 U.S.C. § 7607(d)(9)(A), *with* 5 U.S.C. § 706(2)(A).  The Supreme Court went on to conclude that the agency's decision was arbitrary and capricious because it "offered no reasoned explanation for its refusal to decide" the key question presented by the rulemaking petition.  *Massachusetts v. EPA*, 549 U.S. 2117, 520 (2016).  In *Encino Motorcars*, the Supreme Court reiterated that "[o]ne of the basic *procedural* requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." 136 S. Ct. at 2125 (emphasis added).  The Court then cited 5 U.S.C. § 706(2)(A) and explained that "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  *Id.*  These cases demonstrate that, at least where plaintiffs allege that an agency's action is arbitrary and capricious under § 706(2)(A) *because* of the agency's failure to follow the "basic procedural requirement" of providing a reasoned explanation, *Encino Motorcars*, 136 S. Ct. at 2121, 2125, a procedural standing analysis is appropriate.  *See also City & Cty. of San Francisco v. Whitaker*,

13

357 F. Supp. 3d 931, 942 (N.D. Cal. 2018) (holding that *Massachusetts* and *Encino Motorcars* "suggest that, at least where plaintiffs allege that an agency's action is arbitrary and capricious under § 706(2)(A) because of the agency's failure to follow the 'basic procedural requirement[ ]' of providing any reasoned explanation whatsoever . . . a procedural standing analysis is appropriate" (emphasis omitted)).

### i.  Injury-in-Fact

"To establish an injury-in-fact, a plaintiff challenging the violation of a procedural right must demonstrate (1) that he has a procedural right that, if exercised, could have protected his concrete interests, (2) that the procedures in question are designed to protect those concrete interests, and (3) that the challenged action's threat to the plaintiff's concrete interests is reasonably probable." *California v. Azar*, 911 F.3d at 570 (citing *Citizens for Better Forestry*, 341 F.3d at 969-70). To satisfy prongs one and two, "environmental plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected by" the challenged agency actions. *See Citizens for Better Forestry*, 341 F.3d at 971 ("Environmental plaintiffs seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs, . . . can establish standing without meeting all the normal standards for immediacy." (internal quotation marks omitted); *see W. Watersheds Project*, 632 F.3d at 485 ("We have described the concrete interest test as 'requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact.'" (quoting *Citizens for Better Forestry*, 341 F.3d at 971)).

State Plaintiffs' alleged procedural harms are sufficient to demonstrate a cognizable injury-in-fact. First, the FAC establishes a geographical nexus between the State Plaintiffs and the locations subject to the Final Rule by alleging facts about the species, critical habitats, facilities, and projects within each state which are subject to the revised regulations. *See* ECF No. 28 ¶¶ 19-81. *See W. Watersheds Project*, 632 F.3d at 485 (finding that a geographical nexus "established a concrete interest sufficient to pursue [plaintiffs'] NEPA claim"). Second, Plaintiffs' allegations establish a reasonable probability of the Final Rules' threat to their concrete interest in conserving their natural resources. As discussed above, an "enhanced risk" of biodiversity loss and

degradation of States Plaintiffs' fish and wildlife natural resources clearly follows from the Final Rules' weakening of ESA regulations. *See Citizens for Better Forestry*, 341 F.3d at 974-75 (finding that plaintiffs "suffered a cognizable injury in fact" sufficient to confer standing over their NEPA challenge because "decreased substantive national rules will likely result in less environmental protection at the regional and site-specific levels"); *Mountain States Legal Found*, 92 F.3d at 1234 (finding an "increased risk of wildfire" sufficient to afford plaintiffs standing where the Forest Service's challenged logging plan "reduced potential wildfire fuels by 5.4%, rather than plaintiffs' preferred plan, which reduced the fuels by 14.2%"). Third, it is reasonably probable that the alleged weakening of federal protections will result in "economic harm" to State Plaintiffs by shifting a greater responsibility for, and burden of, protecting imperiled species and habitats to the states. *See California v. Azar*, 911 F.3d at 571-73 (finding it "reasonably probable" that a federal rule exempting employers from covering contraceptive care in group health plans "will inflict economic harm to the states" because "women who lose coverage will seek contraceptive care through state-run programs or programs that the states are responsible for reimbursing"). Therefore, State Plaintiffs have established a procedural injury-in-fact.

Federal Defendants cite *Summers v. Earth Institute* for the proposition that State Plaintiffs must challenge a "concrete application" of the Final Rules rather than bringing a facial challenge. ECF No. 79 at 8-12 (citing 555 U.S. 488, 494 (2009)). In *Summers*, the plaintiff conservation groups challenged regulations promulgated by the U.S. Forest Service, as well as the application of those regulations to a specific salvage project in Sequoia National Forest – the Burnt Ridge Project. *Id.* at 490-91. After the "parties settled their differences" with respect to plaintiffs' as-applied challenge, plaintiffs continued to challenge the "regulation in the abstract." *Id.* at 494. They attempted to demonstrate a procedural injury by relying on a single affidavit which failed to identify any connection between the areas that plaintiffs used and the sites subject to the challenged regulations. *See id.* 495 (The affidavit asserted that a member of the conservation groups "had suffered injury in the past from development on Forest Service land," "has visited many national forests," and "plans to visit several unnamed national forests in the future."). The Supreme Court found that plaintiffs' alleged "deprivation of a procedural right" was insufficient to

15

create Article III standing "without some concrete interest that is affected by the deprivation." *Id.* 496.

