1   XAVIER BECERRA
Attorney General of California
2   DAVID A. ZONANA, State Bar No. 196029
DAVID G. ALDERSON, State Bar No. 231597
3   Supervising Deputy Attorneys General
GEORGE TORGUN, State Bar No. 222085
4   TARA MUELLER, State Bar No. 161536
ERIN GANAHL, State Bar No. 248472
5   Deputy Attorneys General
1515 Clay Street, 20th Floor
6   P.O. Box 70550
Oakland, CA  94612-0550
7   Telephone:  (510) 879-1002
Fax:  (510) 622-2270
8   E-mail:  George.Torgun@doj.ca.gov

9   *Attorneys for Plaintiff State of California*

10   *[Additional counsel listed on signature page]*

MAURA HEALEY
Attorney General of Massachusetts
MATTHEW IRELAND (*pro hac vice*)
TURNER SMITH (*pro hac vice*)
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone:  (617) 727-2200
Email:  Matthew.Ireland@mass.gov
Email:  Turner.Smith@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

11   IN THE UNITED STATES DISTRICT COURT

12   FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14   **STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF MARYLAND, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS, PEOPLE OF THE STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN, DISTRICT OF COLUMBIA, and CITY OF NEW YORK,**

Plaintiffs,

v.

**DAVID BERNHARDT, U.S. Secretary of the Interior, WILBUR ROSS, U.S. Secretary of Commerce, UNITED STATES FISH AND WILDLIFE SERVICE, and NATIONAL MARINE FISHERIES SERVICE,**

Defendants.

Case No. 4:19-cv-06013-JST

Related Cases: No. 4:19-cv-05206-JST

No. 4:19-cv-06812-JST

**STATE PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT**

Date:        July 21, 2021
Time:       2:00 p.m.
Place:      Courtroom 6, 2nd Floor
Judge:     Hon. Jon S. Tigar

1

2

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND COUNSEL OF RECORD:**

3

4

5

6

7

PLEASE TAKE NOTICE that, on July 21, 2021, at 2:00 p.m., Plaintiffs State of California, *et al*. (collectively, "State Plaintiffs"), by and through the undersigned counsel, will, and hereby do, move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Local Rule 7.  This motion will be made before the Honorable Jon S. Tigar, United States District Judge, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612.

8

9

10

11

12

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, State Plaintiffs hereby move for summary judgment on the ground that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  This motion is based on the accompanying Memorandum of Points and Authorities, the Declarations of Chad Dibble, Everose N. Schluter, Tucker Jones, and Drew Feldkirchner, and the administrative record.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................. 1

Statutory Background .................................................................................................... 1

Factual and Procedural Background ............................................................................. 3

Standing ........................................................................................................................ 6

Standard of Review ....................................................................................................... 6

Argument ...................................................................................................................... 8

I.   The Final Rules Are Contrary to the ESA. .......................................................... 8

    A.   The Listing Rule Limits Species Listings and Critical Habitat Designations in Violation of the ESA. ....................................................... 9

    B.   The Consultation Rule Undermines Federal Agencies' Section 7 Duties and the Conservation Purposes of the ESA. ................................... 14

    C.   The 4(d) Rule Is Contrary to the Conservation Purposes of the ESA ....... 21

II.  The Final Rules Are Arbitrary and Capricious under the APA. .......................... 23

    A.   The Services Failed to Adequately Explain or Justify the Final Rules as a "Clarification" or "Streamlining" of Existing Procedures ....... 23

    B.   The Services Failed to Adequately Evaluate or Justify Their Reasons for Each Individual Rule Change. .............................................. 25

        1.   The Listing Rule Arbitrarily Constrains Listing Determinations and Limits Critical Habitat Designations. ........... 25

        2.   The Services Failed to Consider Relevant Factors and Effects of the Consultation Rule, or to Provide Reasoned Explanations for Their Myriad Drastic Changes. ........................ 30

        3.   FWS Failed to Consider How the 4(d) Rule Will Place Species at Risk and Provided No Reasoned Explanation for the Abrupt Reversal of Its Decades-Long Policy ......................... 34

III. The Services Failed to Provide Notice and Comment on Aspects of the Final Rules that are not a "Logical Outgrowth" of the Proposed Rules. .............. 35

IV.  The Services Violated NEPA by Failing to Prepare an EIS on the Final Rules. ................................................................................................................... 37

    A.   The Final Rules Have a Significant Impact on the Environment and Therefore Required Preparation of an EIS. ............................................... 38

    B.   The Final Rules Are Not Eligible for a Categorical Exclusion ................ 39

Conclusion ................................................................................................................... 40

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Alaska Oil & Gas Ass'n v. Pritzker*
    840 F.3d 671 (9th Cir. 2016).................................................................27

5

6

*Alaska v. Lubchenco*
    723 F.3d 1043 (9th Cir. 2013)...............................................................10

7

*Altera Corp. & Subsid. v. Comm'r of Internal Revenue*
    926 F.3d 1061 (9th Cir. 2019)..................................................................7

8

9

*Am. Fuel & Petrochem. Mfrs. v. EPA*
    937 F.3d 559 (D.C. Cir. 2019) ...............................................................18

10

*Am. Rivers v. FERC*
    895 F.3d 32 (D.C. Cir. 2018) .................................................................19

11

12

*Anderson v. Evans*
    371 F.3d 475 (9th Cir. 2004)..................................................................39

13

14

*Cal. ex rel. Lockyer v. USDA*
    575 F.3d 999 (9th Cir. 2009)..................................................................40

15

*California v. Bernhardt*
    472 F. Supp. 3d 573 (N.D. Cal. 2020) .....................................................7

16

17

*California v. U.S. Dep't of the Interior*
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) .................................................40

18

19

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)..................................................................................6

20

*Chevron U.S.A., Inc. v. NRDC*
    467 U.S. 837 (1984)..................................................................................7

21

22

*Coal. of Concerned Citizens v. Fed. Transit Admin. of U.S. Dep't of Transp.*
    843 F.3d 886 (10th Cir. 2016)................................................................37

23

24

*Conner v. Burford*
    848 F.2d 1441 (9th Cir. 1988)..........................................................16, 17

25

*Conserv. Council for Haw. v. Babbitt*
    2 F. Supp. 2d 1280 (D. Haw. 1998) ................................................28, 30

26

*Cooling Water Intake Structure Coal. v. EPA*
    905 F.3d 49 (2nd Cir. 2018)..............................................................19, 20

27

28

1

2

### TABLE OF AUTHORITIES
#### (continued)

Page

3

4

*Cottonwood Environmental Law Center v. U.S. Forest Service*
    789 F.3d 1075 (9th Cir. 2015) ........................................................................... 20, 21

5

*Crooks v. Harrelson*
    282 U.S. 55 (1930) ......................................................................................................... 13

6

7

*Ctr. for Biolog. Divers. v. Bernhardt*
    982 F.3d 723 (9th Cir. 2020) ............................................................................... 20, 33

8

9

*Ctr. for Biolog. Divers. v. BLM*
    698 F.3d 1101 (9th Cir. 2012) ............................................................................. 19, 33

10

*Ctr. for Biolog. Divers. v. Zinke*
    900 F.3d 1053 (9th Cir. 2018) ................................................................................... 27

11

12

*Ctr. for Native Ecosystems v. Cables*
    509 F.3d 1310 (10th Cir. 2007) ................................................................................. 15

13

14

*Dep't of Com. v. New York*
    139 S. Ct. 2551 (2019) ............................................................................................ 8, 25

15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
    140 S. Ct. 1891 (2020) .................................................................................................... 7

16

17

*Empire Health Found. for Valley Hosp. Ctr. v. Azar*
    958 F.3d 873 (9th Cir. 2020) ............................................................................... 35, 36

18

19

*Encino Motorcars, LLC v. Navarro*
    136 S. Ct. 2117 (2016) ....................................................................................... 7, 8, 33

20

*Envtl. Integrity Project v. EPA*
    425 F.3d 992 (D.C. Cir. 2005) ............................................................................. 36, 37

21

22

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) .................................................................................................. 8, 25

23

24

*Fertilizer Institute v. EPA*
    935 F.2d 1303 (D.C. Cir. 1991) ................................................................................. 37

25

*Friends of Blackwater v. Salazar*
    691 F.3d 428 (D.C. Cir. 2012) ................................................................................... 11

26

27

*Gifford Pinchot Task Force v. FWS*
    378 F.3d 1059 (9th Cir. 2004) ..................................................................... 2, 10, 15

28

State Plaintiffs' Notice of Motion and Motion for Summary Judgment – Case No. 4:19-cv-06013-JST

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Greater Yellowstone Coal. Inc. v. Servheen*
　　665 F.3d 1015 (9th Cir. 2011)..................................................................................27

4

*Idaho Sporting Cong. v. Thomas*
　　137 F.3d 1146 (9th Cir. 1998)..................................................................................38

5

6

*In re Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165*
　　704 F.3d 972 (D.C. Cir. 2013) ..................................................................................22

7

*Karuk Tribe of Cal. v. U.S. Forest Serv.*
　　681 F.3d 1006 (9th Cir. 2012)................................................................16, 17, 20

8

9

*League of Wilderness Defs. v. Connaughton*
　　752 F.3d 755 (9th Cir. 2014)....................................................................................38

10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
　　463 U.S. 29 (1983) ...........................................................................................7, 23, 25

11

12

*Nat'l Wildlife Fed'n v. NMFS*
　　524 F.3d 917 (9th Cir. 2008)............................................................................ *passim*

13

14

*NRDC v. EPA*
　　279 F.3d 1180 (9th Cir. 2002)...........................................................................35, 37

15

*NRDC v. U.S. Dep't of Interior*
　　113 F.3d 1121 (9th Cir. 1997)...........................................................................12, 29

16

17

*Occidental Eng'g Co. v. INS*
　　753 F.2d 766 (9th Cir. 1985)...................................................................................6, 7

18

19

*Ocean Advocates v. U.S. Army Corps of Eng'rs*
　　402 F.3d 846 (9th Cir. 2004)....................................................................................38

20

*Or. Nat. Desert Ass'n v. BLM*
　　625 F.3d 1092 (9th Cir. 2010)..................................................................................34

21

22

*Organized Vill. of Kake v. USDA*
　　795 F.3d 956 (9th Cir. 2015)......................................................................................8

23

24

*Pac. Coast Fed'n of Fishermen's Ass'n v. NMFS*
　　265 F.3d 1028 (9th Cir. 2001)...........................................................................15, 16

25

*Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclam.*
　　426 F.3d 1082 (9th Cir. 2005)..................................................................................16

26

27

28

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Pac. Rivers Council v. Thomas*
    30 F.3d 1050 (9th Cir. 1994)......................................................................34

4

*Russello v. United States*
    464 U.S. 16 (1983) ...............................................................................9, 14

5

6

*San Luis & Delta Mendota Water Auth. v. Jewell*
    747 F.3d 581 (9th Cir. 2014)...............................................................19, 33

7

8

*San Luis & Delta-Mendota Water Auth. v. Locke*
    776 F.3d 971 (9th Cir. 2014)...............................................................23, 32

9

*Stewardship Council v. EPA*
    806 F.3d 520 (9th Cir. 2015)......................................................................40

10

11

*Sweet Home Chapter of Cmtys. for a Greater Or. v. Babbitt*
    1 F.3d 1 (D.C. Cir. 1993) ....................................................................23, 35

12

13

*Tenn. Valley Auth. v. Hill*
    437 U.S. 153 (1978) ...................................................................... *passim*

14

*Turtle Island Restor. Network v. NMFS*
    340 F.3d 969 (9th Cir. 2003).......................................................................20

15

16

*Turtle Island Restor. Network v. U.S. Dep't of Commerce*
    878 F.3d 725 (9th Cir. 2017).......................................................................16

17

18

*W. Watersheds Project v. Kraayenbrink*
    632 F.3d 472 (9th Cir. 2011)...................................................................8, 16

19

20

*Weyerhaeuser Co. v. FWS*
    139 S. Ct. 361 (2018) .................................................................................30

21

**STATUTES**

22

5 U.S.C. § 706(2) ..........................................................................................40

23

5 U.S.C. § 706(2)(A)..................................................................................7, 35

24

5 U.S.C. § 706(2)(C) ......................................................................................7

25

5 U.S.C. § 706(2)(D).......................................................................................7

26

16 U.S.C. § 1531(b) .............................................................................. *passim*

27

16 U.S.C. § 1531(c)(1).......................................................................... *passim*

28

v

**TABLE OF AUTHORITIES**
(continued)

Page

16 U.S.C. § 1532(3) ...................................................................................................2, 11, 28

16 U.S.C. § 1532(5)(A) ................................................................................................. *passim*

16 U.S.C. § 1532(6) .................................................................................................................2

16 U.S.C. § 1532(16) ...............................................................................................................3

16 U.S.C. § 1532(19) ...............................................................................................................3

16 U.S.C. § 1532(20) ...............................................................................................2, 10, 27

16 U.S.C. § 1533(a)(1) .............................................................................................2, 9, 25

16 U.S.C. § 1533(a)(2) ............................................................................................................2

16 U.S.C. § 1533(a)(3) .......................................................................................................2, 13

16 U.S.C. § 1533(a)(3)(A) ...............................................................................................11, 12

16 U.S.C. § 1533(b)(1)(A) ...........................................................................2, 9, 10, 25, 26

16 U.S.C. § 1533(b)(2) ...........................................................................................................9

16 U.S.C. § 1533(d) ......................................................................................................3, 8, 22

16 U.S.C. § 1533(f)(1)(B)(ii) ..........................................................................................11, 28

16 U.S.C. § 1536(a)-(c) .........................................................................................................16

16 U.S.C. § 1536(a)(1) ................................................................................................. *passim*

16 U.S.C. § 1536(a)(2) ..............................................................................3, 15, 17, 18, 19

16 U.S.C. § 1536(b)(3) ............................................................................................................3

16 U.S.C. § 1536(b)(3)(A) .......................................................................................3, 16, 18, 20

16 U.S.C. § 1536(b)(4) ....................................................................................................3, 18, 19

16 U.S.C. § 1536(c) ...............................................................................................................17

16 U.S.C. § 1536(c)(1) ............................................................................................................3

16 U.S.C. § 1538(a)(1) ............................................................................................................3

42 U.S.C. § 4332(2)(C) ...................................................................................................37, 38

vi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

**Page**

**LEGISLATIVE HISTORY**

H.R. REP. NO. 95-1625 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453 .................................. 12, 28

H.R. REP. NO. 97-567 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807 ............................................ 9

H.R. CONF. REP. NO. 97-835 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860 ...................... 9, 12, 26

S. REP. NO. 97-418 (1982) ......................................................................................................... 8, 9

S. REP. NO. 100-240 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2700 .............................................. 11


**FEDERAL REGULATIONS**

40 C.F.R. § 1500.1(a) ................................................................................................................... 37

40 C.F.R. § 1508.4 ....................................................................................................................... 40

40 C.F.R. § 1508.18(a) ........................................................................................................... 37, 38

40 C.F.R. § 1508.27(b)(3) ............................................................................................................ 39

