TODD KIM
Assistant Attorney General
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief
COBY HOWELL, Senior Trial Attorney
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1000 S.W. Third Avenue
Portland, OR 97204
Phone: (503) 727-1023
Fax: (503) 727-1117
Email: coby.howell@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (Oakland)

| | |
|---|---|
| STATE OF CALIFORNIA, ET AL., | Case. No. 4:19-cv-06013-JST |
| Plaintiffs, | **FEDERAL DEFENDANTS' MOTION FOR VOLUNTARY REMAND; RESPONSE TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| HAALAND, ET AL., | |
| Federal Defendants. | Date: TBD<br>Time: TBD<br>Place: Courtroom 6, 2nd Floor<br>Judge: The Honorable Jon S. Tigar |

Motion for Voluntary Remand, 4:19-cv-06013-JST

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, as soon as possible, Federal Defendants will move this Court for voluntary remand in the above-captioned case.  This motion will be made before the Honorable Jon S. Tigar, United States District Judge, Oakland Courthouse, 1301 Clay Street, Oakland, California 94612.

Federal Defendants move the Court for an order remanding, without vacatur, the following final rules: 84 Fed. Reg. 44753 (Aug. 27, 2019), 84 Fed. Reg. 45020 (Aug. 27, 2019), and 84 Fed. Reg. 44976 (Aug. 27, 2019).  Federal Defendants respectfully submit this motion in response to Plaintiffs' motions for summary judgment.

This motion is based on the accompanying Memorandum of Points and Authorities and the Third Declaration of Gary D. Frazer ("Third Frazer Decl.") and Fourth Declaration of Samuel D. Rauch III ("Fourth Rauch Decl.").

Counsel for the parties have conferred on this motion.  All Plaintiffs have indicated that they will oppose this motion.  All Intervenor-Defendants have indicated that they will reserve their position until they have an opportunity to review the motion.

Federal Defendants are filing this motion in all three related cases, but the motion and brief are substantively identical in each case.

# TABLE OF CONTENTS

PAGE

MEMORANDUM OF POINTS AND AUTHORTIES ................................................... 1

INTRODUCTION ............................................................................... 1

I.   STATUTORY AND REGULATORY BACKGROUND .......................................... 3

   A.   The Section 4 Revisions ......................................................... 4

   B.   The Section 4(d) Revisions ...................................................... 9

   C.   The Section 7(a)(2) Revisions ................................................... 12

II.  PROCEDURAL BACKGROUND ......................................................... 16

   A.   Rule 12 Responsive Pleadings ................................................... 16

   B.   Motions to Stay .............................................................. 16

   C.   Motions for Summary Judgment ................................................ 18

STANDARD OF REVIEW ........................................................................ 19

I.   THE COURT SHOULD REMAND THE 2019 ESA RULES WITHOUT

VACATUR ................................................................................. 20

   A.   Voluntary Remand is Appropriate. .............................................. 20

   B.   The Court Should Not Vacate the 2019 ESA Rules. ................................ 26

CONCLUSION ............................................................................... 30

1

2

3

**TABLE OF AUTHORITIES**

<u>CASES</u>                                                                    <u>PAGE</u>

*Alliance for the Wild Rockies v. Allen*,
    No. 04-1813-JO, 2009 WL 2015407 (D. Or. July 1, 2009) ...................................... 21

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ...............................................................20, 28

*Animal Legal Def. Fund v. Haaland*, 19-cv-06812 (N.D. Cal., Oct. 21, 2019) ........... 2

*ASSE Int'l v. Kerry*,
    182 F. Supp. 3d 1059 (C.D. Cal. 2016) ...................................................... 21

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
    515 U.S. 687 (1995) ...................................................................... 4

*Cal. Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012)......................................................20, 22, 27

*Cent. Power & Light Co. v. United States*,
    634 F.2d 137 (5th Cir. 1980) ............................................................... 21

*Center for Biological Diversity v. Haaland*,
    19-cv-5206 (N.D. Cal. Aug. 21, 2019) ...................................................... 2

*California v. Haaland,* 19-cv-6013 (N.D. Cal., Sept. 25, 2019) ................................. 2

*Cottonwood Env't L. Ctr. v. Bernhardt*,
    No. CV 18-12-BU-SEH, 2020 WL 7263551 (D. Mont. Dec. 10, 2020) ................... 21

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) .................................................................... 19

*Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*,
    423 U.S. 326 (1976) ...................................................................26, 27

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) .................................................................... 26

*Ford Motor Co. v. Nat'l Lab. Rels. Bd.*,
    305 U.S. 364 (1939) ...................................................................20, 21

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ................................................................................. 27

*In re Clean Water Act Rulemaking,*
    No. C 20-04636 WHA, 2021 WL 4924844 (N.D. Cal. Oct. 21, 2021) ................22, 27

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................................................... 20

*John v. Sec'y of the Interior,*
    No. 3:14-CV-00247-LRH-VP, 2015 WL 505526 (D. Nev. Feb. 5, 2015) ................. 22

*Lockyer v. Mirant Corp.,*
    398 F.3d 1098 (9th Cir. 2005) ............................................................................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................. 19

*Neighbors Against Bison Slaughter v. Nat'l Park Serv.,*
    No. CV 19-128-BLG-SPW, 2021 WL 717094 (D. Mont. Feb. 5, 2021) ................... 22

*Pascua Yaqui Tribe v. United States Env't Prot. Agency,*
    No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021) .............. 27

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015) ................................................................................. 28

*SKF USA, Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001) ..........................................................................20, 22

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    282 F. Supp. 3d 91 (D.D.C. 2017) ........................................................................ 28

*Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt,*
    1 F.3d 1 (D.C. Cir. 1993) ...................................................................................10, 11

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ................................................................................. 11

*Nat. Res. Def. Council v. U.S. Dep't of Interior,*
    275 F. Supp. 2d 1136 (C.D. Cal. 2002) ................................................................. 27

*Western Oil & Gas Ass'n v. EPA,*
  633 F.2d 803 (9th Cir. 1980) ............................................................. 27

*Weyerhaeuser Co. v. FWS,*
  139 S. Ct. 361 (2018) ................................................................... 6, 9

STATUTES

5 U.S.C. § 551(4)-(5) ........................................................................ 29
16 U.S.C. § 1531(b) ........................................................................... 3
16 U.S.C. § 1532 .............................................................................. 8
16 U.S.C. § 1532(5)(A) ....................................................................... 5
16 U.S.C. § 1532(20) ....................................................................... 7, 8
16 U.S.C. § 1533(a)(1) ..................................................................... 5, 8
16 U.S.C. § 1533(a)(3)(A) ................................................................ 5, 6, 8
16 U.S.C. § 1533(b)(1)(A) ................................................................... 7
16 U.S.C. § 1533(b)(2) ....................................................................... 6
16 U.S.C. § 1533(d) ......................................................................... 10
16 U.S.C. § 1536(a)(2) ...................................................................... 12
16 U.S.C. § 1536(b)(3)(A) .................................................................. 14
16 U.S.C. § 1540(f) ........................................................................... 4
16 U.S.C. § 1538(a) ......................................................................... 10
16 U.S.C. § 1538(a)(1)(A)-(G) ............................................................. 10
16 U.S.C. 1604 .............................................................................. 16
43 U.S.C. § 1712 ............................................................................ 16