Unlike the plaintiffs in *Summers*, State Plaintiffs assert detailed allegations regarding their environmental and economic interests affected by the Final Rules. They also identify particular species and lands within each state which are subject to the challenged regulations. *See, e.g., id.* ¶ 21 ("There are currently over 300 species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland state. Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline, the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert, the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests, as well as two different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and their spawning, rearing, and migration habitat in the Bay-Delta and Central Valley rivers and streams."); *id.* ¶¶ 43 ("Nevada has approximately 58,226,015.60 acres of federally-managed land, totaling 84.9 percent of the State's lands. The federal agencies that manage Nevada's many acres are subject to the ESA's section 7 consultation requirements."). State Plaintiffs, therefore, do not challenge the Final Rule "in the abstract." *Summers*, 555 U.S. at 494. Rather, they demonstrate both "deprivation of a procedural right" and "concrete interest[s] that [are] affected by the deprivation." *Id.* at 496.

### ii.     Causation and Redressability

"'[T]he causation and redressability requirements are relaxed' once a plaintiff has established a procedural injury." *California v. Azar*, 911 F.3d at 573 (quoting *Citizens for Better Forestry*, 341 F.3d at 975). Both requirements are met here.[6] "The injury asserted is traceable to the agencies' issuing the [Final Rules] allegedly in violation of the APA's [and NEPA's] requirement[s]." *Id.*; *see also Citizens for Better Forestry*, 341 F.3d at 975 ("There is no dispute about causation in this case, because this requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant.").

---

[6] As noted above, the FAC alleges causation and redressability, ECF No. 28 ¶¶ 114-23, and Federal Defendants do not dispute the sufficiency of these allegations.

16

Moreover, it is possible that the Services' decision to promulgate the Final Rules could have been influenced if they had taken a "hard look" at the environmental impacts of the rules, provided a reasoned analysis for the revisions, or provided meaningful opportunity to comment. *See California v. Azar*, 911 F.3d at 571 ("The plaintiff need not prove that the substantive result would have been different had he received proper procedure; all that is necessary is to show that proper procedure *could* have done so."); *Citizens for Better Forestry*, 341 F.3d at 976 ("It is probable that if USDA had allowed Citizens to participate in its environmental review at some point, or had complied with the ESA formal consultation requirement, this could have influenced its decision to promulgate the 2000 Plan Development Rule.").[7]

### B. Ripeness

#### 1. Legal Standard

The ripeness doctrine is "designed to ensure that courts adjudicate live cases or controversies and do not "issue advisory opinions [or] declare rights in hypothetical cases." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). Because the ripeness doctrine derived "both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," the inquiry "has often involved both a constitutional and a prudential component." *Safer Chems., Healthy Families v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (internal quotation marks and citations omitted).

"To satisfy the constitutional ripeness requirement, a case 'must present issues that are definite and concrete, not hypothetical or abstract.'" *Id.* (quoting *Bishop*, 863 F.3d at 1153). "[C]onstitutional ripeness is often treated under the rubric of standing because 'ripeness coincides squarely with standing's injury in fact prong.'" *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (quoting *Bishop*, 863 F.3d at 1153). The prudential ripeness inquiry is "guided by two overarching considerations: the fitness of the issues for judicial decision and the hardship to the

---

[7] The FAC names several State Plaintiffs. The Court notes that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum For Academic and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 ("[T]he presence in a suit of even one party with standing suffices to make a claim justiciable.").

parties of withholding court consideration." *Bishop*, 863 F.3d at 1154 (citing *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1141) (internal quotation marks omitted). "Prudential considerations of ripeness are discretionary." *Id.*

"[I]n 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'" *Thomas*, 220 F.3d at 1139 (quoting Gene R. Nichol, Jr., *Ripeness and the Constitution,* 54 U. Chi. L.Rev. 153, 172 (1987)); *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014). Where "the sufficiency of a showing of injury-in-fact [is] grounded in potential future harms, . . . the analysis for both standing and ripeness is essentially the same." *Coons*, 762 F.3d at 891.

## 2. Discussion

Federal Defendants argue that State Plaintiffs' case is not ripe because they "bring[] facial challenges" to the Final Rules rather than waiting for each revised regulation to be applied. ECF No. 46 at 35; ECF No. 79 at 29 ("[W]ithout an instance in which these regulations have been applied, a claim against them cannot possibly be ripe."). The Court finds that State Plaintiffs' claims are both constitutionally and prudentially ripe.

Because State Plaintiffs have adequately alleged an injury in fact, their claims are constitutionally ripe. *Coons*, 762 F.3d at 897-99 (applying standing's injury-in-fact analysis to evaluate constitutional ripeness); *Thomas*, 220 F.3d ("[I]n many cases, ripeness coincides squarely with standing's injury in fact prong.").[8]

"Prudential considerations of ripeness are discretionary," *Thomas*, 220 F.3d at 1142, and the Court has "already concluded that [State Plaintiffs] have alleged a sufficient Article III injury," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). To the extent the Services would have the Court "deem [State Plaintiffs'] claims nonjusticiable on grounds that are prudential, rather than constitutional, [t]hat request is in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 167. In light of this "virtually unflagging" obligation,

---

[8] The parties agree that, in this case, "constitutional ripeness 'coincides squarely with standing's injury in fact prong.'" ECF No. 46 at 34 (quoting *Thomas*, 220 F.3d at 1138); ECF No. 74 at 24.

18

"the Court declines to refuse to adjudicate this case on prudential grounds." *Friends of Alaska Nat'l Wildlife Refugees v. Bernhardt*, 381 F. Supp. 3d 1127, 1135-36 (D. Alaska 2019) (citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014)); *see State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018) ("The Ninth Circuit has previously declined to reach prudential ripeness when constitutional ripeness is satisfied.").

## CONCLUSION

For the foregoing reasons, the Court denies Federal Defendants' motion to dismiss.

**IT IS SO ORDERED.**

Dated:  May 18, 2020

_____
JON S. TIGAR
United States District Judge