40 C.F.R. § 1508.27(b)(4) ....................................................................................................... 38, 39

40 C.F.R. § 1508.27(b)(5) ............................................................................................................ 39

40 C.F.R. § 1508.27(b)(7) ............................................................................................................ 39

40 C.F.R. § 1508.27(b)(9) ............................................................................................................ 38

43 C.F.R. § 46.210 ....................................................................................................................... 40

43 C.F.R. § 46.215 ....................................................................................................................... 40

50 C.F.R. § 402.02 ........................................................................................... 14, 15, 18, 30, 31, 32

50 C.F.R. § 402.14(g)(8) ......................................................................................................... 19, 33

50 C.F.R. § 402.14(h)(3) .............................................................................................................. 20

50 C.F.R. § 402.14(l) .................................................................................................................. 6, 33

50 C.F.R. § 402.16 .................................................................................................................. 20, 34

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3    50 C.F.R. § 402.17 ...............................................................................................15, 31

4    50 C.F.R. § 424.11(b) ............................................................................................9, 25

5    50 C.F.R. § 424.11(d) ..........................................................................................10, 26

6    50 C.F.R. § 424.11(e) ..........................................................................................10, 28

7    50 C.F.R. § 424.12(a) ..........................................................................................11, 28

8    50 C.F.R. § 424.12(a)(1) ............................................................................................12

9    50 C.F.R. § 424.12(b)(2) ......................................................................................13, 29

10

11

12   **FEDERAL REGISTER NOTICES**

13   40 Fed. Reg. 44,412 (Sept. 26, 1975).........................................................................3

14   42 Fed. Reg. 32,374 (June 24, 1977) ..........................................................................3

15   43 Fed. Reg. 870 (Jan. 4, 1978) ................................................................................16

16   45 Fed. Reg. 13,010 (Feb. 27, 1980)...........................................................................3

17   49 Fed. Reg. 38,900 (Oct. 1, 1984).............................................................................3

18   51 Fed. Reg. 19,926 (June 3, 1986) ............................................................................3

19   58 Fed. Reg. 51,735 (Oct. 4, 1993)...........................................................................24

20   71 Fed. Reg. 75,924 (Dec. 19, 2006) ........................................................................11

21   73 Fed. Reg. 50,226 (Aug. 26, 2008).........................................................................11

22   74 Fed. Reg. 20,421 (May 4, 2009) ...........................................................................32

23   80 Fed. Reg. 26,832 (May 11, 2015) ...........................................................................3

24   81 Fed. Reg. 7,214 (Feb. 11, 2016).......................................................................3, 31

25   81 Fed. Reg. 7,414 (Feb. 11, 2016)............................................................3, 13, 28, 29, 30

26   82 Fed. Reg. 9,339 (Feb. 3, 2017).............................................................................4

27   84 Fed. Reg. 44,753 (Aug. 27, 2019).........................................................................5

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

84 Fed. Reg. 44,976 (Aug. 27, 2019) .............................................................................5

84 Fed. Reg. 45,020 (Aug. 27, 2019) .............................................................................5

85 Fed. Reg. 43,304 (July 16, 2020) .............................................................................37

**COURT RULES**

Fed. R. Civ. P. 56(a) .......................................................................................................6

State Plaintiffs' Notice of Motion and Motion for Summary Judgment – Case No. 4:19-cv-06013-JST

**INTRODUCTION**

State Plaintiffs challenge the Trump Administration's decision to promulgate three final rules ("Final Rules") that undermine key requirements of the federal Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531 *et seq.*  As the Supreme Court has recognized, the ESA was designed to afford species the "highest of priorities" and "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 184 (1978) ("*Hill*").  But the Final Rules—pushed by the Administration to further its political, deregulatory agenda at the expense of protected species—violate the ESA's plain language, structure, and conservation purposes by, among other infirmities, unlawfully injecting cost considerations into listing decisions, removing species recovery as a requirement for delisting, restricting designation of critical habitat for species survival and recovery, undermining the number, type, and scope of interagency consultations on federal agency actions, and removing critical protections for threatened species.  In addition, Defendants Secretary of the Interior and Secretary of Commerce, acting through the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, "the Services"), have failed to provide any reasoned basis for these rules or an opportunity to comment on new aspects of the Final Rules, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*  Finally, the Services violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, by categorically excluding the Final Rules from environmental review, despite their significant impacts on imperiled species and critical habitat.  Consequently, the Court should grant State Plaintiffs' motion for summary judgment and vacate the Final Rules.

**STATUTORY BACKGROUND**

Signed into law by President Richard Nixon, the ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Hill*, 437 U.S. at 180.  The fundamental purposes of the ESA are to "provide a means whereby the ecosystems upon which endangered ... and threatened species depend may be conserved" and "to provide a program for" the conservation of such species.  16 U.S.C. § 1531(b).  The ESA enshrines a national policy of "institutionalized caution," in recognition of the "overriding need to devote

whatever effort and resources [are] necessary to avoid further diminution of national and worldwide wildlife resources." *Hill*, 437 U.S. at 177, 194 (internal quotation omitted). Accordingly, the ESA declares "the policy of Congress that all Federal departments and agencies *shall seek to conserve* endangered … and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c)(1) (emphasis added). The Act defines "conserve" broadly as "to use and the use of all methods and procedures which are necessary to bring any endangered … or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *i.e.*, to the point of full recovery. *Id.* § 1532(3); *see Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1070 (9th Cir. 2004) ("[T]he ESA was enacted not merely to forestall extinction of species … but to allow a species to recover to the point where it may be delisted.").

The ESA achieves its overriding conservation purpose through multiple vital programs, all of which are undermined by the Final Rules. Section 4 prescribes the process for the Services to list a species as "endangered" or "threatened" based solely on the best scientific and commercial data. 16 U.S.C. §§ 1533(a)(1)-(2), (b)(1).[1] Section 4 also directs the Services to designate, "to the maximum extent prudent and determinable," specified "critical habitat" for each species concurrent with its listing, including areas both currently occupied and unoccupied by those species. *Id.* § 1533(a)(3). Specifically, the ESA defines critical habitat as:

> (i) the specific areas *within* the geographical area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; *and* (ii) specific areas *outside* the geographical area occupied by the species at the time it is listed ... upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A) (emphases added).

Section 7, in turn, requires all federal agencies to "insure" that any action they propose to authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered … or threatened species or result in the destruction or adverse modification of" any

---

[1] The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range," and a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* §§ 1532(6), (20).

designated critical habitat.  16 U.S.C. § 1536(a)(2).  If a proposed federal agency action may affect any listed species or critical habitat, the federal action agency must initiate consultation with the relevant Service.  *Id.* §§ 1536(b)(3), (c)(1).  The Service must then prepare a biological opinion to determine whether the action is likely to jeopardize any listed species or destroy or adversely modify any designated critical habitat and, if so, to provide "reasonable and prudent alternatives" to the agency action that would avoid jeopardy or adverse modification, as well as "reasonable and prudent measures … necessary or appropriate to minimize such impact," and specified "terms and conditions" for implementing those measures.  *Id.* §§ 1536(b)(3)(A), (b)(4).

Finally, section 9 prohibits any person from "taking" (e.g., killing, injuring, harassing or harming) any listed endangered fish or wildlife species and prohibits certain other actions with respect to listed endangered plant species.  16 U.S.C. §§ 1532(19), 1538(a)(1)(B), (G).  Section 4(d) authorizes the Services to extend by regulation any or all of these section 9 prohibitions to threatened species, *id.* § 1533(d), which FWS has done since the 1970s, *see* 40 Fed. Reg. 44,412, 44,414 (Sept. 26, 1975) (fish and wildlife species); 42 Fed. Reg. 32,374 (June 24, 1977) (plants).

## FACTUAL AND PROCEDURAL BACKGROUND

The Services share joint responsibility for implementing the ESA to protect and conserve imperiled species and their habitats.  *See* 16 U.S.C. § 1532(16).[2]  Currently, the ESA protects over 1,600 plant and animal species in the United States and its territories, and millions of acres of land have been designated as critical habitat to allow for species conservation, including recovery.  *See* ECF No. 105, ¶ 105.  The Services adopted joint regulations implementing sections 4 and 7 in the 1980s.  *See, e.g.*, 45 Fed. Reg. 13,010 (Feb. 27, 1980) (section 4); 49 Fed. Reg. 38,900 (Oct. 1, 1984) (section 4); 51 Fed. Reg. 19,926 (June 3, 1986) (section 7).  Since then, the Services have not substantially amended these regulations,[3] and ninety-nine percent of listed species have escaped extinction.  *See* ECF No. 105, ¶ 105.

In early 2017, however, the Trump Administration abruptly reversed course.  On January

---

[2] In general, FWS is responsible for terrestrial and inland aquatic fish, wildlife, and plant species, while NMFS is responsible for marine and anadromous species.
[3] The Services adopted minor revisions in 2015 and 2016.  *See* 80 Fed. Reg. 26,832 (May 11, 2015); 81 Fed. Reg. 7,214 (Feb. 11, 2016); 81 Fed. Reg. 7,414 (Feb. 11, 2016).

3

1   30, 2017, President Trump issued Executive Order 13,771 entitled, "Reducing Regulation and

2   Controlling Regulatory Costs," directing that "for every one new regulation issued, at least two

3   prior regulations be identified for elimination," and that any costs associated with new regulations

4   shall be offset by eliminating costs associated with at least two prior regulations.  82 Fed. Reg.

5   9,339 (Feb. 3, 2017).  Defendants made a concerted effort from "day one" to implement this

6   deregulatory agenda.  *See* ESA2_127465; ESA2_127490 (defining "deregulatory" as an action

7   "expected to have total costs less than zero").[4]  The record reflects that high-level political

8   appointees within the Department of the Interior and the White House—in particular, Defendant

9   Secretary David Bernhardt, then Deputy Secretary of the Interior (*see, e.g.,* ESA2_3466;

10  ESA2_7456; ESA2_15305; ESA2_17620);[5] Todd Willens, Assistant Deputy Secretary and later

11  Secretary Bernhardt's Chief of Staff (*see, e.g.,* ESA2_2008, ESA2_35621); and Stuart

12  Levenbach, a senior policy analyst at the White House Office of Information and Regulatory

13  Affairs ("OIRA")[6] (*see, e.g*., ESA2_2211-12; ESA2_21974)—rushed through proposals to

14  weaken the Services' listing, critical habitat designation, and consultation provisions without

15  meaningful participation by career staff (*see, e.g*., ESA2_10208 ("working under a very

16  compressed time frame from DOI leadership")).  In fact, NMFS did not even learn of Secretary

17  Bernhardt's planned changes to the rules until OIRA sought to add them to its public agenda.

18  *See, e.g*., ESA2_1543; ESA2_2035-37; ESA2_2132; ESA2_4864.  Meanwhile, the Services'

19  career staff expressed repeated frustration regarding their inability to affect the rulemaking

20  process.  *See, e.g.*, ESA2_3417; ESA2_5189; ESA2_54918.

21          Under the direction of Secretary Bernhardt and other high-level political appointees, on

22  July 25, 2018, the Services published three rules proposing to revise numerous key requirements

23  of the ESA's implementing regulations, ESA 206, 222, 227 (collectively, the "Proposed Rules"),

24  including many changes adopted at the request of industry groups in connection with the Trump

25  _____

26  [4] The administrative record is cited as "ESA [page number]" or "ESA2_[page number]," excluding
    leading zeros.

27  [5] Several months after initiating the rulemaking, Secretary Bernhardt belatedly sought an ethics
    clearance "to participate in the rulemaking process" for the Final Rules.  ESA2_52202.

28  [6] In January 2018, Mr. Levenbach was appointed Chief of Staff at the National Oceanic and
    Atmospheric Administration, which oversees NMFS.  *See* ESA2_20888-89.

Administration's Regulatory Reform Task Force.  *See, e.g.*, ESA 2204-10, 2214-27, 2230-32, 2369-73, 2425, 2572-73, 2656-58, 2668, 2713-15, 2847-54, 2869-71.  The Services explicitly characterized all three rules as "deregulatory action[s]" pursuant to Executive Order 13,771.  ESA 218, 224, 233; *see* ESA2_127465; ESA2_17358; ESA2_31865; ESA2_31883; ESA2_50391.

State Plaintiffs submitted comments on the Proposed Rules on September 24, 2018, urging the Services to withdraw the rules on the grounds that they would, if finalized, be unlawful and contrary to the ESA, APA, and NEPA.  ESA 91280.  Despite overwhelming opposition to the Proposed Rules—including from the State Plaintiffs, Plaintiffs in these related cases, and a diverse array of other interest groups—the Services issued the Final Rules on August 27, 2019. 84 Fed. Reg. 44,753 (the "4(d) Rule") (ESA 11); 84 Fed. Reg. 44,976 (the "Interagency Consultation Rule") (ESA 19); 84 Fed. Reg. 45,020 (the "Listing Rule") (ESA 62).  The Final Rules enacted many damaging, illegal changes to key ESA programs.

The <u>Listing Rule</u>: (i) eliminated the requirement that listing decisions be made "without reference to possible economic or other impacts"; (ii) added a requirement that, to list a species as "threatened," the threats and species' responses thereto must be more likely than not to occur in the "foreseeable future," based on "environmental variability" and other factors; (iii) eliminated species recovery as a basis for delisting; (iv) significantly expanded the circumstances in which the Services may find that it is "not prudent" to designate critical habitat for listed species; and (v) restricted the designation of currently unoccupied critical habitat by requiring the Services to first determine that currently occupied areas are inadequate for species conservation, and then to find with "reasonable certainty" that an area will contribute to the conservation of the species and currently contains one or more features "essential to the conservation of the species."

The <u>Interagency Consultation Rule</u>: (i) redefined the definition of "destruction or adverse modification" of critical habitat triggering section 7 consultation, to require the critical habitat to be appreciably diminished in conservation value "as a whole"; (ii) eliminated from the definition of "destruction or adverse modification" any actions that alter "physical or biological features essential to the conservation of a species"; (iii) changed the definition of "effects of the action" by limiting both the type and extent of effects of a proposed federal agency action requiring analysis

1   in the section 7 consultation process; (iv) defined "environmental baseline" to include "ongoing

2   agency activities or existing agency facilities that are not within the agency's discretion to

3   modify," thereby exempting such ongoing actions from analysis as effects of a proposed agency

4   action under section 7; (v) weakened the requirement for action agencies to ensure that mitigation

5   measures for the adverse effects of their actions are actually implemented and enforceable; (vi)

6   created a new consultation procedure allowing the Services to adopt a non-expert federal action

7   agency's biological analyses as their own biological opinions; (vii) authorized "expedited"

8   consultations in 50 C.F.R. § 402.14(l); and (viii) added an exemption from the requirement to

9   reinitiate consultation on implementation of ongoing U.S. Bureau of Land Management ("BLM")

10  land management plans when a new species is listed or new critical habitat is designated.

11       Finally, the 4(d) Rule removed the longstanding "blanket" regulatory extension of all

12  section 9 protections applicable to endangered species to all threatened species, putting newly-

13  listed threatened species at risk of extinction pending promulgation of species-specific rules.