FEDERAL REGULATIONS

50 C.F.R. § 17.31(a) (1978) ............................................................... 10
50 C.F.R. § parts 17, 402, 424 ............................................................. 4
50 C.F.R. § 17.31 ........................................................................... 11
50 C.F.R. § 402 ............................................................................. 13
50 C.F.R. § 402.13(a) .................................................................... 13, 14
50 C.F.R. § 402.13 ..................................................................... 13, 14, 15
50 C.F.R § 402.02 ..................................................................... 14, 15, 25
50 C.F.R § part 402 ......................................................................... 1
50 C.F.R. § 402.14 ......................................................................... 14
50 C.F.R. § 402.14(a) ...................................................................... 13
50 C.F.R. § 402.14(c) ...................................................................... 15
50 C.F.R. § 402.14(g) ...................................................................... 14
50 C.F.R. § 402.14(*l*) ..................................................................... 15
50 C.F.R. § 402.16 ..................................................................... 14, 16

iv

50 C.F.R. § 402.16(b) .................................................................................. 16
50 C.F.R. § 402.17 ................................................................................14, 25
50 C.F.R. § 424.11 ...................................................................................... 6
50 C.F.R. § 424.11(b) (2018) ................................................................. 7, 24
50 C.F.R. § 424.11(d) ............................................................................. 7, 8
50 C.F.R. § 424.11(e) ................................................................................. 8
50 C.F.R. § 424.12(a)(1)(ii) ....................................................................... 8

**Other Authorities**

45 Fed. Reg. 13010 (Feb. 27, 1980) ........................................................... 1
49 Fed. Reg. 38900 (Oct. 1, 1984) ............................................................. 1
51 Fed. Reg. 19926 (June 3, 1986) ........................................................... 13
70 Fed. Reg. 37160, 37195 (June 28, 2005) .............................................. 11
81 Fed. Reg. 7214 (Feb. 11, 2016) ............................................................. 1
81 Fed. Reg. 7414 (Feb. 11, 2016) ............................................................. 1
83 Fed. Reg. 35193 ..................................................................................... 4
83 Fed. Reg 35196. .................................................................................... 8
84 Fed. Reg. 44753 (Aug. 27, 2019) ................................................1, 4, 12
86 Fed. Reg. 7037 (Jan. 20, 2021) .....................................................passim
81 Fed. Reg. 7414 (Feb. 11, 2016) ............................................................. 1
83 Fed. Reg. 35174 ........................................................................4, 12, 14
84 Fed. Reg. 44976 (Aug. 27, 2019) ...............................................1, 4, 6, 14
84 Fed. Reg. 45020 (Aug. 27, 2019) ...................................................passim

## MEMORANDUM OF POINTS AND AUTHORTIES

## INTRODUCTION

More than 30 years ago, the Secretaries of the Departments of the Interior and Commerce ("Secretaries"), acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively, "Services") promulgated comprehensive regulations interpreting and implementing the Endangered Species Act ("ESA" or "Act"). [1]  On August 27, 2019, in three separate rulemakings, the Services issued the currently at-issue revisions to the regulations implementing portions of Sections 4, 4(d), and 7(a)(2) of the ESA.  See 84 Fed. Reg. 45020 ("Section 4 Rule"); 84 Fed. Reg. 44753 ("Section 4(d) Rule"); 84 Fed. Reg. 44976 ("Section 7(a)(2) Rule").  The three revised regulations became effective in late 2019.

Seventeen States, the District of Columbia, and the City of New York ("State Plaintiffs"), the Center for Biological Diversity and other non-governmental organizations ("CBD Plaintiffs"), and the Animal Legal Defense Fund ("ALDF") (collectively, "Plaintiffs") challenge each of these revised regulations in three separate suits alleging violations of the Administrative Procedure Act ("APA"),

---

[1] The Services periodically revised portions of the regulations, such as amendments to the Sections 4 and 7 regulations in 2016.  *See, e.g.,* 81 Fed. Reg. 7214 (Feb. 11, 2016) (amending 50 C.F.R. Part 402); 81 Fed. Reg. 7414 (Feb. 11, 2016) (amending 50 C.F.R. Part 424).  But, in the main, the earlier regulations have remained the operative regulations for 30-plus years.  *See also,* 45 Fed. Reg. 13010 (Feb. 27, 1980); 49 Fed. Reg. 38900 (Oct. 1, 1984).

National Environmental Policy Act ("NEPA"), and ESA.[2]  All three Plaintiffs generally contend they are harmed because the 2019 ESA Rules allegedly undermine the conservation purposes of the ESA.

Pursuant to Executive Order 13990 signed by President Biden on January 20, 2021 (titled "Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis"), the White House directed the Services to evaluate and, where appropriate, revise or rescind environmental and public health-related regulations that issued during the prior four years that conflicted with national objectives set forth in the Order.  86 Fed. Reg. 7037 (Jan. 20, 2021).  In a publication accompanying that Executive Order, the White House specifically directed the Services to review the 2019 ESA Rules challenged in this case.  As a result of the Services' review of these regulations, on June 4, 2021, FWS announced its intent to rescind the Section 4(d) Rule and the Services announced their intent to revise the Section 4 and Section 7 Rules.

Based in part on the Services' intent to rescind and revise the 2019 ESA Rules, on August 13, 2021, Federal Defendants moved this Court for a stay of proceedings to allow the Services to complete their rulemaking processes in

---

[2] This Court has related the three cases: *Center for Biological Diversity v. Haaland*, 19-cv-5206 (N.D. Cal. Aug. 21, 2019); *California v. Haaland*, 19-cv-6013 (N.D. Cal., Sept. 25, 2019); *Animal Legal Def. Fund v. Haaland*, 19-cv-06812 (N.D. Cal., Oct. 21, 2019). Federal Defendants are filing an identical motion and memorandum in all three cases.  For purposes of this memorandum, the cases are referred to collectively in the singular tense.  The Court has also related *California v. Haaland*, 21-cv-00440-JST (N.D. Cal.), which challenges the 2020 Critical Habitat Rules.  The Court previously granted the parties' stipulated stay of proceedings in that case.

Motion for Voluntary Remand, 4:19-cv-06013-JST

accordance with the APA.  The Court denied Federal Defendants' motions on October 7, 2021, finding a possibility of harm to Plaintiffs from continued implementation of the 2019 ESA Rules.  Soon after, Plaintiffs re-filed their motions for summary judgment.