14       Despite the Final Rules' substantive breadth and significant environmental impacts, the

15  Services determined that they are categorically excluded from NEPA review because they are of a

16  legal, technical, or procedural nature.  ESA 17, 58, 93.

17                                    **STANDING**

18       Pursuant to the Court's Order Denying Motion to Dismiss (ECF No. 98) and the

19  Declarations of Chad Dibble, Everose N. Schluter, Tucker Jones, and Drew Feldkirchner,

20  submitted herewith, State Plaintiffs have standing to bring this action because the Final Rules

21  significantly weaken protections for listed species and their habitat—resources within, held in

22  trust, and regulated by State Plaintiffs—and vacatur will remedy those harms.

23                              **STANDARD OF REVIEW**

24       Summary judgment should be granted when the record demonstrates that "there is no

25  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

26  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In deciding whether to

27  grant summary judgment in an APA review of an administrative proceeding, the district court "is

28  not required to resolve any facts."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir.

1    1985).  Rather, the court "is to determine whether or not as a matter of law the evidence in the

2    administrative record permitted the agency to make the decision it did."  *Id.*; *see California v.*

3    *Bernhardt*, 472 F. Supp. 3d 573, 590-91 (N.D. Cal. 2020).  "The APA sets forth the procedures

4    by which federal agencies are accountable to the public and their actions subject to review by the

5    courts."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020)

6    (internal quotations and citation omitted).  A "reviewing court shall ... hold unlawful and set

7    aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

8    accordance with law," "in excess of statutory jurisdiction, authority or limitations," or "without

9    observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

10       The promulgation of a final regulation is invalid as "not in accordance with law" and in

11   excess of its statutory jurisdiction and authority if the regulation is "manifestly contrary to the

12   statute."  *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984) ("*Chevron*").  In making that

13   determination, the Court first determines "whether Congress has directly spoken to the precise

14   question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as

15   well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at

16   842-43.  In this analysis, the court examines "the legislative history, the statutory structure, and

17   other traditional aids of statutory interpretation in order to ascertain congressional intent."  *Altera*

18   *Corp. & Subsid. v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (internal

19   quotations omitted).  If, however, "the statute is silent or ambiguous with respect to the specific

20   issue, the question for the court is whether the agency's answer is based on a permissible

21   construction of the statute."  *Chevron,* 467 U.S. at 843.

22       An agency action is invalid as arbitrary and capricious under the APA where the agency:

23   "has relied on factors which Congress has not intended it to consider, entirely failed to consider

24   an important aspect of the problem, offered an explanation for its decision that runs counter to the

25   evidence before the agency, or is so implausible that it could not be ascribed to a difference in

26   view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

27   *Mut. Auto. Ins. Co*. ("*State Farm*"), 463 U.S. 29, 43 (1983).  An "agency changing its course ... is

28   obligated to supply a reasoned analysis for the change."  *Id*. at 42; *see also Encino Motorcars,*

1    *LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  Thus, "even when reversing a policy after an

2    election, an agency may not simply discard prior factual findings without a reasoned

3    explanation." *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 968 (9th Cir. 2015); *see Dep't of*

4    *Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019).  Further, when an agency's "new policy rests

5    upon factual findings that contradict those which underlay its prior policy," an agency must

6    "provide a more detailed justification than what would suffice for a new policy created on a blank

7    slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  An "unexplained

8    inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and

9    capricious change." *Encino*, 136 S. Ct. at 2126 (internal quotations omitted).

10   **ARGUMENT**

11   **I.    THE FINAL RULES ARE CONTRARY TO THE ESA.**

12          Each of the Final Rules violates both the letter and purpose of ESA and collectively, they

13   wreak havoc on the national policy of "institutionalized caution" enshrined in the Act.  *See Hill*,

14   437 U.S. at 177-78.  Rather than "to halt and reverse the trend toward species extinction,

15   *whatever the cost*[,]" *id.* at 184 (emphasis added), the Final Rules expressly promote a

16   deregulatory agenda at the expense of protected species and their habitat, contrary to the Act's

17   specific requirements and overarching conservation mandate.  *See* 16 U.S.C. §§ 1531(b), (c)(1),

18   1536(a)(1).  The Listing Rule guts both the species listing and critical habitat designation

19   provisions of section 4—the "cornerstone of effective implementation of the [ESA]." S. REP. No.

20   97-418, at 10 (1982).  The Consultation Rule undermines the "explicit congressional decision"

21   reflected in Section 7—the "heart of the ESA"—"to require agencies to afford *first priority* to the

22   declared national policy of saving endangered species."  *Hill*, 437 U.S. at 185 (emphasis added);

23   *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).  And the 4(d) Rule

24   eliminates default protections "necessary to provide for the conservation" of threatened species

25   protected by the Act.  16 U.S.C. §§ 1531(b), (c)(1), 1533(d).  As detailed below, the Final Rules

26   are contrary to the plain language of the ESA and cannot stand.  But even if the Court finds

27   ambiguity in a particular provision of the ESA, the Final Rules violate any permissible

28   construction of the statute.

A.     The Listing Rule Limits Species Listings and Critical Habitat Designations in Violation of the ESA.

**"Presentation of Economic or Other Information" (50 C.F.R. § 424.11(b))**

The Final Rules violate the text and purpose of Section 4 by eliminating regulatory language in former section 424.11(b) requiring that listing decisions be made "without reference to possible economic or other impacts of such determination[s]." ESA 66, 94. As the Services admit, the ESA "does not expressly authorize compiling economic information," ESA 67; indeed, the Act expressly prohibits it. The Act clearly states that listing decisions "*shall*" be made "*solely on the basis of the best scientific and commercial data available*" regarding the status of the species, such as habitat destruction, disease, and predation.[7] 16 U.S.C. § 1533(b)(1)(A) (emphases added). While the ESA expressly authorizes consideration of economic impacts in designating critical habitat, 16 U.S.C. § 1533(b)(2), it requires listing decisions to center exclusively on biological threats to species, *id.* § 1533(a)(1), (b)(1)(A). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations and citation omitted).

The Act's legislative history confirms what its text makes clear: Congress added the term "solely" to section 4's listing provisions to emphasize that listing determinations were to be made "solely upon biological criteria[,] ... to prevent non-biological considerations from affecting such decisions," H.R. REP. No. 97-567, at 12, 19 (1982);[8] to "improve[] and expedite[]" the listing process; and to divert "the balancing between science and economics" to "the [critical habitat] exemption process," *id* at 12.[9] The Services cannot save their unlawful action with the empty promise that they will only spend time and resources "compiling," but not "considering,"

---

[7] The term "commercial data" refers to data about species trading and does "not ... authorize the use of economic considerations in the process of listing a species." H.R. REP. No. 97-567, at 20 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2820.
[8] *See also* H.R. CONF. REP. No. 97-835, at 20 (1982) ("[E]conomic considerations have no relevance to" listing determinations; S. REP. No. 97-418, at 4, 11 (1982).
[9] *See also* S. REP. No. 97-418, at 4 (1982) (1982 amendments "would ensure that ... economic analysis ... will not delay or affect decisions on listing"); *id.* at 11.

9

1    economic impact data.  ESA 66.  Whether enabling the Services to consider—or even just to

2    gather—such information in the listing process, the Listing Rule violates section 4(b)(1)(A).

3          **"Foreseeable Future" (50 C.F.R. § 424.11(d))**

4          The Listing Rule unlawfully limits the circumstances under which the Services may list

5    species as threatened by defining the phrase "foreseeable future" in the statutory definition of

6    "threatened species" (16 U.S.C. § 1532(20)) to mean that "both future threats to a species and

7    species' responses to those threats are likely" (*e.g.*, "more likely than not," ESA 63), taking into

8    account species' "life-history characteristics, threat-projection timeframes, and environmental

9    variability."  ESA 94.  But, again, the Act requires that "the best scientific and commercial data

10   available" drive listing decisions and that such decisions be designed to achieve the Act's

11   overriding goal of recovering such species and giving the benefit of the doubt to the species.  16

12   U.S.C. §§ 1531(b), (c)(1), 1533(b)(1)(A), 1536(a)(1); *Hill*, 437 U.S. at 194 (describing the ESA's

13   overarching policy of "institutionalized caution").  The Act thus does not allow the application of

14   an arbitrary, "more likely than not" (greater than 51%), quantitative standard regarding whether a

15   species will become endangered in the "foreseeable future."  Nor does the ESA authorize the

16   Services to discount evidence of significant future threats to species—such as those posed by

17   climate change—and species' anticipated responses to those threats.  *See* 16 U.S.C. §§ 1532(20),

18   1533(b)(1)(A).  The Listing Rule's new, *ultra vires* requirements unlawfully permit the Services

19   to disregard evidence of severe threats that may be less than 50% likely but that would, if

20   realized, be 100% catastrophic to a species, in violation of section 4(b)(1)(A) as well as the Act's

21   conservation purposes.  *Id.* §§ 1531(b), (c)(1), 1536(a)(1).

22         **"Recovery in Delisting" (50 C.F.R. § 424.11(e))**

23         The Listing Rule also unlawfully removes species recovery as a factor to be considered in

24   whether a species should be delisted.  ESA 63, 94-95.  As the Ninth Circuit aptly recognized, "the

25   ESA was enacted ... to allow a species *to recover* to the point where it may be delisted."  *Gifford*

26   *Pinchot Task Force*, 378 F.3d at 1070 (emphasis added); *accord Alaska v. Lubchenco*, 723 F.3d

27   1043, 1054 (9th Cir. 2013).  The Act is designed to bring endangered and threatened species "to

28   the point at which the measures provided pursuant to this [Act] are no longer necessary," *i.e.*, to

1    the point of full recovery.  16 U.S.C. § 1532(3).  And the ESA mandates that the Services

2    implement recovery plans "for the conservation and survival" of listed species which must

3    include "criteria which, *when met, would result in a determination* in accordance with the

4    provisions of this section, *that the species be removed from the list*."  *Id.* § 1533(f)(1)(B)(ii)

5    (emphases added).  In other words, the Act makes recovery a prerequisite to any delisting

6    determination—a fact Congress confirmed when it added the recovery plan requirement in 1988.

7    *See, e.g.*, S. REP. No. 100-240, at 9 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2700, 2709 (recovery

8    plans to "contain *objective, measurable criteria for removal of a species from the Act's lists*")

9    (emphasis added).  The Listing Rule's removal of species recovery from the delisting analysis

10   thus violates sections 3(3) and 4(f).

11       The Services' reliance on the D.C. Circuit's decision in *Friends of Blackwater v. Salazar,*

12   691 F.3d 428 (D.C. Cir. 2012)—which is not binding on this Court—is unavailing.  *See* ESA 76-

13   77, 230.  Notably, in that case, FWS *did* in fact rely on the recovery of the West Virginia northern

14   flying squirrel as a basis for its delisting decision.  *See Friends of Blackwater,* 691 F.3d at 431; 73

15   Fed. Reg. 50,226 (Aug. 26, 2008) (delisting "due to recovery"); 71 Fed. Reg. 75,924 (Dec. 19,

16   2006) (same).  And, indeed, the court acknowledged that the Act's recovery plan requirement

17   "can be read ... to place a binding constraint upon the Secretary's delisting analysis" and

18   confirmed that the Act's delisting "destination" turns on "recovery of the species."  *Friends of*

19   *Blackwater*, 691 F.3d at 433; *see id.* at 441-42 (Rogers, J., dissenting) (ESA is "exquisitely clear"

20   that recovery plans must be fulfilled prior to delisting).  The decision thus does not, and—in light

21   of the Act's plain text—could not, support removing recovery as a basis for delisting.

22       **"Not Prudent Determinations" (50 C.F.R. § 424.12(a))**

23       The Listing Rule unlawfully expands the limited statutorily authorized circumstances

24   allowing the Services to find that it is "not prudent" to designate critical habitat for listed species.

25   ESA 63, 95.  The Act states that the Services, when listing a species, "shall" designate "*to the*

26   *maximum extent* prudent and determinable" the habitat that "is then considered to be critical," 16

27   U.S.C. § 1533(a)(3)(A) (emphasis added), *i.e.*, "essential to the conservation of the species," *id.* §

28   1532(5)(A).  Recognizing that "the greatest [threat to species] [is] destruction of natural habitats,"

1    *Hill*, 437 U.S. at 179, Congress intended that superlative command to require designation of

2    critical habitat except in the "rare circumstances" when it "would not be beneficial to the

3    species."  H.R. Rep. No. 95–1625, at 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9467; *see*

4    *also NRDC v. U.S. Dep't of Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997) ("*NRDC v. DOI*")

5    ("The fact that Congress intended the imprudence exception to be a narrow one is clear") (citing

6    cases).[10]  The Services' prior regulations hewed to the narrow scope of the Act's "not prudent"

7    exception, identifying only two appropriately narrow qualifying circumstances where the

8    exemption would apply.  50 C.F.R. § 424.12(a)(1) (2017) (where designation would risk harm to

9    species or would not benefit species).

10          The Listing Rule, however, turns the narrow statutory "not prudent" exception into the new

11   norm with an amorphous, unlawful list of circumstances under which critical habitat designation

12   can be deemed "not prudent."  For example, the new exception in section 424.12(a)(1)(ii)—where

13   "threats to the species' habitat stem solely from causes that cannot be addressed through

14   management actions resulting from [section 7] consultation"—conflates the ESA's distinct

15   requirements for critical habitat designation and interagency consultation, 16 U.S.C.

16   §§ 1532(5)(A), 1533(a)(3)(A), 1536(a)(1), and unlawfully authorizes the Services to evade their

17   designation duty based solely on the projected efficacy of later consultations—an authority

18   contemplated nowhere in the Act.  Similarly, the new exception in section 424.12(a)(1)(iii) allows

19   the Services to evade the statute's plain command by claiming critical habitat designation affords

20   only "negligible conservation value" to the species—*i.e.*, that it is not "beneficial enough"—

21   turning on its head Congress's clear intent that designation occur except in "rare circumstances"

22   when designation "would *not be* beneficial to the species."  H.R. Rep. No. 95-1625, at 17 (1978),

23   *reprinted in* 1978 U.S.C.C.A.N. 9453, 9467 (emphasis added); *cf. NRDC v. DOI*, 113 F.3d at

24   1126 ("By expanding the imprudence exception to encompass all cases in which designation

25   would fail to control 'the *majority* of land-use activities occurring within critical habitat,' ... the

26   Service contravenes the clear congressional intent that the imprudence exception be a rare

27

28   ───────────────
     [10] *See also* H.R. Conf. Rep. No. 97-835, at 24 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2865
     ("limited" exemption applies only where "designation would identify the location of the species").

1   exception").  And, perhaps most problematic, the new exception in section 424.12(a)(1)(v) gives

2   the Services vague and unfettered discretion to avoid critical habitat designation if "the Secretary

3   otherwise determines that designation of critical habitat would not be prudent."  The Services'

4   vast expansion of the Act's intentionally narrow "not prudent" exception plainly violates section

5   4(a)(3)(A) and Congressional intent.