Because Plaintiffs moved for summary judgment, Defendants now move the Court to remand the 2019 ESA Rules without vacatur.  This voluntary remand request responds to Plaintiffs' motions for summary judgment by addressing the proper relief the Court should grant in this case.  The requested equitable relief is legally and factually warranted, narrowly tailored, and resolves Plaintiffs' claims; thus, there is no need for the Court to reach the merits of the arguments in this case.  As discussed below, the Court should grant Federal Defendants' motion for remand and deny Plaintiffs' motions for summary judgment.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of [certain] treaties and conventions . . . ."  16 U.S.C. § 1531(b).  To achieve these purposes, Congress set out broad procedural and substantive requirements in various sections of the Act and provided the Secretaries with rulemaking authority to implement those requirements.  16 U.S.C. § 1540(f); *Babbitt v. Sweet Home*

*Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 708 (1995) ("When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretar[ies].").

For over 30 years, the Services have interpreted these broad procedural and substantive requirements principally through joint regulations.  *See, e.g.,* 50 C.F.R. parts 17, 402, 424.  During those decades, the Services gained valuable experience in implementing the Act and their own regulations, and over those years issued guidance interpreting or clarifying the regulations to facilitate implementation of the Act.[3]  To update these regulations, in 2018 the Services issued three separate proposed rules addressing Sections 4(d), 4, and 7(a)(2) of the Act.  83 Fed. Reg. 35174 ("Section 4(d) proposed rule"); 83 Fed. Reg. 35193 ("Section 4 proposed rule"); 83 Fed. Reg. 35178 ("Section 7(a)(2) proposed rule").  The Services provided notice in the Federal Register and solicited public comment on the proposed rules.  After considering and addressing these public comments, the Secretaries exercised their rulemaking authorities and, on August 27, 2019, issued a trio of final rules revising certain portions of the existing regulations.  *See* 84 Fed. Reg. 45020; 84 Fed. Reg. 44753; 84 Fed. Reg. 44976.  The relevant statutory authorities and the revisions to 50 C.F.R. parts 17, 402, and 424, are each addressed below.

A.  The Section 4 Revisions

---

[3] *See, e.g.*, FWS, *Laws and Policies, Regulations and Policies*, available at https://www.fws.gov/endangered/laws-policies/regulations-and-policies.html (last visited Dec. 9, 2021) (identifying interpretive guidance and policies relating to application of Sections 4 and 7 of the ESA).

Under ESA Section 4, the Services "shall by regulation" determine "whether any species is an endangered species or a threatened species" after considering five statutory factors, the best scientific and commercial data available, and States' and foreign governments' efforts to protect the species.  16 U.S.C. § 1533(a)(1), (b)(1)(A). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).  If a listed species no longer meets the definition of an endangered or threatened species, the Services shall remove the ESA's protections from the species (delisting).  If a species is delisted, the Services must monitor that species for at least five years.  *Id.* § 1533(g).

Section 4 also generally directs the Services to designate critical habitat for any species listed as endangered or threatened "to the maximum extent prudent and determinable."  16 U.S.C. § 1533(a)(3)(A).  "Critical habitat" is defined in relevant part as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and . . . (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).  The Services must designate critical habitat on the basis of the "best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact of specifying

5

any particular area as critical habitat." *Id.* § 1533(b)(2).  The Services "may exclude

any area from critical habitat if [they] determine[] that the benefits of such

exclusion outweigh the benefits of specifying such area as part of the critical

habitat, unless [they] determine[] . . . [failure to do so] will result in the extinction of

the species concerned." *Id.*  A critical habitat designation does not directly limit or

affect the conduct of non-federal actors.  *Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361,

365-66 (2018).

   To aid in implementing these statutory duties, the Services jointly

promulgated regulations setting forth the procedures for adding, removing, or

reclassifying endangered or threatened species, 50 C.F.R. § 424.11, as well as the

criteria for designating critical habitat for listed species, *id.* § 424.12.  On July 25,

2018, the Services proposed five general revisions to the listing and critical habitat

regulations.  These revisions entail: (1) the deletion of economic impact language;

(2) the framework for discussing the foreseeable future; (3) factors to consider in

delisting; (4) specific circumstances that support "not prudent" determinations for

critical habitat; and (5) clarifications and revisions to the standards and process for

designating critical habitat in unoccupied areas.  83 Fed. Reg. at 35194-99.  The

Services provided proposed regulatory text addressing each of these issues along

with an explanation and solicited public comments on these as well as other

potential areas for change.  83 Fed. Reg. at 35194.

   On August 27, 2019, the Services published the Section 4 final rule adopting

many of their proposed revisions.  84 Fed. Reg. 45020.  Among the regulatory

6

changes, the Services revised the regulatory text governing the listing inquiry by removing the phrase "without reference to possible economic or other impacts of such determination" from 50 C.F.R. § 424.11(b) (2018).  The Services explained that this change aligns the regulatory text with the statutory language of 16 U.S.C. § 1533(b)(1)(A) and, in limited circumstances, allows the collection and presentation of economic information to the public.

Second, the Services codified the framework for assessing "foreseeable future" as used in 50 C.F.R. § 424.11(d).  A threatened species is statutorily defined as "any species which is likely to become an endangered species within the *foreseeable future* throughout all or a significant portion of its range."  16 U.S.C. § 1532(20) (emphasis added).  Because there is no statutory definition of "foreseeable future," the Services historically have determined its meaning on a case-by-case basis using guidance issued by the Department of the Interior Office of the Solicitor.[4]  The Services' revision codifies the case-by-case approach and provides that, in undertaking this assessment, "[t]he term foreseeable future extends only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely" and that the Services "need not identify the foreseeable future in terms of a specific period of time."  50 C.F.R. § 424.11(d).

---

[4] *See* Department of the Interior, Office of Solicitor's 2009 "M-opinion" on foreseeable future.  84 Fed. Reg. at 45026.

Third, the Services clarified the factors and criteria for delisting a species.  50 C.F.R. § 424.11(e).  As relevant here, the Services made clear that the standards for listing and delisting are the same, *i.e.*, the five enumerated statutory factors in 16 U.S.C. § 1533(a)(1).  83 Fed. Reg. at 35196.  The Services also made a number of changes to address previous regulatory language—that species should be delisted when they no longer meet the definition of an endangered or threatened species.  *Id.* For example, the term "recovery" was removed as one of the bases for delisting to convey that the analysis is based on whether the species meets the definition of an endangered or threatened species in 16 U.S.C. § 1532 (6), (20).  83 Fed. Reg. 35196.

Fourth, with respect to designating critical habitat, the Services revised 50 C.F.R. § 424.12(a)(1) to set forth a non-exhaustive list of circumstances in which the Services may find it "not prudent" to designate critical habitat, as contemplated in 16 U.S.C. § 1533(a)(3)(A) (commonly referred to as "not prudent" determinations), 83 Fed. Reg. at 35196-97.  The Services also explained that they will make "not prudent" determinations clearer and more transparent by basing them on whether particular circumstances are present, rather than a determination of whether it is "beneficial" to a species.  The Services thus removed the prior regulatory language—"would not be beneficial to the species"—from 50 C.F.R. § 424.12(a)(1)(ii).  83 Fed. Reg. at 35197; 84 Fed. Reg. at 45040.