6       **"Unoccupied Critical Habitat" (50 C.F.R. § 424.12(b)(2))**

7       The Listing Rule unlawfully provides that the Services may only designate unoccupied

8   habitat after determining that occupied areas "would be inadequate to ensure the conservation of

9   the species."  ESA 63, 95.  Section 3 of the ESA, however, expressly defines critical habitat to

10  include both "specific areas *within* the geographical area occupied by the species" at the time of

11  listing "*and* specific areas *outside* the geographical area occupied by the species."  16 U.S.C.

12  § 1532(5)(A)(i)-(ii) (emphases added); *see Crooks v. Harrelson*, 282 U.S. 55, 58, (1930) (used in

13  its "ordinary sense," conjunctive term "and" requires "not one or the other, but both"); 1A

14  Sutherland Statutory Construction § 21:14 (7th ed. 2013) ("Statutory phrases separated by the

15  word 'and' are usually interpreted in the conjunctive.").  As the Services themselves have

16  explained, there is "no specific language in the Act that requires the Services to first prove that

17  the inclusion of all occupied areas in a designation are insufficient to conserve the species before

18  considering unoccupied areas," nor any "suggestion in the legislative history that the Services

19  were expected to exhaust occupied habitat before considering whether any unoccupied areas may

20  be essential."  81 Fed. Reg. at 7,426-27.  This new limitation on the designation of unoccupied

21  habitat allows the Services to contravene the Act's core conservation purpose by forgoing

22  designation of habitat that species need to recover to prior population levels and ranges, or to

23  accommodate species migration spurred by, for example, climate change or other natural or

24  human-caused changes.  *See infra* Part I.B.

25      The Listing Rule also unlawfully requires that, in order to designate unoccupied critical

26  habitat, the Services must first determine that that there is a "reasonable certainty both that the

27  area will contribute to the conservation of the species *and* that the area contains one or more of

28  those physical or biological features essential to the conservation of the species."  ESA 95

13

1  (emphasis added).  But even the Services recognize that "the reference to 'physical or biological

2  features' in the definition of 'critical habitat' only occurs in the [subsection] addressing occupied

3  habitat."  ESA 64; *see* 16 U.S.C. § 1532(5)(A)(i).  The subsection defining unoccupied critical

4  habitat merely requires a determination that "such areas are essential for the conservation of the

5  species."  *See* 16 U.S.C. § 1532(5)(A)(ii).  "Had Congress intended to restrict" that subsection, "it

6  presumably would have done so expressly as it did in the immediately [preceding] subsection."

7  *Russello*, 464 U.S. at 23.  And, indeed, Congress's deliberate omission in its unoccupied critical

8  habitat provision makes sense, as areas currently unoccupied by a species need not currently

9  contain features essential to species conservation; what matters is the area's capacity to contribute

10 to conservation when ultimately occupied.  The Listing Rule's addition of those deliberately

11 omitted restrictions is therefore *ultra vires* and unlawful.

12  **B.    The Consultation Rule Undermines Federal Agencies' Section 7 Duties and the Conservation Purposes of the ESA.**

13  **"Destruction or Adverse Modification" of Critical Habitat (50 C.F.R. § 402.02)**

14  The Consultation Rule unlawfully revises the definition of "destruction or adverse

15 modification" of critical habitat in section 7(a)(2)—the statutory trigger for consultation and its

16 associated species and critical habitat protections—to add the requirement that the federal agency

17 action must appreciably diminish the value of the critical habitat "as a whole."  ESA 59.  Under

18 this new standard, an action's adverse effects now trigger consultation only if they "diminish the

19 conservation value of the critical habitat in such a *considerable way* that the *overall value of the*

20 *entire critical habitat designation to the conservation of the species is appreciably diminished*."

21 ESA 29 (emphases added); *see also* ESA 24 (adverse modification analysis to be performed "at

22 the scale of the entire critical habitat designation").  Thus, now, "[i]t is only when adverse effects

23 from a proposed action rise to this *considerable level* that the ultimate conclusion of 'destruction

24 or adverse modification' of critical habitat can be reached."  ESA 29 (emphasis added).

25  The Services' new "as a whole" approach to assessing impacts on critical habitat directly

26 undercuts federal agencies' and the Services' section 7 duties to "insure" no destruction or

27 adverse modification of critical habitat and to "utilize their authorities" to conserve listed species.

28

14

1    16 U.S.C. §§ 1531(b), (c)(1), 1532(5)(A), 1536(a)(1), (a)(2).  This language undermines the very

2    purpose of critical habitat by sanctioning destruction of portions or features of designated critical

3    habitat, which may not necessarily affect the *entirety* of the critical habitat designation, but which

4    are nonetheless "essential for" listed species' conservation.  *Id.* § 1532(5)(A); *see Ctr. for Native*

5    *Ecosystems v. Cables*, 509 F.3d 1310, 1321-22 (10th Cir. 2007) ("critical habitat is impaired

6    when features essential to its conservation are impaired" and "[i]t follows that critical habitat is

7    adversely modified by actions that adversely affect species' recovery").

8         The "as a whole" language further allows a federal action agency and the Services to ignore

9    site-specific, localized, and cumulative impacts on critical habitat, directly contrary to the Ninth

10   Circuit's repeated admonitions that federal agencies' consideration of such impacts is critical to

11   ensure that their section 7 duties are met.  *See Pac. Coast Fed'n of Fishermen's Ass'n v. NMFS*,

12   265 F.3d 1028, 1036-37 (9th Cir. 2001) ("*Pacific Coast I*") (NMFS was required to consider

13   aggregate effect of multiple logging projects in making Section 7 determination); *Gifford Pinchot*,

14   378 F.3d at 1075 ("Focusing solely on a vast scale can mask multiple site-specific impacts that,

15   when aggregated, do pose a significant risk to a species."); *Nat'l Wildlife Fed'n v. NMFS*, 524

16   F.3d 917, 930-31, 934-35 (9th Cir. 2008) ("*NWF v. NMFS*") (NMFS violated ESA by failing to

17   consider short-term effects of dam operations on listed salmon species).  Thus, the Services'

18   amended definition of "destruction or adverse modification" is contrary to section 7, the

19   definition of critical habitat, and the conservation purposes of the Act.

20        **"Effects of the Action" (50 C.F.R. §§ 402.02, 402.17)**

21        The Consultation Rule unlawfully restricts the definition of "effects of the action," which

22   determines the type and extent of effects that must be evaluated by both the federal action agency

23   and the Services during the section 7 consultation process.  The new definition requires that such

24   effects satisfy a new two-prong test that they: (1) would not occur "but for" the proposed agency

25   action; and (2) are "reasonably certain to occur" based on "clear and substantial information."

26   ESA 21, 59, 61.  The rule applies the heightened "reasonably certain" standard to *all* effects of the

27   proposed action, including direct, indirect, interrelated, and interdependent effects, ESA 20,

28   whereas previously, the "reasonably certain" standard applied only to indirect and cumulative

15

1    effects of the proposed action, ESA2_ 15813 (former definitions of "effects of the action" and

2    "cumulative effects").  The Consultation Rule then pronounces that effects deemed to be

3    "geographically remote" or "remote in time" from the proposed action, or that are "only reached

4    through a lengthy causal chain," do not satisfy the new "reasonably certain to occur" standard.

5    ESA 61.  Furthermore, in considering whether an effect of a proposed action is "reasonably

6    certain to occur," the action agency and the Services now may look to non-biological

7    considerations such as "past experiences," "existing plans for the activity," and applicable

8    "economic, administrative and legal requirements."  *Id*.  Finally, the preamble sanctions

9    piecemeal consultations: "a request for consultation on one aspect of a Federal agency's exercise

10   of discretion does not *de facto* pull in all of the possible discretionary actions or authorities of the

11   Federal agency."  ESA 21.

12       These significant new limitations on the analyses of the effects of a proposed agency action

13   violate both the letter and spirit of section 7 and the conservation purposes of the Act.  16 U.S.C.

14   §§ 1531(b), (c)(1), 1536(a)-(c).  Section 7 requires action agencies to consult with the Services if

15   all or any part of a proposed action "may affect any listed species or critical habitat."  *W.*

16   *Watersheds*, 632 F.3d at 495; *see* 43 Fed. Reg. 870, 871 (Jan. 4, 1978) ("Section 7's mandatory

17   directive is quite clear in requiring the initiation of consultation upon a determination that an

18   activity or program may affect a listed species or critical habitat.").  The "may affect" trigger for

19   consultation is a "relatively low threshold[,]" allowing an agency to "avoid the consultation

20   requirement only if it determines that its action will have 'no effect' on a listed species or critical

21   habitat."  *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1027 (9th Cir. 2012) (*en banc*).

22   For agency actions that "may affect" listed species or critical habitat, the Services must evaluate,

23   in a comprehensive biological opinion, the effects of the entire agency action, including short-

24   term, long-term, site-specific, regional, and cumulative effects.  16 U.S.C. § 1536(b)(3)(A); *see,*

25   *e.g.*, *Turtle Island Restor. Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 737-38 (9th Cir.

26   2017); *NWF v. NMFS*, 524 F.3d at 934-35; *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau*

27   *of Reclam.*, 426 F.3d 1082, 1090-95 (9th Cir. 2005) ("*Pacific Coast II*"); *Pacific Coast I*, 265

28   F.3d at 1035-38; *Conner v. Burford*, 848 F.2d 1441, 1453-54, 1457 (9th Cir. 1988).

1    The Consultation Rule's limit on section 7 analyses to effects that are both (1) a "but for"

2    result of the federal agency action, and (2) "reasonably certain to occur" based on a variety of

3    non-biological and unscientific factors, plainly violates section 7.  In particular, the rule allows

4    federal action agencies and the Services to narrowly define the scope of the proposed action and

5    its effects and conduct a piecemeal, limited evaluation of the action's adverse effects on listed

6    species and critical habitat, thus ignoring many of the action's true impacts, contrary to the ESA

7    and governing case law.

8    For example, the "remote in time" and "geographically remote" language could be used to

9    limit Section 7 consultation in cases where there is an "effect" on a listed species that may not be

10   immediate but warrants consideration.  For example, the operation of Federal dams on the west

11   coast produces impacts to migratory salmon populations.  Salmon travel hundreds of miles over

12   time, and mortality may result from juvenile salmon encountering powerhouses or pumps during

13   their outmigration that might not manifest until after the salmon enter the ocean.  Under the

14   Consultation Rule, Federal agencies might argue that this mortality would not count as "effects,"

15   even if likely to occur, as a result of such "remoteness."

16   The "reasonably certain to occur" requirement—which is "a stricter standard than

17   'reasonably foreseeable,'" ESA 35—likewise flouts section 7 and the ESA's overriding

18   conservation purpose, which call for a *low* threshold for adverse effects that is *maximally*

19   protective of species and habitat, 16 U.S.C. §§ 1531(b), (c)(1), 1536(a)(1); *see Karuk Tribe*, 681

20   F.3d at 1027 ("*Any possible effect* … triggers the [section 7] requirement.") (emphasis in

21   original).  Moreover, the "reasonable certainty" factors give the Services unwarranted leeway to

22   ignore climate change and resulting effects.  As discussed *infra* Part II, it is certain that climate

23   change will increasingly adversely affect listed species and habitat, although the *precise extent* of

24   these impacts is not necessarily possible to predict with certainty.[11]

25   Significantly, the D.C. Circuit recently rejected an agency's determination that is

---

[11] The "reasonable certainty" criteria also run counter to the ESA's requirement that the Services must use the "best available science" in conducting consultations and cannot defer analysis or decisions simply because the information or outcome is not "reasonably certain."  *See* 16 U.S.C. § 1536(a)(2), (c); *Conner*, 848 F.2d at 1454 ("incomplete information … does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion").

rulemaking had "no effect" based on a "no reasonable certainty" standard.  *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 597-98 (D.C. Cir. 2019).  The Court reasoned that the agency's statement that certain impacts could not be attributed:

> with reasonable certainty [to promulgation of the rule at issue] are not a "no effect" determination.  The inability to attribute environmental harms "with reasonable certainty" to the … Rule, is not the same as a finding that the … Rule "will not affect" or "is not likely to adversely affect" listed species or critical habitat.

*Id.* at 598 (internal quotations and citations omitted).  The Services' revisions to the definition of "effects of the action" are thus contrary to section 7 of the ESA, the statute's conservation purposes, and controlling case law.

**"Environmental Baseline" (50 C.F.R. § 402.02)**

Contrary to section 7, the ESA's conservation mandate, and controlling case law, the Consultation Rule allows agencies to include any "ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify" as part of the "environmental baseline."  ESA 59.  The baseline describes the condition against which the effects of a proposed agency action are measured in the section 7 consultation process.  *Id*.  This change likewise unlawfully limits both the type and extent of effects that are required to be analyzed as part of the proposed federal agency action.  It thus also limits the type and extent of reasonable and prudent alternatives and mitigation measures that must be included as part of the proposed action to avoid jeopardy and adverse modification and reduce the project's adverse effects on listed species and critical habitat.  16 U.S.C. §§ 1536(a)(2), (b)(3)(A), (b)(4).

The Ninth Circuit has expressly rejected the very approach adopted by the Consultation Rule, holding that the Services cannot minimize the effects of a federal agency action by classifying portions of that action as "ongoing" and/or "non-discretionary" and subsuming them within the environmental baseline.  In *NWF v. NMFS*, for example, the Court invalidated a NMFS biological opinion that incorporated the allegedly "non-discretionary," ongoing impacts of dam operations into the environmental baseline.  524 F.3d at 926, 928-29.  The Court reasoned that the ESA does not permit "agencies to ignore potential jeopardy risks by labeling parts of an action non-discretionary," and may not sweep "so-called 'nondiscretionary' operations into the

1    environmental baseline, thereby excluding them from the requisite ESA jeopardy analysis." *Id.*;

2    *see also San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d 581, 639-40 (9th Cir. 2014).

3            The D.C. Circuit likewise has held that FWS may not "establish[] the environmental

4    baseline without considering the degradation to the environment caused by" the ongoing

5    operation of a hydropower project, and that "attributing ongoing project impacts to the 'baseline'

6    and excluding those impacts from the jeopardy analysis" was inadequate under section 7. *Am.*

7    *Rivers v. FERC*, 895 F.3d 32, 47 (D.C. Cir. 2018); *see also Cooling Water Intake Structure Coal.*

8    *v. EPA*, 905 F.3d 49, 81 (2nd Cir. 2018) (noting that "[w]here the future operation of a regulated

9    facility depends upon the discretion of the acting agency, the continued operation of that facility

10   is not a 'past' or 'present' impact of a previous federal action" that is included in the

11   environmental baseline) (citing *NWF v. NMFS*, 524 F.3d at 930-31). The Services' inclusion of

12   the effects of ongoing agency actions in the environmental baseline is thus contrary to settled law.