Fifth, the Service revised the procedure and criteria for designating unoccupied critical habitat.  84 Fed. Reg. 45053.  The revisions establish a sequence under which the Services "first evaluate areas occupied by the species" and then

turn to consideration of unoccupied habitat.  The Services also clarified that unoccupied habitat is "essential" only if occupied critical habitat is "inadequate to ensure the conservation of the species."  *Id.*  In addition, for an unoccupied area to be considered "essential," there must be reasonable certainty both that "the area will contribute to the conservation of the species" and that it "contains one or more of those physical or biological features essential to the conservation of the species." *Id.*  The Services made these revisions in part to address the Supreme Court's recent decision in *Weyerhaeuser*, 139 S. Ct. 361, where the Court remanded the unoccupied portion of a critical habitat designation because FWS had not determined whether the designated area constituted "habitat" for the species.  84 Fed. Reg. at 45022-23, 45049.

Finally, the Services revised the definition of "physical or biological features," a phrase that appears in the statutory definition of "critical habitat."  84 Fed. Reg. at 45023.  The Services' revised definition provides, in relevant part, that "physical or biological features essential to the conservation of the species are the features that occur in specific areas and that are essential to support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features."  *Id.*

## B.  The Section 4(d) Revisions

ESA Section 4(d) provides that, whenever a species is listed as "threatened," the Services shall issue regulations they consider "necessary and advisable to provide for the conservation of such [threatened] species" and "may by regulation"

9

extend the Section 9 prohibitions to such species.  16 U.S.C. § 1533(d).[5]  These

regulations are known as 4(d) rules.  Congress chose to apply the Section 9

prohibitions only to endangered species but, through Section 4(d), provided the

Services with discretionary rulemaking authority to extend the same prohibitions to

threatened species.[6]  16 U.S.C. §§ 1538(a), 1533(d).

In 1978, FWS, but not NMFS, exercised this authority and extended the

protections of Section 9 to all species listed as "threatened" except where it issued a

special 4(d) rule for a particular species.  50 C.F.R. § 17.31(a) (1978)).  Various

timber groups challenged the regulation, often called the "Blanket 4(d) Rule,"

arguing that FWS cannot automatically extend the protections of Section 9 to all

threatened species in "one fell swoop," but must issue "species-specific" rules.  *Sweet*

*Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 3, 6 (D.C. Cir. 1993),

*modified on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994).  The D.C. Circuit rejected this

challenge, finding that FWS' interpretation of an ambiguous statutory term was

---

[5] The statute provides: "Whenever any species is listed as a threatened species ...
the Secretary shall issue such regulations as he deems necessary and advisable to
provide for the conservation of such species. The Secretary may by regulation
prohibit with respect to any threatened species any act prohibited under section
1538(a)(1) of this title, in the case of fish or wildlife...."  16 U.S.C. § 1533(d).

[6] Section 9 provides in relevant part: "with respect to any *endangered* species of fish
or wildlife listed pursuant to section 1533 of this title it is unlawful for any person
subject to the jurisdiction of the United States to – [import, take, possess, deliver,
sell]. . . or violate any regulation pertaining to such species or to any threatened
species of fish or wildlife listed pursuant to section 1533 of this title and
promulgated by the Secretary pursuant to authority provided by this chapter."  16
U.S.C. § 1538(a)(1)(A)-(G) (emphasis added).

permissible and therefore deferred to the agency.  1 F.3d at 8 ("In light of the statute's ambiguity, the challenged FWS regulation is a reasonable and permissible construction of the ESA.").  While the D.C. Circuit upheld FWS' Blanket 4(d) Rule as a permissible approach under the statute, it also readily acknowledged that a case-by-case approach was consistent with the statute as well.  *Id.*

Since the passage of the ESA, NMFS, unlike FWS, has chosen not to proceed via a similar blanket rule.  Instead, NMFS has issued "species-specific" 4(d) rules for threatened species under its jurisdiction.  These 4(d) rules tailor the level of protections to the particular circumstances, which in many cases fosters better conservation of the threatened species by providing certain incentives to interested parties.  *See, e.g.,* 70 Fed. Reg. 37160, 37195 (June 28, 2005).  NMFS' different approach and interpretation of Section 4(d) also has been upheld by the courts.  *See, e.g., Trout Unlimited v. Lohn*, 559 F.3d 946, 962 (9th Cir. 2009).

On July 25, 2018, FWS proposed to revise 50 C.F.R. §§ 17.31, 17.71 to remove the "blanket" extension of Section 9 protections from all future threatened species.  Instead, FWS proposed to more closely align its approach with NMFS' longstanding approach and promulgate "species-specific" 4(d) rules addressing which Section 9 prohibitions, and any other necessary protections, would be extended to the particular species.  83 Fed. Reg. at 35175.  FWS proposed this revision because it had gained experience developing species-specific rules resulting in benefits, "including removing redundant permitting requirements, facilitating implementation of beneficial conservation actions, and making better use of . . .

11

limited personnel and fiscal resources . . . ."  83 Fed. Reg. 35175.[7]  FWS also

explained that it wanted to align its "practices with those of NMFS" while still

providing a "meaning to the statutory distinction between" endangered and

threatened species.  *Id.*

On August 27, 2019, FWS published the 4(d) final rule.  84 Fed. Reg. 44753.

Consistent with the proposed rule, the final rule removed future application of

blanket protections by specifying that its provisions apply only to species listed as

threatened on or before the effective date of September 26, 2019.  *Id.*  However, for

any species listed after September 26, 2019, FWS "intend[s] to finalize the species-

specific rule[s] concurrent with the final listing or reclassification determination."

84 Fed. Reg. 44753.

## C.  The Section 7(a)(2) Revisions

ESA Section 7(a)(2) imposes procedural and substantive duties.  The statute

procedurally directs each "federal agency" (commonly referred to as an "action

agency") to consult with the "Secretary" in certain circumstances.  16 U.S.C. §

1536(a)(2).  The federal agency consults with the Secretary to meet its substantive

obligation to "insure that any action authorized, funded, or carried out . . . is not

likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification" of designated critical

---

[7] Even under the Blanket Rule, FWS reserved the authority to issue species-specific
4(d) rules rather than rely on the Blanket Rule and did so many times.  84 Fed. Reg.
44754, 44755 (noting FWS promulgated 37 species-specific 4(d) rules over last 21
years).

habitat.  *Id.*  Section 7 provides only general direction in how to fulfill its procedural

consultation obligation and does not define the substantive standards imposed by

Section 7(a)(2).  *Id.*

The Services jointly promulgated regulations in 1986 to interpret and

administer the Section 7(a)(2) consultation process.  *See* 50 C.F.R. § 402; 51 Fed.