13           **Non-Binding Mitigation Measures (50 C.F.R. § 402.14(g)(8))**

14           The Consultation Rule adds a new unlawful provision to section 402.14(g)(8) providing that

15   "[m]easures included in the proposed action or a reasonable and prudent alternative that are

16   intended to avoid, minimize, or offset the effects of an action … do not require any additional

17   demonstration of binding plans." ESA 60. This limits the implementation and enforcement of

18   mitigation measures designed to reduce the adverse effects of a proposed agency action on listed

19   species and critical habitat, in violation of section 7 and the Act's conservation purposes. 16

20   U.S.C. §§ 1531(b), (c)(1), 1536(a)(1), (a)(2), (b)(4). Contrary to the Services' explanation for the

21   rule, ESA 22, 45-50, mitigation measures must be binding and enforceable to ensure that: (1)

22   federal action agencies actually satisfy their obligations under sections 7(a)(1) and 7(a)(2); (2) the

23   "reasonable and prudent measures" in the incidental take statement required under section 7(b)(4)

24   are actually implemented; and (3) there are measurable triggers for reinitiation of consultation if

25   the federal agency does not comply. *See Ctr. for Biolog. Divers. v. BLM*, 698 F.3d 1101, 1115-16

26   (9th Cir. 2012) ("*CBD v. BLM*"). Accordingly, the Ninth Circuit has recognized that federal

27   agency mitigation commitments must be incorporated into the proposed action and be binding

28   and enforceable. *See id.* at 1117; *NWF v. NMFS*, 524 F.3d at 935-36. The Ninth Circuit recently

                                                    19

1   reaffirmed that requirement in *Ctr. for Biolog. Divers. v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020)

2   ("*CBD v. Bernhardt*"), holding that vague, non-specific, and non-binding mitigation measures

3   "are generally unenforceable under the ESA and thus cannot be relied upon." *Id*. at 744.  Thus,

4   the mitigation provision is contrary to section 7.

5   **Adoption of Other Agencies' Biological Analyses (50 C.F.R. § 402.14(h)(3))**

6   The Consultation Rule unlawfully amends section 402.14(h)(3)(i) to allow the Services to

7   adopt, as their own biological opinions, all or part of a federal action agency's consultation

8   initiation package.  ESA 60.  Only the Services, however, and not the federal action agency, are

9   statutorily authorized to perform a biological analysis of the effects of the action and have the

10   requisite biological expertise to do so.  16 U.S.C. § 1536(b)(3)(A); *Karuk Tribe*, 681 F.3d at 1020

11   ("[T]he purpose of consultation is to obtain the expert opinion of wildlife agencies"); *accord*

12   *Turtle Island Restor. Network v. NMFS*, 340 F.3d 969, 974 (9th Cir. 2003).  As the Second Circuit

13   has explained: "[t]he ESA requires the Services to *independently* evaluate the effects of agency

14   action on a species or critical habitat."  *Cooling Water Intake Structure Coal.*, 905 F.3d at 80

15   (emphasis added).  The rule unlawfully permits the Services to abdicate their statutory

16   consultation duty to nonexpert agencies in violation of section 7(b)(3)(A).

17   **Reinitiation of Consultation Exemptions (50 C.F.R. § 402.16)**

18   Finally, the Consultation Rule adds a new, unlawful section 402.16(b), which exempts

19   BLM from having to reinitiate consultation on a land management plan when a new species is

20   listed or new critical habitat is designated in the plan area.  ESA 60-61.  The section 7

21   consultation requirement applies on an ongoing basis to *all* federal agency actions over which the

22   agency retains discretionary involvement or control.  *Karuk Tribe,* 681 F.3d at 1024.  In making

23   that determination, the key issue is not whether the action is "complete," but whether the federal

24   agency has authority and discretion to modify its implementation of the action "for the benefit of

25   a protected species."  *Id.* at 1021; *accord Turtle Island*, 340 F.3d at 974, 977; *NWF v. NMFS*, 524

26   F.3d at 926-29 (obligation to consider effects of ongoing operations of dam, where Congress

27   specified broad goals but agency retained significant discretion as to how to achieve those goals).

28   Applying the Act's plain terms, in *Cottonwood Environmental Law Center v. U.S. Forest*

1    *Service*, 789 F.3d 1075 (9th Cir. 2015), the Ninth Circuit held that a federal agency "has a

2    continuing obligation to follow the requirements of the ESA" where it has continuing regulatory

3    authority over the action.  *Id.* at 1087.  Thus, the Court held that the U.S. Forest Service was

4    required to reinitiate consultation on a management plan where FWS had revised a previous

5    critical habitat designation to include National Forest land.  *Id.* at 1087-88.  The Court reasoned

6    that "requiring reinitiation in these circumstances comports with the ESA's statutory command

7    that agencies consult to ensure the '*continued* existence' of listed species."  *Id.* (emphasis in

8    original).  "[N]ew [critical habitat] protections triggered new obligations," the Court explained,

9    and the Forest Service could not "evade its obligations by relying on an analysis it completed

10   before the protections were put in place."  *Id*. at 1088.

11        The Services do not—and indeed cannot—contend that the BLM does not retain sufficient

12   discretionary involvement, authority, or control over land management plans to implement

13   additional protections for species and habitat upon a new listing or critical habitat designation.

14   Instead, the Services plainly admit that this rule change was designed to overrule the Ninth

15   Circuit's holding in *Cottonwood Environmental Law Center*, 789 F.3d 1075.  ESA 52-53.  But, as

16   explained above, *Cottonwood* merely applies the requirements of the ESA itself.  Consequently,

17   the new rule limiting BLM's obligations to reinitiate consultation is contrary to section 7's

18   requirement to insure no jeopardy and no adverse modification of critical habitat, as well as the

19   ESA's conservation mandate.

20        **C.**    **The 4(d) Rule Is Contrary to the Conservation Purposes of the ESA.**

21        The 4(d) Rule abandons FWS's decades-long policy of automatically extending section 9

22   protections to all newly listed threatened species, and instead leaves such species without any

23   section 9 protections unless and until FWS promulgates a species-specific section 4(d) rule.  ESA

24   11, 16.  FWS's 4(d) Rule thereby contravenes the ESA's conservation mandate and policy of

25   "institutionalized caution," *Hill*, 437 U.S. at 178, because it inevitably will result in inadequate

26   ESA protections for newly-listed threatened species.

27        Section 4(d) provides that "[w]henever any species is listed as a threatened species … , the

28   Secretary *shall issue* such regulations as he deems necessary and advisable *to provide for the*

1    *conservation* of such species," and may by regulation prohibit "with respect to any threatened

2    species" any act that is prohibited by ESA section 9 with respect to any endangered species.  16

3    U.S.C. § 1533(d) (emphases added).  FWS asserts that it will satisfy the conservation purpose of

4    the ESA and section 4(d) by promulgating protective 4(d) rules for each individual threatened

5    species at the time of their listing.  ESA 11, 13.  But FWS simply does not have the capacity or

6    resources to promulgate species-specific 4(d) rules for each individual threatened species at the

7    time of listing.  16 U.S.C. § 1533(d).  FWS's stated intention to issue species-specific rules, which,

8    indeed, may or may not any include section 9 take prohibitions, ESA 16, is belied by given the

9    agency's well-known history of significant listing decision backlogs,[12] and its increasingly limited

10   budget,[13] now further constrained by the Listing Rule's requirement to compile and present

11   economic information.  *See supra* Part I.A.

12           Rather, it is far more likely that FWS will infrequently, if not rarely, promulgate special rules

13   extending the section 9 take prohibition or other protections to newly listed or reclassified

14   threatened species.  In fact, to date, FWS has adopted species-specific rules for only about 4.5% of

15   threatened species under its jurisdiction.  ESA 76511.  And even where species-specific rules are

16   adopted, there will likely be a significant delay during which no section 9 protections are in place.

17   Without interim protections, newly listed or reclassified threatened species will face significant

18   risk of harm, and parties that put threatened species in danger would be free from any

19   consequences.  Both circumstances would upend the conservation mandate and precautionary

20   ———————————

21   [12] *See* ESA 91290 n.27 (GAO Listing Deadline Litigation Report at 5-18, reporting that 141
     lawsuits involving 1,441 species were filed between fiscal year 2005 and 2015 alleging that the

22   Services failed to take actions within the ESA's section 4 deadlines, most of which involved
     missed deadlines to act on listing petitions); ESA 76507-10 (detailing history of listing backlog

23   and noting that, from 1983 to 2014, species have waited an average of 12 years to be listed under
     the ESA); *see also In re Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165*, 704

24   F.3d 972, 975 (D.C. Cir. 2013) (describing listing backlog).

25   [13] FWS's listing budget of just over $11 million decreased by more than $7.75 million in FY 2020.
     *See* FY 2020 INTERIOR BUDGET IN BRIEF, BUREAU HIGHLIGHTS, FWS, Detail of Budget Changes, at

26   BH-67, 68, https://www.doi.gov/sites/doi.gov/files/uploads/2020_highlights_book.pdf.  The entire
     FWS budget decreased from $3.37 billion in FY 2019 to $2.93 billion in FY 2020, with only $2.85

27   billion requested for FY 2021.  *See id.*, Appendix A, Comparison of 2018, 2019, and 2020 Budget

28   Authority, FWS, p. A-5, https://www.doi.gov/sites/doi.gov/files/uploads/fy2021-bib-a0001.pdf.

1   principle enshrined in the ESA, which FWS has implemented for decades by instituting default

2   protections for threatened species to keep them from sliding further toward endangerment and

3   extinction while the details of specially tailored rules, if any, are developed.  *See* 16 U.S.C.

4   §§ 1531(b), (c)(1), 1536(a)(1); *Hill*, 437 U.S. at 178, 194.

5          FWS's claim that the 4(d) Rule's removal of section 9 protections is necessary to

6   "meaningfully recogniz[e]" the statutory distinction between endangered and threatened species

7   rings hollow.  ESA 15.  The D.C. Circuit already has rejected arguments that FWS's prior 4(d)

8   "blanket" regulatory extension of all section 9 protections to newly-listed threatened species

9   impermissibly blurs the statutory distinction between endangered and threatened species.  *See*

10  *Sweet Home Chapter of Cmtys. for a Greater Or. v. Babbitt*, 1 F.3d 1, 6-8 (D.C. Cir. 1993)

11  (finding FWS's former blanket rule was reasonable interpretation of the ESA).

12  **II.    THE FINAL RULES ARE ARBITRARY AND CAPRICIOUS UNDER THE APA.**

13         In addition to violating the ESA's statutory requirements, the Final Rules fail to meet the

14  basic standards for lawful agency rulemaking under the APA.  *See State Farm*, 463 U.S. at 42-43.

15  The Services' justifications lack evidentiary support and are belied by the administrative record,

16  which demonstrates that the Final Rules were a rushed, politically-driven effort to reward industry

17  groups and implement the Trump Administration's nationwide deregulatory agenda, in deliberate

18  disregard of impacts on species and habitat that Congress mandated the Services to consider.

19  Accordingly, the Final Rules must be invalidated as arbitrary and capricious under the APA.

20         **A.    The Services Failed to Adequately Explain or Justify the Final Rules as a
                   "Clarification" or "Streamlining" of Existing Procedures.**

21         As their overarching rationale, the Services repeatedly attempt, but utterly fail, to justify

22  their significant, substantive changes to their longstanding implementing regulations as an effort to

23  "clarify," "streamline," or "simplify" their procedures.  *See, e.g.*, ESA 17, 19, 58, 62, 93.  The

24  Services have failed to support that purported rationale with any evidence identifying specific prior

25  procedures in need of clarification or streamlining, or any specific alleged problems they were

26  trying to solve.  Nor have the Services provided evidence that the Final Rules will in fact make

27  their procedures more streamlined or efficient.  *See San Luis & Delta-Mendota Water Auth. v.*

28

State Plaintiffs' Notice of Motion and Motion for Summary Judgment – Case No. 4:19-cv-06013-JST

1    *Locke*, 776 F.3d 971, 998 (9th Cir. 2014) (agency must "consider all relevant factors and offer an

2    explanation for its conclusion that is grounded in the evidence").  Indeed, despite the fact that each

3    of the Final Rules is "significant" under Executive Order 12,866, ESA 16, 57, 92,[14] and despite

4    OIRA's repeated requests for a Regulatory Impact Analysis ("RIA") required for significant

5    rulemakings, ESA2_23317, ESA2_27641, ESA2_27655, ESA2_28962, the Services failed to

6    prepare or release to the public any RIA or other cost-benefit assessment of the Final Rules.

7         Contrary to the Services' proffered rationale, the record reflects that the Final Rules were

8    rushed through by high-level political appointees within the Department of the Interior—including,

9    in particular, Secretary Bernhardt[15]—solely to reduce the ESA's alleged regulatory burdens at the

10   behest of regulated industry.  *See, e.g.*, ESA 2204-10, 2214-27, 2230-32, 2369-73, 2425, 2572-73,

11   2656-58, 2668, 2713-15, 2847-54, 2869-71.  The Services themselves admit that each of the Final

12   Rules "is an Executive Order 13,771 deregulatory action."  ESA 16, 57, 92; *see also* ESA2 17358

13   (identifying Listing Rule and Consultation Rule as "Upcoming EO 13771 Deregulatory" Actions).

14   And the record further demonstrates that NMFS was not even aware that the Final Rules were

15   being developed by Interior until OIRA sought to add the rules to its Unified Regulatory Agenda,[16]

---

16   [14] *See* Executive Order 12,866, §§ 3(f)(1), 6(a)(3)(C), 58 Fed. Reg. 51,735, 51,738, 51,741 (Oct. 4,

17   1993).

18   [15] *See, e.g.*, ESA2_10208 ("working under a very compressed time frame from DOI leadership");
     ESA2_2120 ("DOI wants regs out in January which would mean we would all have to write these

19   in December"); ESA2_2364-65 ("I have suggested that the Spring agenda would be the better
     option, but David [Bernhardt] and Todd [Willens] said DOI is adamant that it be listed in the Fall

20   agenda. I suspect that is driven by Secretary Zinke"); ESA2_3466 ("High level folks at DOI to
     attend (Bernhardt) and from what I've heard they will direct staff as to what they want changed");

21   ESA2_4865 (regulatory drafting meeting agenda from David Bernhardt); ESA2_5153 ("fast
     tracking already happening"); ESA2_5239 (noting "very tight timeline"); ESA2_7456 ("So the
     push is coming from DOI (It is my understanding that this is coming from David Bernhardt)");

22   ESA2_15305 ("At the request of the DOI Deputy Secretary, the agencies are trying to prepare two
     proposed rules to submit to OMB by the end of January"); ESA2_21974 ("David and Stu

23   discussed those comments this weekend, and the attached reflects their agreement on how to
     proceed with the 402 and 424 rules").