Reg. 19926 (June 3, 1986).  Under that process, to determine if Section 7(a)(2)

applies, a federal agency makes an initial determination of whether its proposed

action "may affect" listed species or critical habitat.  50 C.F.R. § 402.14(a).  If the

federal agency determines that its actions "may affect" listed species or critical

habitat, it must engage in consultation with the Services.  50 C.F.R. §§ 402.13,

402.14.

Consultation may proceed in either of two ways: informal or formal.  Informal

consultation is a process comprised of all discussions and correspondence between

the consulting agency (the Services) and the action agency in order to determine

whether formal consultation is necessary.  50 C.F.R. § 402.13(a).  If an action

agency determines, with the written concurrence of the consulting agency (a "letter

of concurrence"), that the action "is not likely to adversely affect" the listed species

or critical habitat, the consultation process is terminated and formal consultation is

not necessary.  50 C.F.R. § 402.13(a).  If either the action agency or consulting

agency determines that the proposed action is "likely to adversely affect" listed

species or critical habitat, the agencies must engage in formal consultation.  50

C.F.R. §§ 402.13(a), 402.14(a)–(b).  Formal consultation concludes with the issuance

13

of a biological opinion by the consulting agency assessing whether the proposed

action is likely to jeopardize the continued existence of listed species or result in

destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50

C.F.R. § 402.14(g), (h).

On July 25, 2018, the Services proposed eight general revisions to the

consultation regulations.  83 Fed. Reg. 35178.  This included revising the regulatory

definitions of: (1) "destruction or adverse modification" for critical habitat; (2)

"Director;" (3) "effects of the action;" and (4) "environmental baseline."  83 Fed. Reg.

35179, 35182-84; 50 C.F.R § 402.02.  Other more general, non-definitional revisions

addressed: (5) establishing deadlines for informal consultation, 50 C.F.R. § 402.13;

(6) criteria and procedures for formal consultation, 50 C.F.R. § 402.14; (7)

reinitiation of consultation, 50 C.F.R. § 402.16; and (8) a new provision entitled

"[a]ctivities that are reasonably certain to occur," 50 C.F.R. § 402.17.  84 Fed. Reg.

44981.

After considering public comments, the Services finalized the revisions.  As

relevant here, the Services revised the definition of "destruction or adverse

modification" to mean "a direct or indirect alteration that appreciably diminishes

the value of critical habitat as a whole for the conservation of a listed species."  84

Fed. Reg. at 44981, 45016.  Similarly, the Services revised the definitions of "effects

of the action" and "environmental baseline" to modify the regulatory inquiry.  83

Fed. Reg. at 35183-84.  The previous joint regulation had embedded the definition of

environmental baseline within the definition of effects of the action.  50 C.F.R. §

402.02 (2018).  With the revisions, the Services created two separate definitions.

*See* 84 Fed. Reg. at 45016.  The new definition of "effects of the action" also

eliminated the labels of "direct" and "indirect" effects contained in the old

regulation.  84 Fed. Reg. at 44976-77.  Relatedly, the Services also modified the

analysis for determining whether an effect should be considered by the Services by

articulating a two-step test incorporating "but-for" and "reasonably certain to

occur."  84 Fed. Reg. at 44976-79.

The Services also revised some of the procedures for informal and formal

consultation.  50 C.F.R §§ 402.13, 402.14.  As to informal consultation, the Services

clarified the materials that action agencies should submit to the Services and

established a 60-day deadline for the consultation process which may be extended to

a maximum of 120 days.  84 Fed. Reg. at 44979.  For formal consultation, the

Services revised the regulation to specify what is necessary to initiate formal

consultation. 50 C.F.R. § 402.14(c).  The Services also clarified that they add the

effects of the action to the environmental baseline and consider measures intended

to avoid, minimize, or offset the effects of the action like any other portion of the

proposed agency action under review.  *Id.* § 402.14(g)(4)(8).  The Services also

established provisions for an expedited consultation process.  50 C.F.R. § 402.14(*l*).

The Services further addressed the criteria for reinitiating consultation.  50

C.F.R. § 402.16; 84 Fed. Reg. at 45018.  The primary change clarified that an

agency is not required to reinitiate consultation after approving a land management

plan prepared pursuant to 43 U.S.C. § 1712 or 16 U.S.C. § 1604 when (1) a new

species is listed or critical habitat is designated after approval and (2) any action that may affect listed species or critical habitat will be addressed through a separate action-specific consultation.  50 C.F.R. § 402.16(b).  This change was made in part to incorporate certain provisions in the 2018 Omnibus Appropriations Act.  84 Fed. Reg. at 44980.

## II.   PROCEDURAL BACKGROUND

### A.  Rule 12 Responsive Pleadings

Plaintiffs filed complaints in 2019 and Federal Defendants moved to dismiss all three cases on standing and ripeness grounds.  ECF 46; ECF 33; ECF 21.  Federal Defendants argued that Plaintiffs failed to allege specific facts demonstrating injury in fact.  The Court granted the motions with respect to the CBD Plaintiffs and ALDF, finding that those respective complaints failed to include sufficient factual allegations to demonstrate standing.  ECF 87; ECF 60.  The Court, however, denied Federal Defendants' motion to dismiss with respect to the State Plaintiffs. ECF 98.

Following the dismissals, the CBD Plaintiffs and ALDF filed amended complaints with additional factual allegations.  ECF 90; ECF 62.  Federal Defendants filed answers to all three complaints on June 1, 2021, and June 17, 2021, respectively.  ECF 105; ECF 93; ECF 65.  The Court entered a scheduling order for summary judgment motions.

### B.  Motions to Stay

16

On January 18 and 19, 2021, Plaintiffs filed their motions for summary judgment asserting challenges to the merits of the three 2019 ESA Rules.  ECF 86; ECF 116; ECF 130.  The next day, President Biden issued Executive Order 13990. 86 Fed. Reg. 7037.  The Order directed all federal agencies to "immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives . . . ." *Id.*  On the same day it issued Executive Order 13990, the White House also published a fact sheet which directed the Services to review the 2019 ESA Rules.[8]

In compliance with Executive Order 13990, the Services reviewed various rules promulgated over the last four years, including the 2019 ESA Rules.  On June 4, 2021, the Services publicly announced FWS' intent to propose rulemaking to rescind the Section 4(d) Rule and the Services' intent to revise the other two rules at issue in this case (the Section 4 and 7 Rules).[9]

In light of the Services' intention to rescind and revise the 2019 ESA Rules, the parties jointly requested, and the Court granted, a series of stays to allow the

---

[8] *See* The White House, Fact Sheet: List of Agency Actions for Review, https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/ (last visited Dec. 7, 2021) ("White House Fact Sheet").