24

25   [16] *See, e.g.,* ESA2_1544 ("I'm truly confused about Stu's behavior on this one.  He knows these
     are joint regulations and that we are equal partners with DOI on implementing this work");

26   ESA2_1557 ("OIRA flagged that there are a couple of de-regs that FWS is planning for in regards
     to its consultation regulations and its listing/CH designation regs. I would guess that at least the

27   latter is a joint regulation with NMFS? If so, have we heard about this yet?"); ESA2_2175 (noting
     "DOI's desire to list (and have us list) proposed changes to ESA rules on the unified agenda,
     without discussing with us the substance of those changes"); ESA2_2132 ("Stu [Levenbach] - we

28

---

24

1    and that career staff expressed repeated frustration regarding their inability to affect the rushed

2    rulemaking process.[17]

3        Simply put, nothing in the record supports the Services' pretextual claim that the Final Rules

4    aimed at clarifying or streamlining existing procedures.  *Cf. New York*, 139 S. Ct. at 2575

5    (rejecting Secretary of Commerce's "sole stated reason" for adding citizenship question to census

6    where "evidence tells a story that does not match the Secretary's explanation for his decision" and

7    Secretary's "sole stated reason . . . seems to have been contrived").

8        **B.    The Services Failed to Adequately Evaluate or Justify Their Reasons for**
         **Each Individual Rule Change.**

9
10   The Services also arbitrarily ignored many important consequences of each individual rule

11   change on listed species and their habitat, and failed to provide an adequate justification for each

12   change, let alone the "more detailed justification" required for contradicting their prior policies or

13   approach.  *Fox*, 556 U.S. at 515.

14       **1.    The Listing Rule Arbitrarily Constrains Listing Determinations and**
            **Limits Critical Habitat Designation.**

15       **"Presentation of Economic or Other Information" (50 C.F.R. § 424.11(b))**

16   The Listing Rule arbitrarily adds economic impact analyses to the listing process without

17   any reasoned basis.  ESA 66, 94.  First, by injecting economic considerations into the biological-

18   based listing process, the Services relied on factors Congress did not intend for them to consider

19   and entirely "failed to consider important aspects of the problem" at issue—determining whether

20   a species is in fact biologically threatened based on the best available existing science.  *See State*

21   *Farm*, 463 U.S. at 43; *see also* 16 U.S.C. §§ 1533(a)(1), (b)(1)(A).  It defies reason that the

22   Services would go to significant efforts to compile—and then entirely ignore—economic

23   information, as they insist they will do to justify their evasion of the ESA's plain bar on

24   considering the economic impacts of listing, *supra* Part I.A.  ESA 66-68.  But, even taking the

25   _____

26   still have not received any materials from DOI on these rules so we are not exactly sure what
     actions are being proposed").

27   [17] *See, e.g.*, ESA2_3417 (FWS "would likely have no ability to stop/modify any of this");
     ESA2_54918 ("Given how the proposed regs played out, its unlikely internal comments will have
28   much influence in developing any final regulations").

1    Services at their word, they fail to consider how devoting substantial additional time and

2    resources to compile and present such information will not further delay their notoriously

3    backlogged listing decisions and consequently harm at-risk species.  *See supra* note 12.  Worse

4    still, the Services expressly decline to provide any "framework or guidelines" for assessing and

5    presenting economic impacts, ESA 68, thus not only failing to consider, but also affirmatively

6    obscuring, the true impact of their new process on the Act's core requirements.

7         Second, the Services offer no reasoned basis for their drastic, unlawful change.  The

8    ultimately futile effort of preparing and presenting economic impact information would plainly

9    undermine the Services' proffered reason for promulgating the Listing Rule to "streamline" the

10   regulations, ESA 93, inevitably delaying listing decisions notwithstanding their purported, but

11   unsupported, "inten[t]" to comply with court-ordered listing deadlines, ESA 68.  Nor can the

12   Services justify the change—over the objections of "most commenters," ESA 65—on the basis of

13   an alleged interest in "increased transparency" from "some" unnamed members of Congress and

14   the public.  ESA 67.[18]  Indeed, no such interest could authorize the Services to evade the ESA's

15   specific prohibition on the inclusion of economic impacts in listing determinations, 16 U.S.C.

16   § 1533(b)(1)(A); *supra* Part I.A.

17        **"Foreseeable Future" (50 C.F.R. § 424.11(d))**

18        The Services failed to assess how their new interpretation of "foreseeable future" constrains

19   their ability to list and protect species from scientifically credible existential threats, again failing

20   to consider an important aspect of the listing process.  ESA 94.  Specifically, the Listing Rule's

21   new requirement that both threats and species' responses thereto must be "more likely than not"

22   allows the Services to discount potentially devastating threats that may fall below the Services'

23   arbitrary 50% threshold including, in particular, climate change.  The fact that climate change will

24   
_____

25   [18] Tellingly, in the Listing Rule, the Services pivoted to this last-gasp rationale from the rationale
     offered in the proposed rule.  *Compare* ESA 229 (relying on alleged "support" for transparency in
26   "statutes and executive orders governing the rulemaking process"), *with* ESA 68 (disclaiming
     reliance on such authorities).  And for good reason.  *See* H.R. CONF. REP. No. 97-835, at 20 (1982)
27   (noting "economic analysis requirements of Executive Order 12,291, and such statutes as the
     Regulatory Flexibility Act and the Paperwork Reduction Act, *will not apply* to any phase of the
28   listing process").

1   have, and indeed is having, catastrophic impacts on species and their habitat is not in doubt; it is

2   certain.  According to the National Park Service, 35% of species in the United States could

3   become extinct by 2050 due to global climate change.  ESA 91293 n.29.[19]  Though there may be

4   several plausible projections of climate impacts predicting somewhat different effects on species

5   or habitat within different timeframes, such threats cannot be arbitrarily discounted or ignored in

6   assessing the overall "likelihood" that a species will become endangered in the "foreseeable

7   future."  16 U.S.C. § 1532(20).

8          As the Ninth Circuit has explained, "[t]he fact that climate projections" or other modeling

9   "may be volatile does not deprive those projections of value in the rulemaking process" where the

10  Services have used a reasonable methodology for addressing that volatility and explained its

11  shortcomings.  *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 680 (9th Cir. 2016); *see also*

12  *Ctr. for Biolog. Divers. v. Zinke*, 900 F.3d 1053, 1072 (9th Cir. 2018) (FWS must explain why

13  climate change uncertainty favors not listing arctic grayling given evidence of warming water

14  temperatures and decreasing water flows); *Greater Yellowstone Coal. Inc. v. Servheen*, 665 F.3d

15  1015, 1028 (9th Cir. 2011) ("It is not enough for the [FWS] to simply invoke 'scientific

16  uncertainty' to justify its action").  The Services' conclusory statement they will still consider

17  available climate data is unavailing, as it fails to recognize that their new definition raises an

18  arbitrary, quantitative bar against doing so.  ESA 74.

19         The Services also provide no reasoned basis for this damaging change.  Again, rather than

20  "clarify" the listing process, ESA 93, the "foreseeable future" definition is replete with ambiguity

21  and affords them unfettered discretion to disregard profound threats.  *See supra* Part I.A.  Nor

22  does the Listing Rule merely codify a 2009 opinion from the Department of the Interior's Office

23  of the Solicitor ("2009 Guidance"), as the Services claim.  ESA 229.  Unlike the Listing Rule, the

24  2009 Guidance recognizes that the Services must sometimes make listing decisions extrapolating

25  from limited data in line with the Act's overarching conservation purpose.  ESA 91294 n.33.

---

[19] *See also id.* (former FWS Director stating that rapidly changing climate is a principal emerging threat to species nationwide).

1      **"Recovery in Delisting" (50 C.F.R. § 424.11(e))**

2          The Services' sole rationale for eliminating species recovery as a basis for delisting—that

3    the change would "more clearly align" the regulations with the Act—fails to provide the reasoned

4    basis required by the APA.  ESA 230.  As discussed *supra* Part I.A., the Service arbitrarily

5    ignores the ESA's overarching conservation purpose and its specific provisions making recovery

6    a prerequisite to delisting.  16 U.S.C. §§ 1532(3), 1533(f)(1)(B)(ii).

7      **"Not Prudent Determinations" (50 C.F.R. § 424.12(a))**

8          In drastically expanding the "not prudent" exception to critical habitat designation, the

9    Services failed to consider important aspects of critical habitat designation and failed to provide

10   any reasoned explanation for their changed position.  ESA 63, 95.

11         First, the Services failed to consider how their vastly expanded new exceptions to critical

12   habitat designation will reduce the number and extent of such designations and thereby harm

13   listed species and their habitat, contrary to the ESA.  As Congress recognized long ago, "[t]he

14   loss of habitat for many species is universally cited as the major cause for the extinction of

15   species worldwide."  H.R. Rep. No. 95-1625, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453,

16   9455.  But exception (ii) drives a gaping loophole in the Act's critical habitat protections by

17   eliminating critical habitat designations where actions adopted during the section 7 consultation

18   process cannot *by themselves* mitigate threats to species and habitat—including, perhaps most

19   troublingly, climate change.  *See* ESA 84 (explaining that this exception now covers "species

20   experiencing threats stemming from melting glaciers, sea level rise, or reduced snowpack but no

21   other habitat-related threats").  In making that change, the Services arbitrarily dismissed as

22   "incidental" the many benefits of critical habitat designation beyond the section 7 consultation

23   requirement, and failed to consider the vital roles of critical habitat designations in, among other

24   things, educating the public and State and local governments about the importance of certain

25   areas to listed species, assisting in species recovery planning efforts, and establishing pre-

26   consultation protection plans.  *Id.*; *see Conserv. Council for Haw. v. Babbitt*, 2 F. Supp. 2d 1280,

27   1288 (D. Haw. 1998) (discussing "significant substantive and procedural protections" from

28   critical habitat designation); 81 Fed. Reg. at 7,414-15 (describing "several ways" critical habitat

28

1    "can contribute to [species] conservation").

2          The Services also arbitrarily failed to consider the impact on listed species of their vague

3    new exception (iii) for critical habitat that provides "no more than negligible conservation value"

4    to species "occurring primarily outside" the United States, or their exceptionally broad catch-all

5    in exception (v), where the Services "otherwise determine[] that designation of critical habitat

6    would not be prudent."  ESA 95.  As the Ninth Circuit has recognized, it is arbitrary and

7    capricious to expand "the narrow statutory exception for imprudent designations into a broad

8    exemption" for almost any reason.  *NRDC v. DOI*, 113 F.3d at 1126.

9          And, certainly, the Services' singular aim to "reduce the burden of regulation" cannot

10   supply the reasoned basis for unlawfully expanding the "not prudent" exception at the expense of

11   listed species and their habitat, in direct contravention of the ESA's statutory purpose and

12   commands.  ESA 84, 231.  Nor can the Services rely on their passing, unconvincing assurance

13   that "not prudent" determinations will purportedly be "rare," given the plain breadth of the new

14   exceptions.  ESA 83, 231.  Indeed, the Services made no effort to square that hollow claim with

15   their sweeping assertions that the regulation allows the Services to skip critical habitat

16   designation in a variety of circumstances, including whenever a federal action agency cannot

17   singlehandedly mitigate the impacts of climate change on a species' habitat.  ESA 84-85.

18         **"Unoccupied Critical Habitat" (50 C.F.R. § 424.12(b)(2))**

19         The Services wholly failed to consider the effects on listed species of their new, stringent

20   limitations on designating unoccupied critical habitat, which require the Services to first find that

21   currently occupied habitat is inadequate for species conservation and then additionally determine

22   that "there is a *reasonable certainty both* that the area will contribute to the conservation of the

23   species *and* that the area contains one or more of those physical or biological features essential to

24   the conservation of the species."  ESA 95 (emphasis added).  In thus restricting designation of

25   such habitat, the Services failed to contend with the fact that, if a species has been listed, it is

26   virtually certain that it no longer occupies habitat that it once occupied, but that remains critical to

27   its recovery.  *See* 81 Fed. Reg. at 7,435 ("The Services anticipate that critical habitat designations

28   in the future will likely increasingly use the authority to designate specific areas outside the

29

1    geographic area occupied by the species at the time of listing").  The Services also failed to

2    address the fact that essential, but currently unoccupied, degraded habitat may need to be restored

3    to enable a species to recover or even survive.

4         Additionally, with this change, the Services have again overlooked the dire effects of

5    climate change—perhaps the single largest threat to species and their habitat.  The Services

6    explained in 2016 that "[a]s the effects of global climate change continue to influence distribution

7    and migration patterns of species, the ability to designate areas that a species has not historically

8    occupied is expected to become increasingly important" to ensure connectivity between habitats

9    and protect movement corridors and emerging habitat for species experiencing range shifts in

10   latitude or altitude.  81 Fed. Reg. at 7,435; *cf. Conserv. Council for Haw.*, 2 F. Supp. 2d at 1288;

11   *see also* ESA 91299 n.40 (describing habitat shifts wrought by climate change).  But the Services

12   nowhere consider or explain how prioritizing occupied habitat and demanding a "reasonable

13   certainty" that unoccupied habitat *currently* contain essential features will promote, let alone not

14   actively hinder, conservation of species facing such catastrophic threats.

15        Further, the Services failed to provide any reasoned explanation for departing from their

16   prior approach to designating unoccupied critical habitat.  ESA 65.  Their primary rationale—the

17   Supreme Court's decision in *Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361 (2018)—provides no

18   support for devaluing unoccupied critical habitat.  ESA 64.  There, the Court held only that an

19   area of critical habitat (whether occupied or unoccupied) must first fall within the broader

20   category of "habitat" to qualify as "critical habitat."  *Weyerhaeuser*, 139 S. Ct. at 369.  But the

21   court neither defined the term "habitat" nor rejected FWS's previous contention in that case

22   (which was consistent with the ESA but is now directly contradicted by the Listing Rule) that

23   unoccupied habitat *need not* currently contain physical or biological features that are essential to

24   the conservation of the species in order to be designated as critical habitat.  *Id.* at 368-69.

25              **2.    The Services Failed to Consider Relevant Factors and Effects of the
                        Consultation Rule or to Provide Reasoned Explanations for Their
26                      Myriad Drastic Changes.**

27        **"Destruction or Adverse Modification" of Critical Habitat (50 C.F.R. § 402.02)**

28        The Services failed to consider how revising the definition of "destruction or adverse

30

modification" to require that an action "appreciably diminishes the value of critical habitat *as a whole*," and to eliminate consideration of the alteration of "the physical or biological features essential to the conservation of a species," would unreasonably raise the bar for triggering the important species and habitat protections afforded by the section 7 consultation process.  ESA 25, 59 (emphasis added); *see supra* Part I.B.  First, the Services failed to consider the impacts on species of making "destruction or adverse modification" determinations "at the scale of the entire critical habitat designation," and not any "less extensive scale" under the new "as a whole" standard.  ESA 24, 209.  The Services admits that, under their prior practice, "local impacts could indeed be significant" and trigger section 7 consultation, yet they failed to explain this change of position.  ESA 26.

The Services likewise failed to offer any reasoned basis for the changes.  Their conclusory and incorrect assertion that the "as a whole" language simply "clarifies" pre-existing practice does not assist them.  The Services referenced the "as a whole" language only in the preamble to their 2016 rule to explain the importance of considering impacts on "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  81 Fed. Reg. at 7,221.  But the Services did not sanction wholly *ignoring* potentially significant localized impacts in the consultation process, as they now do.  ESA 26.  The Services also failed to offer a reasoned explanation for eliminating the requirement to consider the alteration of "the physical or biological features essential to the conservation of a species," which they determined—only four years ago—was necessary to "highlight certain types of alterations that may not be as evident as direct alterations" and to "provides clarity and transparency to the definition."   81 Fed. Reg. at 7,219.  The Services did not explain the nature of the purported "controversy among the public and many stakeholders" they claim justifies the rule, how any such controversy has affected implementation of the Act, or, most importantly, how deleting the language quoted above will adversely affect listed species.  *See* ESA 28.