[9] *See* Press Release: U.S. Fish and Wildlife Service and NOAA Fisheries to Propose Regulatory Revisions to Endangered Species Act, https://www.fws.gov/news/ShowNews.cfm?ref=u.s.-fish-and-wildlife-service-and-noaa-fisheries-to-propose-regulatory-&_ID=36925 (last visited Dec. 7, 2021) ("Services' Press Release").

parties time to determine how to proceed in these cases. *See, e.g.,* ECF 95; ECF 129; ECF 143. When the last short-term stay expired, the parties had not reached agreement on how the cases should proceed and Federal Defendants filed opposed motions to stay. *See, e.g.,* ECF 150, ECF 150-1 ("Second Frazer Decl."), ECF 150-2 ("Third Rauch Decl."). The Court subsequently terminated Plaintiffs' motions for summary judgment pending resolution of Federal Defendants' motion to stay. ECF 86; ECF 116; ECF 130.

Given the pending litigation and in support of the motions to stay, the Services developed a schedule for rulemaking to revise and rescind the 2019 ESA Rules consistent with the requirements of the APA and other procedural agency rulemaking requirements. ECF 150-1, Second Frazer Decl. ¶¶ 6-7. This rulemaking schedule, however, hinged on the Court granting the Services' motions for stay, which would have allowed the agencies to work on these rulemakings without pending litigation. The Court, however, denied Federal Defendants' motions to stay proceedings. *See, e.g.,* ECF 159. The rulemaking schedule set forth in the Second Frazer Declaration (ECF 150-1) and Third Rauch Declaration (ECF 150-2) has since been modified. *See* Third Frazer Decl. ¶ 14; Fourth Rauch Decl. ¶ 11.

### C. Motions for Summary Judgment

Following the Court's denial of the motions for stay, the Court issued a briefing schedule. ECF 161. The following day Plaintiffs refiled their motions for summary judgment. ECF 162; ECF 142; ECF 107. Plaintiffs challenge the 2019

18

1    ESA Rules alleging violations of the APA, ESA, and NEPA, and seek vacatur of the

2    2019 ESA Rules.

3        Federal Defendants are now moving for voluntary remand.  This narrowly

4    tailored, equitable relief affords Plaintiffs the relief they would be entitled to receive

5    if they prevailed on summary judgment.  Because the Services intend to reconsider

6    the 2019 ESA Rules, the request for voluntary remand also constitutes Federal

7    Defendants' response to Plaintiffs' motions for summary judgment.

8                              **STANDARD OF REVIEW**

9        Agencies have inherent authority to reconsider past decisions and to revise or

10   replace them.  *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *Motor*

11   *Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983).

12   Similarly, an agency's interpretation of a statute it administers is not "carved in

13   stone" but must be evaluated "on a continuing basis," for example, "in response to . .

14   . a change in administrations."  *Nat'l Cable & Telecomms. Ass'n v. Brand X*

15   *Internet Servs.,* 545 U.S. 967, 981 (2005) (citations omitted).  An "agency may seek

16   a remand to reconsider its decision because of intervening events outside of the

17   agency's control" or, "even in the absence of intervening events, the agency may

18   request a remand, without confessing error, to reconsider its previous position."

19   *SKF USA, Inc. v. United States,* 254 F.3d 1022, 1028 (Fed. Cir. 2001) ("*SKF USA*");

20   *see also Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citing

21   *SKF USA*).  Even if no intervening events have occurred that require remand,

22

23

24

Motion for Voluntary Remand, 4:19-cv-06013-JST

"[g]enerally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith."

Remanded agency actions need not be vacated.  Instead, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (adopting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  The assessment of the appropriateness of vacatur is an equitable one.  *Ford Motor Co. v. Nat'l Lab. Rels. Bd.*, 305 U.S. 364, 373 (1939) ("The jurisdiction to review the orders of [the agency] is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.").

## DISCUSSION

### I.   THE COURT SHOULD REMAND THE 2019 ESA RULES WITHOUT VACATUR.

#### A.  Voluntary Remand is Appropriate.

The Services have identified substantial concerns with the 2019 ESA Rules and on this basis request voluntary remand.  This request is neither frivolous, nor made in bad faith.  Thus, voluntary remand is appropriate here.

A "voluntary remand" is a request by an agency for "remand without [judicial] consideration of the merits," while "a court-generated remand" is "a remand after consideration of the merits." *Cent. Power & Light Co. v. United*

20

*States*, 634 F.2d 137, 145 (5th Cir. 1980).  A court's authority to remand a decision without judicial consideration is vested in its equitable powers.  *Alliance for the Wild Rockies v. Allen*, No. 04-1813-JO, 2009 WL 2015407, at *2 (D. Or. July 1, 2009) ("[i]t is within this court's equitable power to remand an agency decision without judicial consideration of the merits") (citing *Ford Motor Co.,* 305 U.S. at 373).  A voluntary remand serves the interests of judicial economy by allowing an agency to reconsider and rectify a decision without further expenditure of judicial resources. *ASSE Int'l v. Kerry,* 182 F. Supp. 3d 1059, 1063 (C.D. Cal. 2016) (citations omitted). "[E]ven in the absence of intervening events [since the agency's original action], the agency may request a remand, without confessing error, to reconsider its previous position." *Cottonwood Env't L. Ctr. v. Bernhardt*, No. CV 18-12-BU-SEH, 2020 WL 7263551, at *1 (D. Mont. Dec. 10, 2020) (citing *SKF USA*, 254 F.3d at 1028). Similarly, an agency need not defend a challenged action and may request voluntary remand without confessing error.  *In re Clean Water Act Rulemaking*, No. C 20-04636 WHA, 2021 WL 4924844, at *4 (N.D. Cal. Oct. 21, 2021), appeals docketed, *Am. Rivers v. Am. Petroleum*, No. 21-16958, *Am. Rivers v. Arkansas*, No. 21-16961 (9th Cir. Nov. 22, 2021).

When agencies desire to reconsider challenged actions, it is "common practice in the Ninth Circuit to grant a federal agency's voluntary request for a remand unless the request is frivolous or made in bad faith." *Neighbors Against Bison Slaughter v. Nat'l Park Serv.*, No. CV 19-128-BLG-SPW, 2021 WL 717094, at *2 (D. Mont. Feb. 5, 2021) (citation omitted), *appeal docketed*, No. 21-35144 (9th Cir. Feb.

21

23, 2021).  Courts grant such voluntary remand requests where the agency

identifies "substantial and legitimate concerns for [the agency] to revisit prior

decisions . . . and how those decisions have been implemented . . . ." *Id.*; *see also Cal.*

*Cmtys. Against Toxics*, 688 F.3d at 992 (citing SKF USA, 254 F.3d at 1029 (noting

that, "if the agency's concern is substantial and legitimate, a remand is usually

appropriate")); *John v. Sec'y of the Interior*, No. 3:14-CV-00247-LRH-VP, 2015 WL

505526, at *2 (D. Nev. Feb. 5, 2015) (granting motion for voluntary remand where

plaintiffs did not show it was frivolous or made in bad faith).