**"Effects of the Action" (50 C.F.R. §§ 402.02, 402.17)**

The Services failed to consider the relevant factors or provide a reasoned explanation for changes to the definition of "effects of the action," which significantly limit both the type and

1   extent of effects considered during the consultation process.  *See supra* Part I.B.  First, the

2   Services altogether failed to evaluate how the changes will affect section 7 protections for listed

3   species and critical habitat going forward, ignoring or minimizing a wide variety of agency

4   impacts on listed species and critical habitat and associated mitigation measures.

5         Once again, the Services provided only the vague excuse that these changes are intended to

6   simplify the definition and "reduce confusion" regarding how the Services identify relevant

7   effects of a proposed action, because, they claim, the prior regulations "occasionally produced

8   determinations that were inconsistent or had the appearance of being too subjective."  ESA 19-20,

9   31.  But the Services did not explain what the confusion was or how the changes would lessen it,

10  or offer any evidence or analysis demonstrating inconsistent application.  In fact, the Services'

11  new requirements that all effects of a federal agency action must be a "but for" cause of the action

12  and be "reasonably certain to occur" based upon "clear and substantial information" actually

13  undermine their purported rationales because those changes only further confuse the section 7

14  effects analysis.  Indeed, the Services admit that the expanded concept of reasonable certainty

15  (now requiring reasonable certainty not only for indirect and cumulative effects but also for direct

16  effects) is vague, and they fail to explain how expanding its use will reduce, and not exacerbate,

17  inconsistency and subjectivity in agencies' section 7 determinations.  ESA 20.[20]

18        **"Environmental Baseline" (50 C.F.R. § 402.02)**

19        The Services also failed to consider how inclusion of "ongoing agency activities or existing

20  agency facilities" within the "environmental baseline," and exclusion of such activities and

21  facilities from the section 7 effects analysis of the proposed agency action, will significantly

22  reduce protections for species and habitat afforded by the section 7 consultation process.  *See*

23  *supra* Part I.B.  While the Services again claim to be addressing unspecified "confusion" on this

24  issue, ESA 21, the Ninth Circuit has already made clear that the "effects of the action" must

25  include *all* effects of an ongoing federal action subject to section 7 consultation, and "non-

26  discretionary" activities cannot be subsumed into the environmental baseline.  *See, e.g.*, *San Luis*

---

[20] The Services' new definition appears to be nothing more than a reprisal of a 2008 definition, also advocated by Secretary Bernhardt, which was ultimately rejected by Congress and withdrawn by the Services.  *See* 74 Fed. Reg. 20,421 (May 4, 2009).

1      *& Delta-Mendota Water Auth.,* 747 F.3d at 639-40.  And FWS itself has refuted the Services'

2      rationale, explaining that the prior regulations contained "currently understood, and practiced

3      concepts" which "ha[ve] never created controversy or inconsistent findings."  ESA2_118019.

4      **Non-Binding Mitigation (50 C.F.R. § 402.14(g)(8))**

5      The Services failed to consider that eliminating requirements to ensure that any mitigation

6      measures are binding and enforceable will reduce implementation and enforceability of such

7      measures, to the detriment of listed species and critical habitat.  That risk is precisely why the

8      Ninth Circuit has repeatedly rejected the Services' reliance on non-binding measures and required

9      mitigation to include "specific and binding plans."  *See, e.g.*, *NWF v. NMFS*, 524 F.3d at 935-36;

10     *CBD v. Bernhardt,* 982 F.3d at 743-44.

11     Nor, again, do any of the Services' justifications hold up.  The Services' assertion that

12     consultation can be reinitiated if the federal action agency fails to carry out the mitigation

13     measures does not account for the lack of enforceability of such measures necessary to trigger

14     reinitiation.  ESA 47-48; *see CBD v. BLM*, 698 F.3d at 1114-16 (explaining role of enforceable,

15     binding mitigation measures in providing triggers for reinitiation of consultation).  Here, too, the

16     Services failed to explain how the regulation will "improve the availability and quality of

17     information" or "resolve confusion."  ESA 46-47.

18     **Expedited Consultations (50 C.F.R. § 402.14(l))**

19     The Services provided no evidence to support their claim that the new "expedited

20     consultation" process "will benefit species and habitats by promoting conservation … through

21     improved efficiencies in the section 7 consultation process," nor did they provide any explanation

22     as to how this expedited process "will still allow for the appropriate level of review."  ESA 51.

23     *See Encino,* 136 S. Ct. at 2126 (unexplained change is arbitrary and capricious).  While claiming

24     that "many" projects that "have minimal adverse impacts" would qualify for the new expedited

25     consultation procedure, the Services identify just one such example and provide no qualifying

26     criteria for such projects.  ESA 51.  The lack of any appropriate guidelines on this process, such

27     as limiting it to projects where the primary purpose is the conservation of listed species with a

28     successful record of implementation, as exists in current FWS guidance, ESA2_2731-37, will

1    only lead to further confusion and arbitrary application of the regulation.

2              **Reinitiation of Consultation Exemptions (50 C.F.R. § 402.16)**

3           The Services also failed to consider how exempting BLM land management plans from the

4    reinitiation of consultation requirements upon new species listings or critical habitat designations

5    would adversely affect listed species and critical habitat, and failed to provide a reasoned

6    explanation for this change.  For example, the Services asserted that reinitiation of consultation on

7    federal management plans "does little to further" the ESA's conservation goals because such

8    plans have "no immediate on-the-ground effects," but the Services failed to explain or justify that

9    statement.  ESA 54.  Contrary to this conclusory assertion, the effects of resource management

10   plans can be "immediate and sweeping."  *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1123 (9th

11   Cir. 2010); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994)

12   (management plans "have an ongoing and long-lasting effect even after adoption").  And the

13   Services wholly fail to support their final claim that this new exemption "will enable an action

14   agency to better synchronize its actions and programs with the conservation … needs of listed and

15   proposed species."  ESA 53.  While the Services' note that specific actions taken under these

16   plans may be subject to later section 7 consultation, ESA 52, site-specific review is no substitute

17   for programmatic consultation on an entire plan.  *See Pac. Rivers*, 30 F.3d at 1053-56 (discussing

18   importance of consultation on programmatic plans that guide future site-specific actions).

19              **3.    FWS Failed to Consider How the 4(d) Rule Will Place Species at Risk**
                        **and Provided No Reasoned Explanation for the Abrupt Reversal of Its**
20                      **Decades-Long Policy.**

21          FWS failed to consider the harm its removal of the longstanding blanket section 9

22   protections will cause to threatened species.  As discussed *supra* Part I.C., FWS's notorious

23   backlog of listing decisions, combined with its limited and diminished budget, do not provide it

24   with the capacity or resources to reliably and timely promulgate species-specific 4(d) rules upon

25   listing or reclassifying species as threatened.  And, yet, the 4(d) Rule lacks any acknowledgement

26   or discussion of FWS's resource constraints or the increased workload and delay associated with

27   conducting species-by-species assessments and promulgating special rules for all newly-listed

28   threatened animals or plants as necessary to adequately protect such species in the absence of the

                                              34

1    blanket take prohibition.  FWS's failure to consider that critical aspect of species listing

2    undermines the ESA's overriding conservation purpose and will harm imperiled species.

3        Moreover, FWS's only justifications for the 4(d) Rule—to "meaningfully recogniz[e]" the

4    statutory distinction between endangered and threatened species and to align FWS's policy with

5    that of NMFS—are insufficient and unavailing.  ESA 15; ESA2_51586.  As discussed *supra* Part

6    I.C, the D.C. Circuit already has rejected that argument.  *See Sweet Home*, 1 F.3d at 6-7.  Nor does

7    FWS's alleged intent to align its practice with that of NMFS provide sufficient justification.

8    NMFS has jurisdiction over, and manages fewer than, one hundred ESA-listed species in the

9    United States,[21] with a 2019 budget of more than $118.3 million for their protection and

10   management, including listing.[22]  By contrast, FWS manages 1,666 ESA-listed species in the

11   United States,[23] yet FWS's 2019 budget for ESA-listed species resource management was just

12   $247.8 million, of which only *$18.8 million* was for listing.[24]  Thus, while NMFS may have the

13   capacity and resources to promulgate species-specific rules with each new threatened species

14   listing, FWS simply does not.  Indeed, to date, FWS has adopted specified-specific rules for only

15   about 4.5% of threatened species under its jurisdiction.  ESA 76511.  FWS failed to provide any

16   explanation for how it will overcome this budgetary hurdle and ensure protection of listed species.

17   **III.   THE SERVICES FAILED TO PROVIDE NOTICE AND COMMENT ON ASPECTS OF THE FINAL
         RULES THAT ARE NOT A "LOGICAL OUTGROWTH" OF THE PROPOSED RULES.**

18       The APA provides that an agency action undertaken without adequate notice and comment

19   is "arbitrary or an abuse of discretion."  5 U.S.C. § 706(2)(A), *see also NRDC v. EPA*, 279 F.3d

20   1180, 1186 (9th Cir. 2002).  As the Ninth Circuit has acknowledged, notice is insufficient under

21   the APA where the final rule is not a "logical outgrowth" of the proposal.  *See, e.g.*, *Empire*

22

23   [21] *See* NOAA Fisheries Endangered Species Conservation,
     https://www.fisheries.noaa.gov/topic/endangered-species-conservation (NMFS has jurisdiction

24   over 165 endangered and threatened marine species, including 66 foreign species)
     (last visited Dec. 21, 2020).

25   [22] *See* NOAA, 2020 Budget Summary,
     https://www.noaa.gov/sites/default/files/atoms/files/FY2020-BlueBook.pdf, at p. 94.

26   [23] FWS, *Environmental Conservation Online System, Listed Species Summary*,
     https://ecos.fws.gov/ecp/report/boxscore (FWS has jurisdiction over a total of 2,360 ESA-listed

27   species, 694 of which are foreign species) (last visited Dec. 21, 2020).

28   [24] *See* FWS, 2020 Budget Overview,
     https://www.doi.gov/sites/doi.gov/files/uploads/fy2020_bib_bh061.pdf, at p. BH-67.

1    *Health Found. for Valley Hosp. Ctr. v. Azar*, 958 F.3d 873, 882-83 (9th Cir. 2020). In evaluating

2    whether the final rule is a "logical outgrowth" of the proposed rule, courts evaluate "whether

3    interested parties could have anticipated the final rulemaking" or whether, instead, "a new round

4    of notice and comment would provide the first opportunity for interested parties to offer

5    comments that could persuade the agency to modify its rule." *Id.* Here, at least two aspects of the

6    Final Rules could not have been anticipated from the proposed rules and, therefore, were

7    promulgated without adequate notice and comment in violation of the APA.

8         First, the Listing Rule's definition of unoccupied critical habitat imposes several additional

9    requirements and restrictions that appeared nowhere in, and were not foreseeable from, the

10   proposed rule. The Services originally proposed that "for an unoccupied area to be considered

11   essential, the Secretary must determine that there is a reasonable likelihood that the area will

12   contribute to the conservation of the species," ESA 235; set out a three-part test for meeting that

13   standard; and provided that an unoccupied area could be designated in lieu of occupied habitat if

14   doing so would lead to more "efficient" species conservation. ESA 232, 235.

15        The final Listing Rule, however, fundamentally raised the bar even higher for designating

16   unoccupied critical habitat by adopting a "reasonable certainty" standard in place of the

17   "reasonable likelihood" proposal, wholly removing the three-part test for meeting that standard,

18   and eliminating the proposal's "efficient" conservation criterion. ESA 63. And the Listing Rule

19   added a new requirement that an unoccupied area must "contain[] one or more of those physical

20   or biological features essential to the conservation of the species," *id.*—a complete reversal from

21   the Services' long-held position, in line with the Act, that unoccupied critical habitat does *not*

22   have to include such features, ESA 65; *see* 16 U.S.C. § 1532(5)(A)(ii). Thus, the Listing Rule's

23   unoccupied habitat provisions are not a "logical outgrowth" of the Service's proposal, in violation

24   of the APA. *See Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996-98 (D.C. Cir. 2005) (rule

25   violated logical outgrowth test when it altered agency's previous interpretation without notice).

26        Second, the Consultation Rule raised the bar for determining that the effects of an action are

27   reasonably certain to occur by introducing—for the first time—the requirement that such a

28   conclusion be based upon "clear and substantial information." ESA 20. The Services' new,

---

36

1   higher evidentiary standard was an unforeseeable departure from the proposed rule.  The

2   proposed rule relied upon the Service's position in previous rulemakings that the "reasonably

3   certain to occur" standard does *not* require a guaranteed outcome, but merely required that the

4   effect be "more than a mere possibility," and that the Services "establish a rational basis for [a]

5   finding."  ESA 212.  And, contrary to the Services' claim, ESA 35-36, an agency "cannot

6   bootstrap notice from a comment" requesting further specificity of the "reasonably certain to

7   occur" requirement.  *Fertilizer Institute v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (citation

8   omitted).  Rather, the agency itself bears the burden of "fairly appris[ing] interested persons of the

9   subjects and issues before the [a]gency," *NRDC v. EPA*, 279 F.3d at 1186, particularly where, as

10  here, changes made in finalizing a rule represent a significant departure from past agency

11  practice.  *Envt'l Integrity Project*, 425 F.3d at 996-98.

12  **IV.   THE SERVICES VIOLATED NEPA BY FAILING TO PREPARE AN EIS ON THE FINAL RULES.**

13          The Services violated NEPA by disregarding their obligation to analyze and disclose the

14  significant environmental impacts of the Final Rules.  NEPA is the "basic national charter for the

15  protection of the environment," 40 C.F.R. § 1500.1(a),[25] and requires the preparation of a detailed

16  environmental impact statement ("EIS") for any "major federal action significantly affecting the

17  quality of the human environment," 42 U.S.C. § 4332(2)(C), including "new or revised agency

18  rules [and] regulations," 40 C.F.R. § 1508.18(a).  An agency may only avoid its statutory duty to

19  evaluate the environmental impact of its proposed action in "certain narrow instances" where that

20  action falls under a defined categorical exclusion ("CE").  *See Coal. of Concerned Citizens v.*

21  *Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 902 (10th Cir. 2016).  Here, the Final

22  Rules are unquestionably major federal actions that require preparation of an EIS, and the

23  Services unlawfully and inexplicably relied on an inapplicable categorical exclusion for rules that

24  are of a legal, technical, or procedural nature.  ESA 17 (4(d) Rule), 58 (Consultation Rule), and

25  93 (Listing Rule).

26  _____

27  [25] On July 16, 2020, the Council on Environmental Quality ("CEQ") finalized an update to its
    1978 regulations implementing NEPA, which took effect on September 14, 2020.  85 Fed. Reg.
    43,304 (July 16, 2020).  Since the Final Rules were finalized under the prior 1978 regulations,
28  those regulations govern and are cited herein.