The grounds upon which Federal Defendants seek voluntary remand in this

case are neither frivolous nor made in bad faith.  On January 20, 2021, President

Biden issued Executive Order 13990.  This order directed Federal agencies to

review all actions taken during the past four years and consider whether to take

additional action to fulfill environmental objectives and bolster resilience to climate

change.  Third Frazer Decl. ¶ 2.  On the same day, President Biden issued a list of

agency actions that agency heads must review in accordance with E.O. 13990

(entitled "Fact Sheet: List of Agency Actions for Review"), which included the rules

challenged in this case.  *Id.* ¶¶ 2, 3.  Following their review and evaluation of the

challenged rules, on June 4, 2021, the Services publicly announced FWS' intent to

propose rulemaking to rescind the Section 4(d) Rule and the Services' intent to

revise the other two rules at issue in this case (the Section 4 and 7 Rules).

The Services declared their intent to engage in rulemaking to revise and

rescind the challenged 2019 ESA Rules because they have substantial and

legitimate concerns over many aspects of these rules.  *See* Third Frazer Decl. ¶¶ 4-10; Fourth Rauch Decl. ¶¶ 7-8.  For example, FWS has substantial concerns about the Section 4(d) Rule that eliminated the so-called "blanket" protections for species listed as threatened following promulgation of that rule.  Third Frazer Decl. ¶ 5.  Although every species listed as threatened following the promulgation of the Section 4(d) Rule has received protections because of an attendant species-specific rule, the Section 4(d) Rule reduces FWS' "flexibility and may require additional resources at the time of listing as compared to the blanket rule."  *Id.*  Because of this reduced flexibility and potential for expenditure of additional resources, FWS would like the opportunity to rescind this rule through rulemaking.

The Services have similar concerns regarding the Section 4 Rule.  One such concern involves the removal of the regulatory language "without reference to possible economic or other impacts of such determination," previously contained in 50 C.F.R. § 424.11(b).  The removal of this phrase has the potential to cause "confusion regarding the Services' intentions pertaining to consideration of economics in listing determinations, or intentions to collect and present economic impact information stemming from the listing of species."  Third Frazer Decl. ¶ 6.  The removal of this regulatory language may also "create[ ] a risk that economic information may influence" the listing determination, which would run afoul of the statutory language.  *Id.*; *see also* Fourth Rauch Decl. ¶ 7.  These are legitimate bases to revisit the Section 4 Rule.

There are also substantial concerns with the Section 4 Rule regarding the circumstances when it is "not prudent" to designate critical habitat. The 2019 provision sought to clarify the rare circumstances under which the Services would find that designating critical habitat is "not prudent." Yet, the revised language, and in particular the phrase "threats to the species' habitat stem solely from causes that cannot be addressed through management actions" may have the potential to cause confusion when the Services make a "not-prudent" finding. Third Frazer Decl. ¶ 7. Because "[p]ublic support and understanding of the ESA's regulatory provisions is important to the Services' successful implementation of the ESA," particularly for provisions that apply to private lands (like this one), and in light of the potential for public confusion, the Services have legitimate concerns with this regulatory language. *Id.*

The Services also have substantial concerns with certain aspects of the Section 7(a)(2) Rule, namely the provisions related to "effects of the action" and its definition in 50 C.F.R. §§ 402.02 and 402.17. The revised definition of "effects of the action" and the related provisions regarding "reasonably certain to occur" in 50 C.F.R. § 402.17 were intended to provide clarification, but the revisions may not have the intended effect of clarifying the types of agency action effects that the Services will consider during the consultation process. Third Frazer Decl. ¶ 9; Fourth Rauch Decl. ¶ 7. This potential confusion could detract from the Services effective implementation of Section 7 by adding time and expenses to a consultation.

*Id.*  The expenditure of additional resources or public confusion are legitimate bases to revisit the Section 7(a)(2) Rule.

The Services also have substantial concerns related to the NEPA documents they prepared when promulgating the 2019 ESA Rules.  The Services invoked categorical exclusions for the 2019 ESA Rules.  Third Frazer Decl. ¶ 10; Fourth Rauch Decl. ¶ 8.  However, there is concern that "some aspects of the rationale for invoking the categorical exclusions may not be adequately supported by the record." Third Frazer Decl. ¶ 10.  In light of this concern, the Services should be given the opportunity to determine, in the first instance, the appropriate level of NEPA review to accompany the promulgation of revised or rescinded rules on remand. Fourth Rauch Decl. ¶ 8.

As described above, the Services have substantial concerns with the 2019 ESA Rules, both with respect to certain substantive provisions as well as certain procedures that were utilized in promulgating these regulatory revisions.  While this is not a confession of error, the Services' concerns are neither frivolous, nor provided in bad faith.  Indeed, although we may disagree with Plaintiffs' substantive and procedural challenges, Plaintiffs identify many of the same concerns with the 2019 ESA Rules.  This illustrates that voluntary remand is appropriate here, rather than adjudication of the merits of Plaintiffs' claims.

Finally, if the Court were to reach the merits of Plaintiffs' claims and find that the 2019 ESA Rules were arbitrary and capricious or unlawful, the proper course would be to remand to the agency for reconsideration.  *Fla. Power & Light*

*Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (judicial review of agency action ordinarily requires remand to agency so that agency can exercise its discretion). By granting this motion, the same relief can be provided now, without the added expense of further litigation (here or on appeal) and permit the expert agencies the opportunity to bring to bear their expertise on the issues that they and the Plaintiffs have identified. There is widespread caselaw recognizing that federal agencies are better positioned than courts to navigate and weigh the many interests that have a stake in important, technical regulatory regimes and the Court should allow the Services to resolve these issues in the first instance. *Id.* Allowing the Services to pursue rulemaking through APA notice and comment, which allows for public participation and results in greater transparency, will only aid the Services' implementation of the ESA. Thus, voluntary remand is appropriate under these circumstances.

**B. The Court Should Not Vacate the 2019 ESA Rules.**

As the Ninth Circuit and many other courts have recognized, even "[a] flawed rule need not be vacated" and "'when equity demands, the regulation can be left in place while the agency follows the necessary procedures' to correct its action." *Cal. Cmtys, Against Toxics,* 688 F.3d at 992 (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)); *see also Western Oil & Gas Ass'n v.*

1   *EPA*, 633 F.2d 803, 813 (9th Cir. 1980) (recognizing that courts have equitable

2   discretion to leave a Clean Air Act regulation in place during remand).