A.   **The Final Rules Have a Significant Impact on the Environment and Therefore Required Preparation of an EIS.**

The Services' Final Rules are unquestionably "major federal action[s]" within the meaning of NEPA. *See* 40 C.F.R. § 1508.18(a) ("new or revised agency rules [and] regulations"). Likewise, the Final Rules, which govern the implementation of one of our nation's bedrock environmental laws, "significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C). The "low standard" of a significant effect, *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014), is met if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor," *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998). Such "substantial questions" are raised when the action may adversely affect a listed species or designated critical habitat or may have highly controversial effects. 40 C.F.R. § 1508.27(b)(4), (9). The presence of any one of these factors may be sufficient to require preparation of an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004).

The Final Rules—which, as described above, fundamentally change the listing, delisting, critical habitat designation, and consultation processes and eliminate section 9 protections for newly-listed threatened species—indisputably meet NEPA's "low standard" for actions causing significant effects on the environment. *League of Wilderness Defs.*, 752 F.3d at 760. First, the Final Rules plainly "may adversely affect" listed species and critical habitat. 40 C.F.R. § 1508.27(b)(9). For example, the Listing Rule, as discussed *supra* Part I.A, limits the circumstances under which species can be listed as "threatened" in the future, and fundamentally alters the Services' approach to designating critical habitat such that less habitat will likely be designated for species recovery. The Consultation Rule, as discussed *supra* Part I.B, would upend the ESA's section 7 federal agency consultation process by, for example, significantly limiting the number, type, and scope of section 7 consultations and consequently limiting the situations in which alternatives and mitigation measures will be imposed to avoid or reduce the impacts of federal agency actions on listed species and critical habitat. And, as discussed *supra* Part I.C, the 4(d) Rule would strip fundamental protections from newly-listed threatened species, likely leaving them with fewer protections and with a greater likelihood of harm for extended

38

1   periods, if not indefinitely.

2       Second, there can be little doubt that impacts from the Final Rules "are likely to be highly

3   controversial."  40 C.F.R. § 1508.27(b)(4).  The impact of an action is "highly controversial"

4   when there is a substantial dispute "about [its] size, nature, or effect."  *Anderson v. Evans*, 371

5   F.3d 475, 489 (9th Cir. 2004) (citations and quotations emitted).  Here, the Services have

6   admitted as much.  *See* ESA2_16876 ("We are going to state that these regulations will likely be

7   controversial"); ESA_ 25908 ("This proposed rule is expected to be controversial"); ESA2_27076

8   (same); ESA2_29170 (same).  And the Services predictably received over 200,000 public

9   comments on the Proposed Rules (ESA 3356-394071), including thousands of individual

10   concerned citizens, non-governmental organizations, municipal and regional agencies, industry

11   groups, twenty states, and numerous members of Congress, including a wide range of

12   stakeholders opposing the proposed rules and disputing the consideration of impacts.[26]

13       Finally, other factors triggering preparation of an EIS also apply to the Final Rules, such as

14   their effects on "park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically

15   critical areas," cumulative effects, and that fact that the rules involve "highly uncertain" or

16   "unique or unknown" risks.  40 C.F.R. § 1508.27(b)(3), (5), (7).

17       In sum, because the Final Rules will reduce protections for imperiled species and their

18   habitats and are highly controversial, the Services were required to prepare an EIS before

19   promulgating the Final Rules.

20       **B.**    **The Final Rules Are Not Eligible for a Categorical Exclusion.**

21       The Services unlawfully concluded that the Final Rules were categorically excluded from

22   NEPA review because they "are of a legal, technical, or procedural nature."  ESA 17, 58, 93.  But

23   this categorical exclusion only encompasses actions that are purely ministerial, non-substantive,

24   or otherwise do not have the potential for any significant environmental effect—such as personnel

25   actions, organizational changes, routine financial transactions, nondestructive data collection, and

26

27   [26] *See, e.g*., ESA 545-53 (105 members of Congress), 706-07 (Ranking Members of the Senate Committee on Environment and Public Works and House Committee on Natural Resources); 95767-96311 (thousands of scientists); 100639-100641 (East Bay Municipal Utility District);

28   194384-194386 (Association of Zoos and Aquariums).

1   other routine government business.  *See generally* 43 C.F.R. § 46.210.  The exclusion plainly

2   does not apply to the substantive, significant changes reflected in the Final Rules.  *See Cal. ex rel.*

3   *Lockyer v. USDA*, 575 F.3d 999, 1013-14, 1017 (9th Cir. 2009) (rejecting reliance on analogous

4   categorical exclusion because replacing substantive environmental protections with less-

5   protective regulatory regime qualified "as 'substantive' action and would meet the relatively low

6   threshold to trigger some level of environmental analysis under [NEPA]").

7        Moreover, even if the Final Rules otherwise qualified for coverage under the Services' cited

8   exclusions, they nonetheless present "extraordinary circumstances in which a normally excluded

9   action may have a significant environmental effect," and therefore still would require an EIS.  40

10  C.F.R. § 1508.4.  "Extraordinary circumstances" preclude application of categorical exclusions

11  for actions that, among other things:  have highly controversial, uncertain, or potentially

12  significant environmental effects; unique or unknown environmental risks; significant impacts on

13  ESA-listed species or critical habitat; or violate applicable environmental laws.  *See* 43 C.F.R.

14  § 46.215.  While only one of these factors need apply to render a proposed agency action

15  ineligible for exclusion, here, for the reasons explained above, every one of these factors applies.

16       In sum, in their zeal to effectuate the Trump Administration's political, deregulatory

17  agenda, the Services have blatantly violated NEPA.

18                                **CONCLUSION**

19       Declaratory relief and vacatur are the proper remedies "when a court concludes that an

20  agency's conduct was illegal under the APA."  *California v. U.S. Dep't of the Interior*, 381 F.

21  Supp. 3d 1153, 1178 (N.D. Cal. 2019) (citing *Stewardship Council v. EPA*, 806 F.3d 520, 532

22  (9th Cir. 2015)); *Lockyer*, 575 F.3d at 1020 (upholding vacatur of rule based on NEPA violation);

23  *see* 5 U.S.C. § 706(2) ("reviewing court shall … hold unlawful and set aside" agency action that

24  violates the APA).  Given the Services' numerous violations of law in promulgating the Final

25  Rules, State Plaintiffs respectfully request that this Court grant their motion for summary

26  judgment, declare the Final Rules unlawful, and vacate the Final Rules.

27

28

1

Dated:  January 18, 2021                    Respectfully submitted,

2

XAVIER BECERRA                              MAURA HEALEY
Attorney General of California              Attorney General of Massachusetts

3

DAVID A. ZONANA
DAVID G. ALDERSON                           /s/ Matthew Ireland

4

Supervising Deputy Attorneys General        MATTHEW IRELAND (*pro hac vice*)
                                            TURNER SMITH (*pro hac vice*)

5

/s/ George Torgun                           Assistant Attorneys General
GEORGE TORGUN, State Bar No. 222085          Office of the Attorney General

6

TARA MUELLER, State Bar No. 161536           Environmental Protection Division
ERIN GANAHL, State Bar No. 248472            One Ashburton Place, 18th Floor

7

Deputy Attorneys General                     Boston, MA 02108
1515 Clay Street, 20th Floor                 Telephone:  (617) 727-2200

8

P.O. Box 70550                               Email:  Matthew.Ireland@mass.gov
Oakland, CA  94612-0550

9

Telephone:  (510) 879-1002                   *Attorneys for Plaintiff*
Email:  George.Torgun@doj.ca.gov             *Commonwealth of Massachusetts*

10

11

*Attorneys for Plaintiff State of California*

12

BRIAN E. FROSH                              PHILIP J. WEISER
Attorney General of Maryland                Attorney General of Colorado

13

/s/ Steven J. Goldstein                     /s/ Eric R. Olson

14

STEVEN J. GOLDSTEIN (*pro hac vice*)         ERIC R. OLSON (*pro hac vice*)
Special Assistant Attorney General           Solicitor General

15

Office of the Attorney General               1300 Broadway, 10th Floor
200 Saint Paul Place, 20th Floor             Denver, Colorado 80203

16

Baltimore, Maryland 21202                    Telephone:  (720) 508-6548
Telephone:  (410) 576-6414                   Email:  Eric.Olson@coag.gov

17

Email:  sgoldstein@oag.state.md.us
                                            *Attorneys for Plaintiff State of Colorado*

18

*Attorneys for Plaintiff State of Maryland*

19

WILLIAM TONG                                KWAME RAOUL
Attorney General of Connecticut             Attorney General of Illinois

20

/s/ Matthew I. Levine                       /s/ Jason E. James

21

MATTHEW I. LEVINE*                           JASON E. JAMES (*pro hac vice*)
DANIEL M. SALTON (*pro hac vice*)            Assistant Attorney General

22

Assistant Attorneys General                  MATTHEW J. DUNN*
Office of the Attorney General               Chief, Environmental Enf./Asbestos Litig. Div

23

P.O. Box 120                                 Office of the Attorney General,
55 Elm Street                                Environmental Bureau

24

Hartford, CT 06141-0120                      69 W. Washington St., 18th Floor
Telephone:  (860) 808-5250                   Chicago, IL 60602

25

Email:  Daniel.Salton@ct.gov                 Telephone:  (312) 814-0660
                                            Email:  jjames@atg.state.il.us

26

*Attorneys for Plaintiff State of Connecticut*   *Attorneys for Plaintiff State of Illinois*

27

28

State Plaintiffs' Notice of Motion and Motion for Summary Judgment – Case No. 4:19-cv-06013-JST

| | |
|---|---|
| FOR THE PEOPLE OF THE STATE OF MICHIGAN | KEITH M. ELLISON<br>Attorney General of Minnesota |
| /s/ Nathan A. Gambill<br>NATHAN A. GAMBILL (*pro hac vice*)<br>(Michigan Bar No. P75506)<br>Assistant Attorney General<br>Environment, Natural Resources,<br>and Agriculture Division<br>P.O. Box 30755<br>Lansing, MI 48909<br>Telephone: (517) 335-7664<br>Email: gambilln@michigan.gov | /s/ Peter N. Surdo<br>PETER N. SURDO (*pro hac vice*)<br>Special Assistant Attorney General<br>Minnesota Office of the Attorney General<br>445 Minnesota Street<br>St. Paul MN 55101<br>Telephone: (651) 757-1061<br>Email: peter.surdo@ag.state.mn.us |
| *Attorney for Plaintiff the People of the State of Michigan* | *Attorney for Plaintiff State of Minnesota* |
| GURBIR S. GREWAL<br>Attorney General of New Jersey | AARON D. FORD<br>Attorney General of Nevada |
| /s/ Lisa Morelli<br>LISA MORELLI, State Bar No. 137092<br>Deputy Attorney General<br>Environmental Enforcement &<br>Environmental Justice<br>R.J. Hughes Justice Complex<br>P.O. Box 093<br>Trenton, NJ 08625<br>Telephone: (609) 376-2708<br>Email: Lisa.Morelli@law.njoag.gov | /s/ Tori N. Sundheim<br>TORI N. SUNDHEIM, State Bar No. 294559<br>Deputy Attorney General<br>Office of the Attorney General<br>100 North Carson Street<br>4 Carson City, Nevada 89701-4717<br>Telephone: (775) 684-1219<br>Fax: (775) 684-1180<br>Email: tsundheim@ag.nv.gov |
| *Attorneys for Plaintiff State of New Jersey* | *Attorneys for Plaintiff State of Nevada* |
| LETITIA JAMES<br>Attorney General of New York | HECTOR BALDERAS<br>Attorney General of New Mexico |
| /s/ Laura Mirman-Heslin<br>LAURA MIRMAN-HESLIN*<br>Assistant Attorney General<br>TIMOTHY HOFFMAN*<br>Senior Counsel<br>JENNIFER NALBONE<br>Environmental Scientist<br>Office of the Attorney General<br>Environmental Protection Bureau<br>28 Liberty Street<br>New York, NY 10005<br>Telephone: (212) 416-6091<br>Email: Laura.Mirman-Heslin@ag.ny.gov | /s/ William Grantham<br>WILLIAM GRANTHAM (*pro hac vice*)<br>Assistant Attorney General<br>201 Third St. NW, Suite 300<br>Albuquerque, NM 87102<br>Telephone: (505) 717-3520<br>E-Mail: wgrantham@nmag.gov |
| *Attorneys for Plaintiff State of New York* | *Attorneys for Plaintiff State of New Mexico* |

ELLEN F. ROSENBLUM
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN (*pro hac vice*)
Attorney-in-Charge
STEVE NOVICK (*pro hac vice*)
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4593
Email: Steve.Novick@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Gregory S. Schultz
GREGORY S. SCHULTZ*
Special Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Email: gschultz@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Aurora Janke
AURORA JANKE (*pro hac vice*)
Assistant Attorney General
Washington Attorney General's Office Counsel
for Environmental Protection
800 5th Ave Ste. 2000 TB-14
Seattle, Washington 98104-3188
Telephone: (206) 233-3391
Email: Aurora.Janke@atg.wa.gov

*Attorney for Plaintiff State of Washington*

JOSHUA H. STEIN
Attorney General of North Carolina

/s/ Amy L. Bircher
AMY L. BIRCHER (*pro hac vice*)
Special Deputy Attorney General
SCOTT A. CONKLIN*
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6400
Email: abircher@ncdoj.gov
Email: sconklin@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

JOSH SHAPIRO
Attorney General of Pennsylvania

/s/ Aimee D. Thomson
AIMEE D. THOMSON (*pro hac vice*)
Deputy Attorney General
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
Telephone: (267) 940-6696
Email: athomson@attorneygeneral.gov

*Attorneys for Plaintiff
Commonwealth of Pennsylvania*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

/s/ Ryan P. Kane
RYAN P. KANE (*pro hac vice*)
Office of the Attorney General
109 State Street
Montpelier, VT 05602
Telephone: (802) 828-3171
Email: ryan.kane@vermont.gov

*Attorneys for Plaintiff State of Vermont*

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Gabe Johnson-Karp
GABE JOHNSON-KARP (*pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707
Telephone: (608) 267-8904
Fax: (608) 267-2223
Email: johnsonkarpg@doj.state.wi.us

Attorneys for Plaintiff State of Wisconsin


KARL A. RACINE
Attorney General of the
District of Columbia

/s/ David Hoffmann
DAVID HOFFMANN*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General
441 4th Street, N.W., Suite 630 South
Washington, D.C. 20001
Telephone: (202) 724-9727
Email: david.hoffmann@dc.gov

Attorneys for Plaintiff District of Columbia


JAMES E. JOHNSON
Corporation Counsel
for the City of New York

/s/ Antonia Pereira
ANTONIA PEREIRA (*pro hac vice*)
Assistant Corporation Counsel
New York City Law Department
Environmental Law Division
100 Church Street, Room 6-140
New York, New York 10007
Telephone: (212) 356-2309
Email: anpereir@law.nyc.gov

Attorneys for Plaintiff City of New York


*Application for admission pro hac vice forthcoming

State Plaintiffs' Notice of Motion and Motion for Summary Judgment – Case No. 4:19-cv-06013-JST