3       Although a request by the government for voluntary remand does not require

4   this Court to reach the merits, courts apply the same equitable analysis used to

5   determine whether invalidated administrative actions should be vacated during the

6   remand period. *See Nat. Res. Def. Council v. U.S. Dep't. of Interior*, 275 F. Supp. 2d

7   1136, 1143 (C.D. Cal. 2002).[10]  Most fundamentally, courts have "looked at whether

8   the agency would likely be able to offer better reasoning or whether by complying

9   with procedural rules, it could adopt the same rule on remand, or whether such

10  fundamental flaws in the agency's decision make it unlikely that the same rule

11  would be adopted on remand." *Pollinator Stewardship Council v. EPA*, 806 F.3d

12  520, 532 (9th Cir. 2015) (citing *Allied–Signal*, 988 F.2d at 151 (declining to vacate

13  because there was "at least a serious possibility that the [agency would] be able to

14  substantiate its decision on remand"); *see also Standing Rock Sioux Tribe v. U.S.*

15  *Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) ("Put otherwise, this

16  Court must determine whether there is at least a serious possibility that the agency

17

18  _____

19  [10] Courts have recognized that definitive findings on the merits are not required in
    order to vacate a challenged agency action. *In re Clean Water Act Rulemaking,*

20  2021 WL 4924844, at *5 ("This order agrees with the foregoing opinions from
    district judges within our circuit that, when an agency requests voluntary remand,

21  a district court may vacate an agency's action without first making a determination
    on the merits."); *Pascua Yaqui Tribe v. United States Env't Prot. Agency*, No. CV-

22  20-00266-TUC-RM, 2021 WL 3855977, at *4 (D. Ariz. Aug. 30, 2021) (plaintiffs "cite
    to out-of-circuit authority finding remand with vacatur inappropriate in the absence

23  of a merits adjudication . . . but the parties have not identified any Ninth Circuit
    case so holding."), *appeal docketed*, No. 21-16791 (9th Cir. Oct. 26, 2021).  .

24

27

will be able to substantiate its decision on remand, and whether vacatur will lead to impermissibly disruptive consequences in the interim.").

The Court should not vacate the 2019 ESA Rules for three reasons.  First, the Services will be able to offer better reasoning and substantiate their decisions during any remand.  In fact, the Services have repeatedly stated that they intend to address the perceived flaws in the 2019 ESA Rules in accordance with all applicable procedural requirements and are in the process of either revising or rescinding the 2019 ESA Rules through rulemaking.  Fourth Rauch Decl. ¶ 6 ("The Services are reconsidering the 2019 Joint ESA Rules in light of the text and purpose of the ESA, its Congressional history, and the principles outlined in EO 13990.  If the Court grants the motion to remand without vacating the 2019 Joint ESA Rules, the Services plan to reconsider and revise the 2019 Joint ESA Rules consistent with EO 13990 and their legal authority.").  Because this case largely entails whether the Services exercised their rulemaking authorities within very broad statutory mandates, there is a serious possibility that the Services will be able to provide more robust reasoning thereby substantiating any future decision.  *Id.*  Moreover, granting this relief will allow the agencies to comply with the APA's procedures when revisiting the three regulations.  *See* 5 U.S.C. §§ 551(4)-(5), 553(a)-(c) (requiring agencies to provide notice of proposals to create, amend, or repeal rules and an opportunity for interested persons to comment on the proposal).  The relief also provides redress to Plaintiffs by ensuring the rules are revisited in compliance

with procedural requirements, such as the APA's rulemaking provisions, which notably Plaintiffs allege were violated in the 2019 rulemakings.

Second, vacatur would result in disruptive consequences. Fourth Rauch Decl. ¶ 12. Vacatur by the Court would be disruptive of ongoing and future implementation of ESA consultations and listing actions. It would cause confusion among the public, other agencies, and stakeholders, and impede the efficiency of ESA implementation, by abruptly altering the applicable regulatory framework and creating uncertainty about which standards to apply. In contrast, remand would establish an orderly process in which the Services would have the opportunity to present a proposed rule, explain the rationale for proposed changes, take public comment, and then, in a final rule, explain to the public and stakeholders which changes were adopted and provide further explanation of their interpretation and application. *See* Fourth Rauch Decl. ¶ 12; *see also* ECF 150-1, Second Frazer Decl. ¶ 12 ("If the Services are able to focus their resources on the rulemakings and complete them according to schedule, it will benefit Plaintiffs and the general public."); ECF 150-2, Third Rauch Decl. ¶ ("Public confusion or misunderstanding of this kind could impede effective and efficient implementation of the ESA in the future."). Uncertainty and possible confusion work against effective implementation of the ESA and therefore could harm endangered and threatened species.

Third, remand without vacatur does not harm Plaintiffs in ways that outweigh the concerns identified above. Federal Defendants are cognizant that the

Motion for Voluntary Remand, 4:19-cv-06013-JST

Court already denied their request for a stay of proceedings and are mindful that, in doing so, the Court performed a similar, although not identical, harm analysis.  In its oral ruling, the Court found that there was a possibility of harm to Plaintiffs during a stay.  *See* Hearing Transcript on Motions to Stay at 22 ("They have made out a good case that those [plaintiffs'] interests are damaged by the continuing application of these regulations, and that is the possible damage.").  Federal Defendants disagree with this finding, and will not further belabor the point, but Plaintiffs have failed—and continue to fail—to present even one concrete example of how implementation of the 2019 ESA Rules harms their stated interests.  *See, e.g.,* ECF 150, 156.

In any event, the standard for vacatur, in particular whether there will be disruptive consequences, is different from the "fair possibility of harm" standard this Court used to evaluate our request for a stay of proceedings.  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) ("'[I]f there is even a fair possibility that the stay ... will work damage to someone else, the party seeking the stay 'must make out a clear case of hardship or inequity.'").  Under the correct standard, Plaintiffs cannot show that vacatur is warranted because they fail to provide evidence of any real and tangible harm to them that is likely during the remand period.  For these reasons, vacatur is not warranted.

## CONCLUSION

The Services have identified legitimate and substantial concerns with the 2019 ESA Rules and would like the opportunity, in the first instance, to address

Motion for Voluntary Remand, 4:19-cv-06013-JST

these concerns through APA rulemaking.  This will allow the Services to bring their

expertise to bear on technical regulatory frameworks, while also allowing for public

participation.  Federal Defendants are mindful of the Court's previous orders and

comments, and this motion does not seek to prolong implementation of the 2019

ESA Rules.  Rather the motion seeks to effectuate the Services' desire to revise

and/or rescind the 2019 ESA Rules through APA rulemaking.  In light of the

Services' legitimate and substantial concerns and the desire to revise and/or rescind

the 2019 ESA Rules through rulemaking, the Services request voluntary remand.

Because this remedy is reasoned, narrowly tailored, and resolves Plaintiffs' claims,

the Court should grant Federal Defendants' motion and remand the 2019 ESA

Rules without vacatur and deny Plaintiffs' motions for summary judgment.


DATED: December 10, 2021.


TODD KIM
Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

*/s/ Coby Howell.*
COBY HOWELL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1000 S.W. Third Avenue
Portland, OR 97204
Phone: (503) 727-1023

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Fax: (503) 727-1117
Email: coby.howell@usdoj.gov

*Attorneys for Federal Defendants*

1

## CERTIFICATE OF SERVICE

2

   I hereby certify that I electronically filed the foregoing with the Clerk of the Court
using the CM/ECF system, which will send notification of such to the attorneys of
record.

3

4

5

6

                                    */s/ Coby Howell*
7                                    COBY HOWELL, Senior Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24